# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____
                                    :
DAVERLYNN KINKEAD and               :
CLAUDE MATHIEU, individually        :
and on behalf of all others similarly, :      CIVIL CASE NO.: 3:15-cv-01637 (JAM)
situated,                           :
        Plaintiffs,              :
                                    :
v.                                  :
                                    :
HUMANA, INC., HUMANA AT HOME,       :
INC., AND SENIORBRIDGE FAMILY       :
COMPANIES (CT), INC.,               :
                                    :
        Defendants.              :
_____:


## DEFENDANTS' MEMORANDUM IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR RULE 23 CLASS CERTIFICATION

David R. Golder (ct 27941)
Noel Tripp (pro hac vice)
Kristi Rich Winters
Jackson Lewis P.C.
90 State House Square, 8th Floor
Hartford, CT 06103


Counsel for Defendant
Humana Inc., Humana at Home, Inc.,
and Seniorbridge Family Companies
(CT), Inc.

**ORAL ARGUMENT REQUSTED**

**TESTIMONY NOT REQUIRED**

# TABLE OF CONTENTS

TABLE OF AUTHORTIES ...................................................................................................ii

I.      INTRODUCTION ...................................................................................................1

II.     SUMMARY OF APPLICABLE LAW.................................................................1

        a.      Pertinent Wage Law Applicable to Live-In HHWs .................................1

        b.      Rule 23 Certification Standard .................................................................4

III.    PROCEDURAL HISTORY ....................................................................................5

IV.     LEGAL ARGUMENT ............................................................................................7

        a.      Mathieu Lacks Standing and is an Inadequate Representative to Pursue Her Class Claims ......7

        b.      Plaintiffs Cannot Satisfy Rule 23 for Their "Effective Date" Overtime Classes.......................9

                i.      The "Effective Date" Class is Overbroad Because it Includes Non-Live-In HHWS Who Were Never Classified as Exempt ...................................................9

                ii.     The Claims of the Named Plaintiffs are Not Typical of the Putative Class .................12

                iii.    Individualized Issues Predominate the Liability Determination...................................12

                iv.     A Class Action is Not a Superior Method of Resolving the "Effective Date" Claims.......25

                v.      *Kinkead* Is Not the Superior Action to Resolve the New York Labor Law Claims, *Green* Is ...........................................................................27

        c.      Plaintiffs Cannot Satisfy Rule 23 for The "Unpaid Hours" Classes.......................................28

                i.      Individualized Issues Predominate the Liability Determination......................................28

                ii.     The New York "Unpaid Hours" Class is Temporally Overbroad ...................................30

V.      CONCLUSION......................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Bd. of Pub. Educ.*,
495 F.3d 1306 (11th Cir. 2007) ........................................................................... 22

*Am. Express v. Italian Colors Rest.*,
570 U.S. 228 (2013) ............................................................................................... 4

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ............................................................................................... 5

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
222 F.3d 52 (2d Cir. 2000) .................................................................................... 8

*Banford v. Entergy Nuclear Operations, Inc.*,
649 F. App'x 89 (2d Cir. 2016) ........................................................................... 23

*Brown v. Kelly*,
609 F.3d 467 (2d Cir. 2010) .............................................................................. 4, 5

*Brown v. Scriptpro, LLC*,
700 F.3d 1222 (10th Cir. 2012) ........................................................................... 22

*Callari v. Blackman Plumbing Supply, Inc.*,
307 F.R.D. 67 (E.D.N.Y. 2015) ........................................................................... 12

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ................................................................................................. 5

*De Carrasco v. Life Care Servs., Inc.*,
2017 U.S. Dist. LEXIS 206682 (S.D.N.Y. Dec. 15, 2017) ........................... 3, 28

*Dudley v. Hanzon Homecare Servs.*,
No. 15-CV-8821, 2018 U.S. Dist. LEXIS 8112 (S.D.N.Y. Jan. 17, 2018) .... 8, 26

*Dunnigan v. Metro Life Ins. Co.*,
214 F.R.D. 125 (S.D.N.Y. Jan. 2, 2003) ............................................................. 27

*Enriquez v. Cherry Hill Mkt. Corp.*,
993 F. Supp. 2d 229 (E.D.N.Y. Sept. 30, 2013) ................................................ 25

*Forrester v. Roth's I.G.A. Foodliner, Inc.*,
646 F.2d 413 (9th Cir. 1981) ............................................................................... 22

*Gen. Tel. Co. of the Sw. v. Falcon*,
457 U.S. 147 (1982) ............................................................................................... 7

*Glatt v. Fox Searchlight Pictures, Inc.*,
    811 F.3d 528 (2d Cir. 2016) ........................................................................................... 12

*Heredia v. Americare, Inc.*,
    2018 U.S. Dist. LEXIS 86918 (S.D.N.Y. May 23, 2018) ...................................... 13, 28, 29

*Hertz v. Woodbury County*,
    566 F.3d 775 (8th Cir. 2009) ......................................................................................... 22

*Holzapfel v. Town of Newburrgh, N.Y.*,
    145 F.3d 516 (2d Cir. 1998) ......................................................................................... 22

*In re Initial Pub. Offering Sec. Litig. ("In re IPO")*,
    471 F.3d 24 (2d Cir. 2006) ............................................................................................ 4

*Kellar v. Summit Seating*,
    664 F.3d 169 (7th Cir. 2011) ......................................................................................... 22

*Kim v. 511 E. 5th St.*,
    LLC, 133 F. Supp. 3d 654, 659 (S.D.N.Y. 2015) ............................................................ 26

*Kuebel v. Black & Decker, Inc.*,
    643 F.3d 352 (2d Cir. 2011) ......................................................................................... 21

*Linscheid v. Natus US Med., Inc.*,
    No. 3:12-cv-67-TCB, 2015 U.S. Dist. LEXIS 40255 (N.D. Ga. Mar. 30, 2015) ................. 14

*Lundy v. Catholic Health Systems of Long Island, Inc.*,
    711 F.3d 106 (2d Cir. 2013) ......................................................................................... 25

*Myers v. Hertz Corp.*,
    624 F.3d 537 (2d Cir. 2010) ........................................................................................... 5

*Nakahata v. New York-Presbyterian Healthcare Sys.*,
    723 F.3d 192 (2d Cir. 2013) ......................................................................................... 25

*Oram v. SoulCycle LLC*,
    979 F. Supp. 2d 498 (S.D.N.Y. 2013) .............................................................................. 8

*Palmer v. Friendly Ice Cream Corp.*,
    2006 Conn. Super. LEXIS 311 (Super. Ct. Jan. 25, 2006) .............................................. 13

*Ramirez v. Riverbay Corp.*,
    39 F. Supp. 3d 354, 371 (S.D.N.Y. 2014) ...................................................................... 25

*Rodriguez v. Avondale Care Grp., LLC*,
    2018 U.S. Dist. LEXIS 51578 (S.D.N.Y. Mar. 27, 2018) ................................................... 3

*SEC v. Bear, Stearns & Co.*,
    2003 U.S. Dist. LEXIS 14611 (S.D.N.Y. Aug. 25, 2003) .................................................... 6

*Severin v. v. Project OHR, Inc.*,
  2012 U.S. Dist. LEXIS 85705 (S.D.N.Y. June 20, 2012) ........................................... *passim*

*Shillingford v. Astra Home Care, Inc.*,
  2018 U.S. Dist. LEXIS 29576 (S.D.N.Y. Feb. 23, 2018)............................................. 19, 28

*Shillingford v. Astra Home Care, Inc.*,
  293 F. Supp. 3d 401, 418 (S.D.N.Y. Feb. 23, 2018) ........................................ 4, 15, 16, 28

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) .......................................................................................................... 7

*Tokhtaman v. Human Care*,
  LLC, 149 A.D.3d 476 (1st Dep't 2017) .......................................................................... 2, 3

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 131 S. Ct. 2541 (2011) ................................................................................... 4

*White v. Baptist Mem. Health Care*,
  699 F.3d 869 (6th Cir. 2012) .............................................................................................. 22

*Williams v. Bier Int'l*,
  LLC, 2015 U.S. Dist. LEXIS 94609 (S.D.N.Y. July 21, 2015) .......................................... 26

**Statutes**

29 U.S.C. § 213(a)(15).............................................................................................................. 1

Connecticut Minimum Wage Act ..................................................................................... *passim*

Connecticut State Law .............................................................................................................. 2

FLSA........................................................................................................................................ *passim*

New York Labor Law ......................................................................................................... 6, 27

New York Labor Law ................................................................................................................ 7

New York State Law................................................................................................................. 5

NYLL........................................................................................................................................ *passim*

State Minimum Wage Law ....................................................................................................... 3

**Other Authorities**

12 N.Y.C.R.R. § 142-2.1 ......................................................................................................... 2

12 N.Y.C.R.R. § 142-2.1(b)..................................................................................................... 3

Counsel Opinion Letter, N.Y. Dep't of Labor, RO-09-00169 ................................................ 2

## I.      INTRODUCTION

Plaintiffs' Daverlynn Kinkead ("Kinkead") and Claude Mathieu's ("Mathieu") (collectively "Plaintiffs") Motion for Class Certification must be denied because of the individualized analysis of each putative class member's daily activities this Court would have to undertake to evaluate the claims. Analysis of each Home Healthcare Worker's ("HHW") claim requires a review of not only the sleep, break, and eating habits of each HHW, but also the unique needs and habits of each individual client serviced.

After completing this fact-intensive, threshold analysis of each claim, the Court would then have to evaluate whether any violation of the applicable state law has occurred.  At a minimum, the Court would have to evaluate whether Defendants have already paid each putative class member all of the minimum wage and overtime pay they are entitled to under Connecticut and New York law, whether each particular HHW reported their hours accurately, and whether Defendants were aware of the hours that each HHW claims to have worked.

Notably, in a recent, analogous HHW case, the district court denied Rule 23 class certification on a similar record to the one at issue here even though conditional certification of an FLSA collective was granted as the standard for Rule 23 certification is materially higher.  Plaintiffs' claims regarding their hours worked and the alleged resulting damages are not susceptible to common proof under the "opt out" standard for class certification.   An FLSA collective was already certified, allowing approximately 190 plaintiffs to seek the relief that is largely duplicative of the relief they could obtain under New York or Connecticut law.  Primarily for these reasons, but also for others discussed in detail below, Defendants respectfully submit that this Court should deny the Rule 23 certification that Plaintiffs seek.

## II.     SUMMARY OF APPLICABLE LAW

### a.   Pertinent Wage Law Applicable to Live-In HHWs

For an extensive period, federal law provided that "any employee employed in domestic service employment to provide companionship services for individuals who . . . are unable to care for themselves" was exempt from the FLSA's overtime requirements.  *See* 29 U.S.C. § 213(a)(15).  New

York and Connecticut State Law, tracking federal law, also recognized this "companionship exemption."

This began to change in October 2013, when the United States Department of Labor ("DOL") introduced regulations that substantially limited the scope of the companionship exemption. These regulations, and their effective date, have been litigated extensively—including in this case. *See* Dkt. 57 (order denying motion to dismiss). The history of those regulations will not be rehashed here; suffice it to say that this Court ruled that this exemption no longer definitively applied to HHWs after January 1, 2015. *See id.* Plaintiffs baldly suggest that this ends the analysis—and suggest that all HHWs had to be paid for a specific number of hours for overtime purposes from that date forward.

New York state law, however, is hardly that clear.   On March 11, 2010, the New York Department of Labor (NYDOL) issued an Opinion Letter opining that a Live-In aide should be paid for "Not less than for thirteen hours per twenty-four hour period provided that they are afforded at least eight hours for sleep and actually receive five hours of uninterrupted sleep, and that they are afforded three hours for meals."  Counsel Opinion Letter, N.Y. Dep't of Labor, RO-09-00169 Live-In Companions (March 11, 2010), available at http://labor.ny.gov/legal/counsel-opinion-letters.shtm (interpreting 12 N.Y.C.R.R. § 142-2.1).   However, that letter (like prior NYSDOL guidance on this issue) expressly "assumed that . . . [the] employees are within the FLSA companionship exemption" and thus entitled solely to minimum wage, and not to regular rate overtime.  *Id.*[1]  Further complicating the issue is the related determination of whether the individual providing home care services – who resides in the house from anywhere between a day and the entire workweek – is a "residential employee."  *Id.*   It has long been understood that these regulations do not require employers to pay HHWs for sleep or meal breaks (*i.e.* time not actually spent working).

Some recent authority from New York's State Courts suggest that this is, or should no longer be, the case—and that employers should be required to pay HHWs for 24 hours.  *See e.g., Tokhtaman*

---

[1] *See also* N.Y. Dep't of Labor, Op Ltr.  Dated July 14, 1995.

*v. Human Care,* LLC, 149 A.D.3d 476 (1ˢᵗ Dep't 2017).[2]  Federal courts within this Circuit, however, have rejected that position and continue to hold to the minimum wage "13-hour rule"(though they have not properly addressed whether and how the rule – or FLSA principles – should apply to HHWs now that they are no longer "exempt" companions).  *See e.g., De Carrasco v. Life Care Servs., Inc.*, 2017 U.S. Dist. LEXIS 206682, at *16 (S.D.N.Y. Dec. 15, 2017) ("The Court here joins the other federal district courts that have considered the issue and rejects the *Tokhtaman* line of cases from the New York Appellate Division. The Court finds, as did the *Severin* Court, that the Opinion letter is <u>not</u> in conflict with the regulation; rather it <u>expands</u> upon the Regulation, by defining what it means to be 'available for work.'  The Court also concurs with the *Severin* Court that the Opinion Letter is neither 'unreasonable' nor 'irrational.'") (quoting *Severin v. v. Project OHR, Inc.*, 2012 U.S. Dist. LEXIS 85705, at *9 (S.D.N.Y. June 20, 2012) (emphasis in original)).

The applicable regulations were thus recently clarified, by amendment intended to have retroactive implication and largely in response to the *Tokhtaman* decision, to make clear that they "*shall not* be construed to require that the minimum wage be paid for meal period and sleep times that are excluded from hours worked under the [FLSA]…for a home care aide who works a shift of 24 hours or more." 12 N.Y.C.R.R. § 142-2.1(b) (emphasis added).  The legislative history of the amendment makes clear that its "purpose and intent" was to codify the "longstanding and consistent interpretation that compensable hours worked under the State Minimum Wage Law do not include meal periods and sleep time of home care aides who work shifts of 24 hours or more."  *Rodriguez*, 2018 U.S. Dist. LEXIS 51578, *13.  Thus, under New York Law, all that is clear is that HHWs historically could be paid for thirteen hours at the minimum wage per twenty-four hour shift period (which Humana's HHWs always have been) as long as they are afforded at least eight hours of sleep, actually receive five hours of uninterrupted sleep, and get three hours total for meal breaks.

---

[2] The New York Court of Appeals has yet to rule on this issue, but is expected to do so soon.  "[T]he Court of Appeals is unlikely to follow the *Tokhtaman* line of cases."  *Rodriguez v. Avondale Care Grp., LLC*, 2018 U.S. Dist. LEXIS 51578, *14 (S.D.N.Y. Mar. 27, 2018).

3

Far from settled, the law governing the number of hours worked for live-in care is so unsettled that the NYSDOL has scheduled a hearing for July 11, 2018 on the issue. *See* https://www.labor.ny.gov/workerprotection/sleep-time.shtm (last visited June 19, 2018).

      b.  Rule 23 Certification Standard

"Unlike the minimal burden imposed by the FLSA, Rule 23 requires a more searching inquiry, and Plaintiff bears a heavy burden to satisfy the 'rigorous analysis' required at the class certification stage' that often 'entail[s] some overlap with the merits of the plaintiff's underlying claim.'" *Shillingford v. Astra Home Care, Inc.*, 293 F. Supp. 3d 401, 418 (S.D.N.Y. Feb. 23, 2018) (quoting *Ruiz v. Citibank, N.A.*, 687 Fed. App'x 39, 40 (2d Cir. 2017)).  Indeed, "[Rule 23] imposes stringent requirements for certification that in practice exclude most claims." *Am. Express v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013).  "[A] district judge may not certify a class without making a ruling that each Rule 23 requirement is met." *In re Initial Pub. Offering Sec. Litig. ("In re IPO")*, 471 F.3d 24, 27 (2d Cir. 2006); *Severin v. Project OHR, Inc.*, 2012 U.S. Dist. LEXIS 85705, *10 (S.D.N.Y. June 20, 2012).

Pursuant to Rule 23(a), a plaintiff may proceed on behalf of a class only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  *See* FED. R. CIV. P. 23(a); *see also Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010).  Rule 23(a)(2) requires that Plaintiffs establish questions common to the class by offering "significant proof" that the questions will resolve a significant aspect of potential class member claims on a classwide basis. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 353 131 S. Ct. 2541, 2551 (2011). Under *Dukes*, a common question is not enough; rather, certification is only appropriate if a "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350.  Differences within the proposed class have the potential to impede the generation of common answers, and therefore weigh against certification.  *Id.*

Even if the criteria of Rule 23(a) are satisfied, a case may proceed as a class action only if it also qualifies under at least one of the categories provided in Rule 23(b). *See Brown*, 609 F.3d at 476. In this case, Plaintiffs seek to certify a class under Rule 23(b)(3), which permits certification "if the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class litigation is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

"As a general matter, the Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Brown*, 609 F.3d at 476. It is "far more demanding" than the commonality requirement of Rule 23(a). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). This requirement's "purpose is to ensure that the class will be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). It is met only "if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof." *Brown*, 609 F.3d at 483.

## III.    PROCEDURAL HISTORY

Plaintiff Kinkead (a former HHW who worked for Defendants only within the State of Connecticut) filed this action on November 10, 2015. Dkt. 1. The original complaint asserted claims on behalf of putative nationwide collective, as well as a Rule 23 class consisting of HHWs employed by Defendants within the State of Connecticut. Dkt. 1, ¶ 2. The complaint, at that time, did not assert any claims under New York State Law.

On August 19, 2016, Plaintiff and Grenesha Upton (who was then the only opt-in) moved for conditional certification of a putative collective containing "[a]ll current or former health care workers employed by [Defendants] and/or any of their affiliated entities who were not paid overtime wages." Dkt. 66-1, at 23. Defendants opposed that motion.

Before that motion was decided, but after it was fully briefed, the parties stipulated to conditional certification of a collective consisting of "all home healthcare employees…[who were] classified as FLSA exempt…and worked more than 40 hours in at least one workweek." Dkt. 113-1, ¶ 4. That stipulation was so ordered by this Court. Dkt. 114. Subsequently, Plaintiffs sent notice of this lawsuit to more than 900 people. Approximately 190 of those people opted-in to the conditionally certified collective—including several individuals who worked for Defendants in New York or Connecticut.

A similar action, captioned *Green v. Humana at Home, Inc. d/b/a Seniorbridge Family Companies, Inc.*, was filed in the Southern District of New York on September 28, 2016 by a former New York-based employee of Defendants. *See* 1:16-cv-07586, Dkt. 1. In addition to a putative FLSA collective, *Green* seeks certification of a "New York Class" consisting of "[a]ll CHHAs employed by Defendant, who worked in excess of 40 hours per week, and who were denied overtime wages…in violation of the FLSA and NYLL." *Id.* ¶ 36. A motion to certify that class was filed on April 20, 2018 (*Id.*, Dkt. 48), and remains pending before the United States District Court for the Southern District of New York.

Almost a year after *Green* was filed, on September 19, 2017, Plaintiffs moved to amend the complaint to add one of the opt-ins (Claude Mathieu) as a named plaintiff and, through her, to assert a variety of violations of the NYLL that largely mirror those asserted in *Green*. *See* Dkt. 170. That motion was granted on November 8, 2017. Dkt. 180.

On May 7, 2018—two and a half years after the original complaint was filed and six months after the motion to amend was granted but, not coincidentally, only two weeks after a motion to certify was filed in *Green*—Plaintiffs filed the instant motion for Rule 23 certification of putative classes asserting violations of New York and Connecticut Law.[3] *See* Dkt. 204. For all of the reasons discussed below, Defendants respectfully submit that Plaintiffs' motion should be denied in full.

---

[3] Two days later, on May 9, 2018, Claude Mathieu sought leave to file an *amicus* brief in the *Green* action—seeking to oppose the motion for certification filed in that case. Of course, Plaintiff Mathieu here, who has belatedly sought to coopt the New York Labor Law, are not "friends" of the *Green* court: they are interested litigants. *See SEC v. Bear, Stearns & Co.*, 2003 U.S. Dist. LEXIS 14611 (S.D.N.Y. Aug. 25, 2003) (declining to confer amicus status on clearly "partisan interests" not acting as "dispassionate 'friend[s] of the court').

IV.     **LEGAL ARGUMENT**

Plaintiffs request certification of two separate "Effective Date" classes for all Connecticut and New York HHWs, respectively, for the period between January 1 and October 12, 2015.  The Court should deny Plaintiffs' requests because individual issues predominate the liability determinations for each HHW, because Plaintiffs' claims are not typical of the claims of non-Live-In HHWs and because the Court would have to conduct individual mini-trials merely to determine whether each HHW worked enough hours per week to recover for overtime under either the New York Labor Law ("NYLL") or Connecticut Minimum Wage Act ("CMWA").

a.     Mathieu Lacks Standing and is an Inadequate Representative to Pursue Her Class Claims

"Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1543-44 (2016) (citations omitted).  If the named plaintiff has not suffered the concrete injury at issue, a Plaintiffs' class certification motion should be denied.  *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (cannot certify a class where representatives lack standing to sue).

Mathieu testified that she never worked more than three live-in shifts in any week. Deposition of Claude Mathieu ("Mathieu Dep."), Exhibit A at 88:14-17.  Three shifts, multiplied by 13 hours per shift (if determined to be the correct number of hours), amounts to 39 hours worked per week (meaning no overtime violation), because she did not work more than 40 hours.  Mathieu did not work 40 hours per week as revealed by her schedules and her admissions.  *See* Mathieu Dep. at 28:13-14, 29:13-17, 39:22-24, 88:14-17 (worked only three shifts per week); 31: 24-25, 32: 1-13 (solely performed work for a single client); Deposition of Robbi Matusz ("Matusz Dep."), Exhibit B at 141:18-143:2 (identifying workweeks in which Mathieu worked three live-in shifts

per week constituting 24 hours of work).  Plaintiff Mathieu, therefore, does not and cannot state an overtime claim even on her own behalf, much less on behalf others.[4]

In addition to her lack of standing to proceed with an overtime claim, Mathieu lacks standing to proceed with a minimum wage claim, again assuming she "worked" 13 hours per live-in shift.  Mathieu always received $130 per shift for working a live-in shift.  Mathieu Dep. at 167:16-22.  Even if the law required that (newly non-exempt) Plaintiff Mathieu be paid 13 hours at minimum wage, such law has not been violated: 13 times the 2015 New York minimum wage of $8.75 equals $113.75.  New York law requires "only that the total wages paid to the employee are equal or greater to the total sum of the applicable minimum wage rate times the number of hours worked by the employee."  *Oram v. SoulCycle LLC*, 979 F. Supp. 2d 498 (S.D.N.Y. 2013).[5]

Finally, Mathieu's brief employment with Humana highlights the difficulty of determining whether she was "residential," under the New York regulations or (to the extent applicable) FLSA guidance.[6]  Mathieu did not live at her Humana client for three days and return home for four days: she lived exclusively with two different clients, one through Humana and one through another agency.  Ultimately, a determination will be required as to whether she was residential as to all such employment, only one, or neither.

---

[4] To the extent this Court were inclined to entertain certification based on Plaintiffs' assertion that New York law always required payment of minimum wage for all 24 hours of a live-in shift, as opined by two intermediate New York state courts and roundly rejected by numerous federal courts, Defendants note that the same considerations addressed herein still apply – in particular the determination regarding whether an HHW is "residential," and thus outside the scope of those holdings – and that furthermore any certification decision on such basis should be stayed pending the final outcome of the appeals in those state cases, which are consolidated before the New York Court of Appeals.

[5] The fact that Mathieu is an inadequate class representative is all the more reason to leave the New York "Effective Date" claims to the *Green* case pending in the Southern District of New York.  *See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000) (holding that class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation).  Plaintiffs concede these claims are pending in the *Green* case and that Green has already moved for Rule 23 certification of these claims.  *See* Plaintiffs' Brief at 19.  Unlike Mathieu, other aides may not suffer from the clear limitations on her putative claims.

[6] *See* Dkt. 225 at 9 (authority regarding calculation of work hours under FLSA); *Dudley v. Hanzon Homecare Servs.*, No. 15-CV-8821, 2018 U.S. Dist. LEXIS 8112 (S.D.N.Y. Jan. 17, 2018) (questions of fact regarding hours of work by live-in aid under FLSA and New York law).

Because Mathieu was a part-time HHW with a second Live-In job who did not work 40 hours, and because she cannot state a minimum wage claim if she worked thirteen hours per shift, there are factual and legal defenses applicable to the Class Representatives, but not applicable to the Putative Classes.  The putative class would be prejudiced if this Court certified a New York "Effective Date" class with a representative Plaintiff who the factfinder may determine never worked overtime and cannot state a claim for minimum wage.  In addition to obvious standing and adequacy problems, Mathieu's claims are not typical of the claims she advanced on behalf of the New York "Effective Date" class.

      b.  <u>Plaintiffs Cannot Satisfy Rule 23 for Their "Effective Date" Overtime Classes</u>

Plaintiffs' central allegation in this case, at least with respect to the Live-In HHWs, is that the hours each HHW claims Defendants "paid them for" (either eight, ten or thirteen hours per day) do not match the actual hours that they worked.[7]  In other words, Plaintiffs claim that HHWs worked "off the clock."  Resolution of this central issue inevitably requires individualized analysis of each HHW's claim, and those individual analyses would predominate this case.  *See* pages 12-25 below.  For these reasons, expounded upon below, Plaintiffs cannot satisfy either the Rule 23(a) commonality requirement or the Rule 23(b) predominance requirement for their proposed "Effective Date" Classes even if those classes were limited to only Live-In HHWs in Connecticut and New York.

      i.  <u>The "Effective Date" Class is Overbroad Because it Includes Non-Live-In HHWS Who Were Never Classified as Exempt</u>

However, first, Plaintiffs' proposed "Effective Date" classes are not limited to only Live-In HHWs.  The putative classes also include Non-Live-In HHWs in Connecticut and New York between January 1 and October 12, 2015.  Neither Kinkead nor Mathieu can satisfy the Rule 23(a) typicality requirement for these non-Live-In HHWs because neither of them ever worked for Defendants as non-Live-Ins, and because non-Live-Ins do not and cannot advance either of the claims as the Live-In HHWs. Likewise, the Non-Live-Ins cannot testify as to the Live-Ins' claims as they do not even know the Live-

---

[7] Defendants' position is that Live-In HHWs were paid a "day rate" for all hours worked during a Live-In shift, and also provided guidance regarding how many hours of intermittent work to perform.  As the testimony to date makes clear, Live-In HHWs had substantially different work experiences, and substantially different understandings regarding the nature of their compensation.

Ins' duties or how they spend their time.  *See* Deposition of Joanne Keller ("Keller Dep."), Exhibit C at 92:8 - 22.  The Live-Ins' "Effective Date" claim is twofold.  First, they claim that prior to October 12, 2015, Humana failed to pay overtime for hours worked over 40 per week.  Unlike Live-Ins, non-Live-In HHWs were always paid for overtime throughout the time period at issue.  They were never classified pursuant to the companionship exemption.  They have always received premium overtime at time-and-one-half their hourly rate of pay.  The reclassification and "Effective Date" dispute at the core of this case never applied to them.  Matusz Dep. at 15:16-20.  Second, the Live-Ins claim that the number of hours Humana assumed each Live-In worked during each shift did not accurately reflect the hours they worked.

The Non-Live-In HHWs do not make this "off the clock" claim either.   The Non-Live-In HHWs that have been deposed both admit they entered all of their working hours on Defendants' Santrax system and admit they entered and have been paid or all the hours they worked.  Keller Dep. at 57:1-7; Deposition of Ruth Ann Shaw ("Shaw Dep."), Exhibit D at 40:8-41:17, 49:20-23, 50:7-13. When the Non-Live-In HHWs worked past their shift times, they reported all of that time and were paid. Keller Dep. at 81:14-22; Shaw Dep. at 40:13-41:17.  Accordingly, the central claim Plaintiffs advance for the Live-In HHWs (which include both Kinkead and Mathieu) does not even apply to the non-Live-In HHWs.  For this reason, Kinkead and Mathieu's claims are not "typical" of Non-Live-Ins' claims.  In addition, Humana contends that the Live-Ins were paid a "day rate" for all hours worked (subject to and in compliance with the minimum wage requirements of New York law noted above) while non-Live-Ins were paid by the hour.  This is another individualized defense that applies only to Live-Ins.  Therefore, even if this Court certifies Plaintiffs' "Effective Date" classes, such classes should not include Non-Live-In HHWs.  They were never treated as exempt companions.

Kinkead and Mathieu only worked for Humana as Live-Ins.  Mathieu Dep. at 26:10-22; Deposition of Daverlynn Kinkead ("Kinkead Dep."), Exhibit H at 67:8-12.  A live-in case is where a HHW stays at a client's house, apartment or living facility for an extended period.  *See* Deposition of Michael Allen ("Allen Dep."), Exhibit E at 98:5-9.  Live-In clients should be able to function unsupervised without constant attention, especially while sleeping.  *Id.* at 177:10-12.  Humana contends

that Live-Ins are paid a "day rate" for all hours worked.  *Id.* at 31:25-32:3.  As previously discussed, Humana instructs Live-Ins that they are to spend a significant amount of time at their client's home engaging in non-work time.  Humana expects Live-Ins to abide by this instruction.

However, the shifts worked by HHWs are not limited to Live-Ins and vary based on each client's needs and can include two, four or twelve hour shifts.  Allen Dep. at 173:16-21, 177:2-5; Keller Dep. at 26:25-27:7, 33:15-18; Shaw Dep. at 24:15-21, 26:6-8.  More serious cases where the client's medical issues require 24-hour attention are assigned two twelve hour shifts.  *Id.* at 177:6-14; Deposition of Joan Morant ("Morant Dep."), Exhibit F at 34:16-25.  If Humana determines that a client needs two 12-hour shifts, it would not assign that client to a Live-In.  Allen Dep. at 178:12-16.  Unlike Live-Ins, all Non-Live-In shifts are paid an hourly rate.  Matusz Dep. at 30:16-23, 31:22-25; Keller Dep. at 13:22, 37:19-23; Shaw Dep. at 27:9-13, 69:9-13.  Unlike Live-Ins who are expected to spend significant time attending their own pursuits, non-Live in HHWs are not even permitted to do any personal business during their shifts.  Allen Dep. at 163:9-18, 171:6-16.  Non-Live-Ins cannot make personal calls or sleep during their shifts.  *Id.* at 166:23-167:8; Keller Dep. at 31:10, 54:23-24; Shaw Dep. at 32:18-20.  Unlike Live-Ins, non-Live-Ins do not have any hours during their shifts they are not expected to be working and are not paid for.  On a 12-hour shift, a HHW eats during paid time and does not take any non-compensable breaks.  Allen Dep. at 193:7-17; Keller Dep. at 83:16-23; Shaw Dep. at 32:3-11.  In short, the role of a non-Live-In HHW is different from a Live-In's as are the method of pay and down time expectations.  Shaw Dep. at 26:14-16.

These fundamental factual differences between Live-In and Non-Live-In HHWs clearly affect the central liability issue in the case—whether each HHW worked more hours than they have been paid for, or worked overtime at all.  While Plaintiffs have articulated why they believe Live-Ins worked more hours than they claim to have been paid for, they have failed to offer *any* basis for why a large portion of the putative classes (non-Live-In HHWs) would have worked outside of the hours they were paid for.

   ii. <u>The Claims of the Named Plaintiffs are Not Typical of the Putative Class</u>

   Plaintiffs' proposed "Effective Date" classes seek allegedly unpaid overtime.  But not all of Humana's HHWs put in 40 hours per week; some of them have other jobs.  Allen Dep. at 150:23-25.  Some HHWs work for other clients through other agencies.  *Id.* at 265:4-7.  Plaintiff Mathieu and Opt-in Morant are good examples of Live-Ins that did not work 40 hours.  As previously discussed, Mathieu worked only three days per week for what she understood Humana expected would be either 24 (8*3) or 39 (13*3) hours per week.  Likewise, Morant only worked for Defendant five days per week as a Live-In for two weeks.  Morant Dep. at 23:18-24:5.  Otherwise, she worked non-Live-In shifts three days per week.  *Id.* at 23:11-13.  Both non-Live-In deponents, Shaw and Keller, likewise did not work 40 hours during the relevant time period.  Keller Dep. at 24:3-20 (works only 24 hours per week); Shaw Dep. at 73:24-74:2 (worked less than 40 hours per week in 2015).

   For this reason, the Court will have to conduct mini-hearings to determine if an HHW's hours of work push them beyond 40 hours every week <u>and</u> whether they told their managers in that week about the unreported hours.  This individualized analysis adds another layer of complexity that precludes class certification.  *See, e.g. Callari v. Blackman Plumbing Supply, Inc.*, 307 F.R.D. 67, 76-77, 82 (E.D.N.Y. 2015) ("question of whether the class members worked in excess of forty hours per week would require the Court to make individual determinations with respect to each class member, and thus does not satisfy the commonality requirement.").

   iii. <u>Individualized Issues Predominate the Liability Determination</u>

   The principal reason that Rule 23 certification is inappropriate here is because Plaintiffs fail to satisfy Rule 23(b), and specifically the predominance and superiority requirements. Plaintiffs fail to raise common questions that will generate resolution-driving common answers for their proposed "Effective Date" classes.  Plaintiffs must establish that "the most important question in [the] litigation" can be "answered with generalized proof."  *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 539 (2d Cir. 2016) (reversing, on an abuse of discretion standard, a district court's order granting Rule 23 class certification).  It is not sufficient for Plaintiffs to establish the mere existence of

some common questions to satisfy Rule 23(b).  "What matters to class certification is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."  *Severin*, 2012 U.S. Dist. LEXIS 85705, *11 (quoting *Wal-Mart*, 131 S. Ct. at 2551 (2011)).[8]  "[T]he plaintiffs must demonstrate that the general proof of the class-wide factual and legal issues will predominate over the individualized proof for each and every one of the . . . prospective members of the putative class."  *Palmer v. Friendly Ice Cream Corp.*, 2006 Conn. Super. LEXIS 311, at *10 (Super. Ct. Jan. 25, 2006).

Judge Pauley recently held that predominance was not satisfied in an analogous case, holding:

> While Plaintiffs frame the class definition in terms of their overtime claims, they bring a potpourri of other wage claims, including those for unpaid minimum wage and unpaid wages for all 24 hours of their 24-hour shifts . . . . Whether a 24-hour shift consists of 13 hours or 24 hours is integral to whether [Defendant] properly paid the overtime rate or minimum wage. And that analysis turns on whether an employee received eight hours of sleep per night (as long as five of those hours were uninterrupted) and three hours of meal breaks . . . This requires a tailored review of each Plaintiff's meal breaks and hours slept, varying down to the particular shift . . . For instance, an HHA may have been paid the proper minimum wage for four 24-hour shifts if each shift counted as 13 hours, but her pay would fall well below minimum wage if that shift were counted as 24 hours. That determination requires an analysis of the breaks the employee took during each shift. Plaintiffs cannot ignore the need for these individualized assessments . . . As a result, common questions do not predominate.

*Heredia v. Americare, Inc.*, 2018 U.S. Dist. LEXIS 86918, at *10 (S.D.N.Y. May 23, 2018).

A similar holding is appropriate here, under similar facts.  As described below, a litany of individualized, fact-specific determinations ultimately drive any liability determination in this case—rendering this case ill-suited for resolution as a class action.

---

[8] The "droves" of issues Plaintiffs identify on page 12 of their Brief are unquestionably common questions.  However, these legal questions have no bearing on how this Court will have to determine whether Defendants have any liability to each individual HHW.  For that reason, they are not "the most important question in the litigation."

There is a liability question regarding how many hours each HHW worked and how many hours each was paid for. *See* Kinkead Dep. at 36:21-22 (describing claim that she worked more than the ten hours per day she claims to have been paid for); Mathieu Dep. at 90:11-15 (describing claim in this case as seeking compensation for all the time spent at the client's home). But, the named Plaintiffs' testimony and the testimony of additional class members highlights that these determinations (how many hours they worked, and how many each believe s/he was paid for) all are individualized, and each HHWs belief varies. *Id.* The live-in agreement for Mathieu reflects that her hourly rate for non-live-in work would be $10/hour, and her daily rate for live-in work would be $130, consistent with an understanding that the baseline for the live-in shift (where actual hours could vary) would be equivalent to 13 hours of hourly-rate work. *See* Exhibit I (Mathieu Live-In Agreement)

Plaintiffs' core argument for certification is that Defendants' use of a daily rate and baseline expectation regarding Live-In HHW hours per shift was unlawful. However, there is no liability for any Live-In HHW if they received all minimum wage owed, and did not "work" (as ultimately determined in his or her individual case) overtime. Indeed, Plaintiffs admit that "in order to determine the amount of overtime owed to the Plaintiffs under their CMWA and NYLL Effective Date claims, the Court will have to determine the number of hours that Plaintiffs worked each week during the Effective Date period." Plaintiffs' Brief at 2. Kinkead admits that she has no idea whether other Live-In HHWs worked beyond the number of hours they claim to have been paid for. Kinkead Dep. at 74:14. Indeed, from Kinkead, Morant and Green's testimony, it is not even clear whether *they* believe they worked hours beyond those they were paid for. *See id.* at 52:11-18 (admitting the hours she was paid for accurately reflect the hours she worked when questioned by Humana attorney) and 90:10-14 (retracting admission of same during redirect by Plaintiffs' lawyers). *See also* Morant Dep. at 29:11-14 (testifying that she was paid for 13 hours) and 30:11-31:3 (after consultation with counsel, changing

14

testimony to reflect payment of fixed shift pay for 24 hours).  Plaintiff Molly Green testified that she was

paid for 13 hours per Live-In Shift.  *See* Deposition of Molly Green ("Green Dep."), Exhibit G at 86:11-

14.[9]  Plaintiffs have therefore admitted that individualized inquiries are necessary to determine liability.

Plaintiffs' characterization of this determination as an accounting exercise based on Humana's payroll

conventions is spurious.  *Linscheid v. Natus US Med., Inc.*, No. 3:12-cv-67-TCB, 2015 U.S. Dist. LEXIS

40255 (N.D. Ga. Mar. 30, 2015) (rejecting position that an exempt employee's salary compensated 86.67

hours as an accounting convention).  Courts have previously refused to certify claims under such

circumstances because they require an entirely individualized inquiry.

> Whether or not a home attendant actually received eight hours of sleep time
> and five hours of continuous sleep is an inherently fact-specific inquiry that
> is likely to hinge heavily on the characteristics of particular clients to whom
> sleep-in home attendants were assigned . . . Individual plaintiffs may still
> establish an NYLL violation by showing that they did not *in fact* receive
> eight hours of sleep time or five hours of continuous sleep while working
> sleep-in shifts.  But that is a different theory of liability than the one
> heretofore pursued by the plaintiffs, and they have not demonstrated that it
> is susceptible to classwide resolution.

*Severin*, 2012 U.S. Dist. LEXIS 85705, *33 (S.D.N.Y. Jun. 20, 2012).

In *Severin*, as in this case, the named plaintiffs testified that on numerous occasions, they were

unable to sleep through the night because they were required to attend to clients' physical and mental

impairments.  *Id.*  As the court held, "[r]esolving the plaintiffs' minimum wage claims will require, at a

minimum, establishing the truth or falsity of a Plaintiffs' sleep deprivation contentions, the frequency

with which the issue arose for a plaintiff, whether the plaintiff reported the problem to [her employer],

and [the employer's] response."  *Id.* at *33-34.  The court further found that "[a]nswering these

questions is unlikely to 'generate common answers apt to drive the resolution of' class litigation, or

'resolve . . . issue[s] that [are] central to the validity of each one of the [class] claims in one stroke.'"  *Id.*

at * 34 (citing *Wal-Mart*, 564 U.S. at 353).  Accordingly, the *Severin* court held that "[b]ecause the

---

[9] Humana continues to conduct depositions of putative class members, and reserves the right to supplement the
evidentiary record as to the individualized nature of these inquiries.

plaintiffs have failed to show that common questions of law or fact predominate over individual ones as to their NYLL minimum wage claim, class certification of this claim must be denied as well." *Id.*

Similarly, in *Shillingford v. Astra Home Care, Inc.*, the court denied a motion to certify overtime claims under the NYLL in a directly analogous case, involving a putative class of home healthcare workers. *See* 293 F. Supp. 3d 401 (S.D.N.Y. Feb. 23, 2018). Addressing the putative plaintiffs' overtime claim in that case, Judge Failla observed that:

> To establish liability under the NYLL for violations of the overtime provision, the class plaintiffs would have to show that they worked more than either 40 or 44 hours in a workweek, and that they were not compensated for the excess hours. This, in turn, depends on a determination of whether the class plaintiffs are residential or non-residential employees — the latter are entitled to overtime after 40 hours in a week while the former are only entitled to overtime after 44 hours in a workweek. *Id.* A liability determination also depends, to an extent, on the number of breaks an aide received and for how long. These questions cannot be answered by the documents before the Court.

*Id.* at 418. Notably, Rule 23 certification was denied in the *Shillingford* case even though conditional certification of an FLSA collective was granted. 293 F. Supp. 3d at 419.

The same outcome is appropriate here, under similar facts. The entire live-in arrangement is predicated on Humana paying each Live-In a daily rate with a baseline number of hours of expected work, getting eight hours of sleep, five, three or no hours of free time and three hours for meals, and reporting to Humana if the case is not permitting same.[10]   Allen Dep. at 91:9-12, 102:9-103:22; 121:3-8; Matusz Dep. at 84:13-25; Mathieu Dep. at 91 (understood how to request that a specific case be split, but purposefully did not so request to avoid personal travel). Inherent in Humana's assignment of a client to a live-in shift is that the HHW will be able to take their sleep,

---

[10] Prior to September 2011, Humana's Agreements with the HHWs stated the Company paid for ten hours of intermittent work per day at the day rate. Allen Dep. at 120:20-21, 255:10-13; Matusz Dep. at 54:22-55:10, 106:20-107:19. After September 2011, the Agreements changed to say the Company paid for eight hours of intermittent work per day at the day rate. *Id.*; Plaintiffs' Brief at 5, 6. Beginning January 2016, and consistent with their non-exempt status, live-ins have been expressly told that thirteen hours of intermittent work per day is required. Matusz Dep. at 108:5-7, 110:5-13, 130:24-131:6; 174:16-24; Plaintiffs' Brief at 2, 5, 6. These changes applied to all live-ins in New York and Connecticut. *Id.* at 113:25-114:6, 131:15-16; Plaintiffs' Brief at 5, 6.

meal and rest time.  Allen Dep. at 178:20-24.  The degree to which each-live in adhered to the assumed hours of intermittent work during every single live-in shift determines liability.

For example, Kinkead contends she was paid for ten hours of work during each live-in shift, and that ten hours was the "typical" number of hours she worked.  Kinkead Dep. at 22:7-11, 7:11-18, 85:25-86:2.  Mathieu and Morant believe they were told they were supposed to work and get paid for thirteen hours per day.  Mathieu Dep. at 168:14-19, 169:5-11; Morant Dep. at 29:11-14, 33:22-24.[11]  Accordingly, whether any individual shift was "atypical," which would determine whether each HHW worked "off the clock," depends on a host of completely individualized facts including but not limited to:

1)   **Each client's sleeping habits.**  Mathieu and Morant admitted that they understood that they were supposed to be taking adequate time for breaks and sleep, and that they were not supposed to be working 24 hours per day.  Mathieu Dep. at 140:3-7, 140:23-141:7, 143:8-14, 147:10-13; Morant Dep. at 33:16-34:3, 35:10-15.  Mathieu, however, also acknowledged that the reality of each situation varied with each client's sleeping habits; and even that any particular client's sleep habits would change at times, such as after a medication change.  Mathieu Dep. at 52:12-53:4, 56:23-57:3, 58:21-59:5, 103:16-18, 105:2-16, 106:25-107:4.

Kinkead admitted that she was able to get eight hours of sleep during 70% of her shifts.  Kinkead Dep. at 32:14-19.  Kinkead also testified that she was also able to get five hours of uninterrupted sleep on more than 70% of her work days, but cannot recall the exact percentage.  *Id.* at 34:21-35:2.  If Kinkead's client got her up during the night, whether Kinkead was able to still get five hours of uninterrupted sleep depended on how she felt, i.e. it depended upon her personal ability to fall back asleep.  *Id.* at 35:20-36:3.  On the other 30% of her work days, Kinkead testified that she was up with the client doing bathroom chores, reading or just sitting up with the client.  *Id.* at 32:20-25.  Kinkead further testified that on some occasions her sleep was interrupted to go to the emergency room with the client.  *Id.* at 32:25-33:1.  Accordingly, even for the same

---

[11] After meeting with counsel during a break, Morant changed her testimony to state that she believed she was being paid for 24 hours of work.  Morant Dep. at 30:14-22.

HHW, the facts vary as to whether the HHW actually received eight hours of sleep. The inquiry is all the more individualized from one HHW to another as each client's ability to sleep through the night on their own varies. *Id.* at 85:7-10. Kinkead is not even able to present evidence of the percentage of nights she did not get five hours of uninterrupted sleep herself, much less for any other HHW.

A comparison of the two Named Plaintiffs provides a good example of the individualized inquiry required to determine whether each HHW received the assumed sleep time. In stark contrast to Kinkead, Mathieu was awoken by her client constantly ("every night") and was never able to get eight or even five hours of sleep each night because the client was constantly "up and down." Mathieu Dep. at 34:3-25, 51:3-23, 90:17-91:8, 93:9-11. Mathieu's testimony is completely different from Kinkead's, as she claims she was never able to get five hours of uninterrupted sleep. As Mathieu readily admits "every case is different . . . very much so." *Id.* at 115:16-17, 116:3-6. The amount of sleep varies for every case based on each client's needs. *Id.* at 183:16-184:7.

In contrast to both Kinkead and Mathieu, Morant's ability to get eight hours of uninterrupted sleep varied by client. Morant Dep. at 41:23-42:13. For clients she worked for only on the weekend, she was always able to get eight hours of uninterrupted sleep whereas for the client she worked for multiple weeks straight, there were two occasions when her sleep was interrupted. *Id.* at 41:23-42:13, 43:16-20. Morant always received five hours of uninterrupted sleep. *Id.* at 46:8-12. Morant also testified that she recorded the occasions on which her sleep was interrupted in a handbook kept at each client's home. Morant Dep. at 43:21-44:8. Thus, for Morant and any other HHW who engaged in this practice, the factfinder would have to review each handbook or other related care document to determine when each HHW worked during their sleeping hours.

Plaintiff in *Green* testified that her ability to sleep varied on the live-in case comprising the bulk of her Humana employment. Green Dep. at 51:12-16. She provided very little specifics regarding the frequency of patient sleep or sleep interruption, ultimately concluding that she could

not estimate how often the patient got up, and conceding than when she did it was typically for 5-10 minutes. *Id.*

Therefore, whether each HHW worked in excess of the number of hours they claim to have been paid turns completely on individualized factual issues such as each client's medication regimen and each client and HHW's ability to fall back asleep when woken.  Such factual issues could not be more individualized, not "common" to the putative class members, and would completely dominate the factfinder's liability determinations.

  2) **The amount of time each HHW could take for breaks.** Whether each HHW was able to take three hours of break time varies even by the day for the Named Plaintiffs.  Kinkead was "sometimes" able to take three hours for breaks each day.  *Id.* at 76:1-3.  Mathieu claims she "very rarely" had any free time because the client she serviced could not be left alone. Mathieu Dep. at 63:3-5, 66:11-14, 142:11-13, 157:17-19.  Morant, by contrast, received three hours per day for meals.  Morant Dep. at 36:22-24.

These variations will be even more striking for each HHW included in the putative classes given the incredibly individualized factors such as the unique health issues of each of Humana's clients.  On this basis, the court in *Shillingford v. Astra Home Care, Inc.*, 2018 U.S. Dist. LEXIS 29576 (S.D.N.Y. Feb. 23, 2018) denied an identical motion to certify overtime claims under the NYLL.  The court held that "[a] liability determination also depends, to an extent, on the number of breaks an aide received and for how long."  *Id.* at 32.

  3) **Whether each HHW lived in the client's home**.  At a minimum, this fact would affect whether each HHW was able to take meal breaks as one is far more likely to take bona fide breaks in the home in which they live given they have no other place to read, watch TV, check their phones, or speak on the phone with friends and family.  *See, e.g.* Morant Dep. at 48:15-49:18 (during Live-In shifts, spent free time reading books and watching TV with the client).  Kinkead clearly lived in the client's home, while Mathieu arguably did not.[12]  Kinkead Dep. at 70:13-71:14;

---

[12] Again, a determination of whether Mathieu was "residential" or lived in her Humana client's home for an "extended" period – both relevant considerations – based on the scenario where she lived exclusively in the homes of two clients while engaged through two different agencies is a novel one.  Mathieu Dep. at 21:24-22:2.

Mathieu Dep. at 29:18-31:2.  With respect to this critical fact, the Named Plaintiffs' claims are not even "common" with each other.  Nor will these claims be common or typical of any claims asserted by non-Live-In HHWs.

        4)        **Whether each HHW was required to stay onsite throughout their shifts**. Likewise, there is variation as to whether each HHW is required to stay on site with their client throughout their entire shift.  Allen Dep. at 160:25-161:14.  Even amongst Live-Ins, whether a particular HHW is permitted to go off-site without their client is client-specific and varies based on need.  *Id.* at 164:2-10.  This factual distinction would clearly affect the ability of each HHW to take breaks and as a result, the number of hours the HHW potentially worked beyond the hours they claim to have been paid for.

        5)        **Each HHW and each client's idiosyncrasies, preferences and habits.**  As is clear from the above, each client is unique.  Each client has a plan of care based on their individual needs that establishes what the HHW does for the client which is client-driven and client-specific. *Id.* at 138:9-13, 142:11-18; Morant Dep. at 56:2-16; Keller Dep. at 82:1-12; Shaw Dep. at 48:10-12.  Accordingly, the job duties and schedule of each HHW depends upon the individual client's needs, and therefore varies substantially.  Allen Dep. at 136:14-21; Keller Dep. at 27:8-16; Shaw Dep. at 20:12-19, 82:9-11.

        Indeed, Kinkead admits that the amount of time each HHW spent performing certain activities varied based on the client she was servicing.  Kinkead Dep. at 88:16-17.  The idiosyncrasies and preferences that affect the amount of work each HHW does include: when each HHW and their clients eat their meals, what the HHW choses to do while her client naps, how much interaction the HHW had with her client's relatives, how much cleaning was required, the time each HHW's client liked to go to sleep at night, how much the HHW chose to use her cell phone for personal reasons (or read a book, or watch television alongside the patient), how much personal business each HHW needed to attend to and whether each HHW's client had trouble sleeping or took sleeping medication.  Kinkead Dep. at 78:11-85:6, Mathieu Dep. at 159:6-19.

Neither Kinkaid nor any other HHW could possibly testify as to how "common" such duties are or how long they take.

Another idiosyncrasy that affects the amount of time each Live-In works is whether she was relieved during some of their shifts by visitors or family members.  While neither Mathieu nor Kinkead testified to regularly being relieved by family members, Morant testified that her client's daughter relieved her for two to three hours every other evening.  Morant Dep. at 52:15-53:12.  During this time, Morant let her client and her daughter "have their privacy" such that Morant was not even with her client.  *Id.* at 52:15-53:12; 64:19-65:7.  Plaintiff Green testified that her patient's niece visited once per week for "two hours, three hours."  Green Dep. at 45:20-25.

In addition to all of these individualized factual inquiries that will determine whether there is any liability to each HHW, there is also the practical matter of how Plaintiffs can prove their claims.  Plaintiffs argue that the predominance inquiry is often satisfied in wage cases because the putative class members "have the same job duties" and as a result, liability is a common issue that "turns on uniform policies and practices."  *See* Plaintiffs' Brief at 17.  This case is an exception first because the putative class members do not necessarily perform the same duties; those duties vary by client.  This case is also an exception because the employees do not work at one location where employees follow the same company policies.  To the contrary, *none* of the putative class members in this case work at the same location and *nobody* other than themselves and their clients have any knowledge at all of each putative class member's practices.

Indeed, Kinkead and Mathieu both readily admit that the only individuals that would have knowledge of the number of hours each HHW worked are the HHW themselves and for some, their clients.  Kinkead Dep. at 45:24-48:12; Mathieu Dep. at 182:2-9.  Kinkead and Mathieu also admit they have no knowledge of the number of hours any other HHW worked; nor would any other HHWs have any knowledge about the number of hours they each worked.  *Id.*; Kinkead Dep. at 47:1-8, 88:12-15.  Mathieu admits that the HHWs were not even allowed to discuss the number of hours they slept or took for breaks with each other because of privacy concerns.  Mathieu Dep. at 182:13-14.  These admissions are tantamount to a concession that in order to determine liability

21

(i.e. how many hours each HHW worked in excess of the number they claim to have been paid for), the factfinder would have to ask each HHW or perhaps their clients.  There is no way to determine liability on a classwide basis using "representative" testimony or sampling as Plaintiffs contend.  Kinkead admits as much.  *Id.* at 48:15-20 (there is nobody other than the companion and in some circumstances, the client, that would have personal knowledge of the number of hours each companion worked).  In other words, predominance is not satisfied—and the "Effective Date" classes should not be certified.

Even after the Court determines whether a given Live-In HHW worked hours in excess of hours paid, the Court would also have to determine whether Defendants had actual or constructive knowledge of such work in order to determine liability.  *See Kuebel v. Black & Decker, Inc.*, 643 F.3d 352, 361 (2d Cir. 2011) ("To establish liability . . . on a claim for unpaid overtime, a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work.") (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946); *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 287 (2d Cir. 2008); *Grochowski v. Phoenix Constr. Corp.*, 318 F.3d 80, 87 (2d Cir. 2003)); *Holzapfel v. Town of Newburrgh, N.Y.*, 145 F.3d 516, 524 (2d Cir. 1998) ("[f]or compensation to be awarded, plaintiff's activities must not only [be work], but must also be performed with the employer's knowledge").  If each Live-In HHW failed to make Humana aware of work they performed when there were sufficient means for reporting such time, the work they performed outside of the expected hours the Live-Ins claim they were paid for, such time is not compensable and Defendants cannot be liable for such hours.[13]

This individualized inquiry of whether Humana had sufficient knowledge of the alleged "extra" work being performed is particularly acute in this case because Humana was explicit with the Live-In HHWs about the need to report work performed outside of the intermittent eight, ten or thirteen hours

---

[13] *Brown v. Scriptpro, LLC*, 700 F.3d 1222, 1230-31 (10th Cir. 2012) ("[W]here the employee fails to notify the employer through the established overtime record-keeping system, the failure to pay overtime is not a FLSA violation."); *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1314-15 (11th Cir. 2007); *White v. Baptist Mem. Health Care*, 699 F.3d 869, 876 (6th Cir. 2012) (citation omitted); *Kellar v. Summit Seating*, 664 F.3d 169, 177 (7th Cir. 2011); *Hertz v. Woodbury County*, 566 F.3d 775, 781 (8th Cir. 2009) (citations omitted); *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 415 (9th Cir. 1981).

per shift. Humana's agreements with the HHWs state that if they believe they are being overworked, they need to immediately report it to their manager. Allen Dep. at 92:18-21. The Live-In HHWs are instructed that if they are not getting eight hours of sleep or the expected meal and free time, they need to contact their manager and alert them. *Id.* at 183:25-184:6, 195:12-19, 109:5-12. Because the Live-Ins work alone, Humana reminds them that the Company relies upon them to report when they are working more than their scheduled hours or not getting their sleep or meal time so the Company can address the situation. *Id.* at 110:12-15, 111:8-15, 192:14-19. Because Humana cannot track the daily activities of the Live-Ins, Humana relies on the Live-Ins to "raise their hand to their manager" if they are being required to do work in excess of the expected hours because they are not supervised in the clients' homes. *Id.* at 185:5-10. The HHW informing Humana is the only way the Company would know if the hours expectations are not being followed. *Id.* at 185:22-25.[14]

If a Live-In alerts their manager they are working more than their expected hours, Humana addresses the issue with the client and the client's family to discuss: (1) the hours the client is paying for so that the Live-In would get their time off going forward; (2) that if the Live-In is required to work more than the expected hours, the client could potentially be charged for the extra time; and (3) whether the client needs more around-the-clock care. *Id.* at 109:16-110:2, 290:19-291:5, 186:19-25. When Humana is informed by the Live-In, Humana may pay the HHW extra compensation on top of their day rate.[15]   *Id.* at 110:2-5, 111:23-112:4; 219:10-16, 290:19-291:5.

Kinkead, Mathieu and Morant all concede they knew it was Humana's expectation that they report when they worked hours in excess of the expected hours. Mathieu concedes that Humana asked the HHWs to report to the Company if conditions with the client changed that required the HHW to

---

[14] Again, this is a different issue from the number of hours the Aides' fixed daily rate pay was "intended to compensate" based on the continued (and good faith) assumption that the companionship exemption applied during this period. *Banford v. Entergy Nuclear Operations, Inc.*, 649 F. App'x 89 (2d Cir. 2016). The record is clear that the HHWs understood that they were required only to record the beginning and end of a live-in shift and that, absent communication on their part, they would receive the fixed day rate.

[15] This possibility of extra pay for hours worked outside of those expected introduces yet another individualized liability inquiry. If a HHW was paid such extra time, there would be no liability for that HHW in this case. This inquiry is particularly individualized because each local branch manager makes the decision whether to pay each HHW additional hourly pay when they report they have worked more than their expected hours. Allen Dep. at 112:8-10, 114:19-21; Matusz Dep. at 58:14-16. Humana has indeed made such supplemental payments. *Id.* at 113:6-11.

work more hours than their scheduled work time. Mathieu Dep. at 50:7-13, 54:17-21, 173:2-6. Mathieu in fact testified both that she intentionally withheld information in this regard, and that she communicated to Humana that her client needed to be handled differently. *Compare Id.* at 50:23-51:4, 58:11-17 (discussed case with other assigned aide and jointly agreed not to request change in care structure) *with* 54:25-55:4. Mathieu claims she told Humana's nurse that she was not getting five hours of uninterrupted sleep. *Id.* at 73:24-74:4, 91:21-25, 173:7-17. Mathieu concedes that despite her claim that she was never able to take three hours of break time or sleep for five hours per night because of her client's needs, she never communicated to Humana that her case needed to be split between two HHWs or that her client was waking up every few hours every night. *Id.* at 91:9-12, 152:19-24.

Kinkead likewise knew that Humana only expected that she would work ten hours per day, and that she was expected to inform Humana if she worked more. Kinkead Dep. at 74:6-10. However, Kinkead admits that in violation of company policy, she did not regularly inform Humana when she needed to work more than ten hours in a day. *Id.* at 55:9-21. She also did not inform Humana when she was not able to get eight hours of sleep. *Id.* at 86:6-9. She likewise did not inform the company when she was not able to take at least three hours of break time each day. *Id.* at 76:7-9. Kinkead admits that Humana would not have had any way of knowing she performed work during the fourteen hours per day she claims not to have been paid for. *Id.* at 77:17-21.

Likewise, Morant's supervisor told her that if she was not able to get eight hours of sleep, she was to call the office and report it. Morant Dep. at 36:2-5. Morant informed her supervisor on the two occasions when her eight hours of sleep were interrupted. *Id.* at 45:16-46:7.

Plaintiffs' claims amount to a bait and switch: they concede they knowingly failed to report the very time they are claiming in this case during their employment. Whether and how often Kinkead, Mathieu or Morant chose to follow company policy and inform Humana of the need to perform additional work has no bearing on whether every other putative class member likewise informed Humana of such extra work or how often. Because the off-the-clock time Plaintiffs claim to have worked is not compensable unless Humana had reason to know the work was being performed, the factfinder must conduct this individualized inquiry of whether each HHW informed the company in

24

each instance of whether they worked in excess of their expected hours in order to determine liability. In effect, each of the hundreds of HHWs in the proposed classes would have to prove that they *violated* Humana's policy of requiring HHWs to report hours of work beyond their expected hours in order to establish liability.

All of the individualized inquiries discussed above are necessary even if the factfinder ultimately adopts *Plaintiffs'* theory of the case; namely that Humana's "day rates" for Live-In HHWs were not day rates but somehow shams (where the record is clear and unequivocal that they were not) and the HHWs compensation was actually paid only for a specific limited number of intermittent hours (eight, ten or thirteen) rather than for all hours worked during each shift.  Of course, Humana contends (and Plaintiffs admit) that the Live-In HHWs were paid a flat day rate for all of their hours worked, regardless of how few or how many.  Matusz Dep. at 87:8-18; Allen Dep. 90:4-5; 90:21-23; Morant Dep. at 30:14-22; Mathieu Dep. at 19:22-24.  Humana's "day rate" defense is another individualized defense that only applies to Live-Ins because the overtime liability inquiry for a HHW that understood she was being paid a day rate for all hours worked are very different from the inquiries for another HHW that disputes Humana's day rate and contends they were paid an hourly rate.[16]

In light of the foregoing, Defendants respectfully submit that Plaintiffs have failed to meet their burden of establishing that issues capable of generalized proof predominate.  To the contrary, it is clear from the existing record that individualized issues will drive any liability determination.  Accordingly, the "Effective Date" classes should not be certified.

### iv.   A Class Action is Not a Superior Method of Resolving the "Effective Date" Claims

For the same reasons that predominance does not exist, the second prong of Rule 23(b)(3), superiority, is also not satisfied.  Precedent is clear that certification should be denied where the liability determination would "require a mini-hearing on the merits of each case."  *See e.g.,*

---

[16] Mathieu understood that she was paid $130 per day and that this was a different pay structure than hourly pay. Mathieu Dep. at 167:16-168:7.

*Enriquez v. Cherry Hill Mkt. Corp.*, 993 F. Supp. 2d 229, 236 (E.D.N.Y. Sept. 30, 2013).   In this case, class membership is not ascertainable without such mini-hearings because if each HHW did not work over 40 hours in the week, even with the alleged time they worked in excess of the hours they claim to have paid for, there can be no liability for overtime under the NYLL or CMWA.   *See Nakahata v. New York-Presbyterian Healthcare Sys.*, 723 F.3d 192, 201 (2d Cir. 2013) (dismissing NYLL overtime claim for failure to allege employees worked more than 40 hours in a week); *Ramirez v. Riverbay Corp.*, 39 F. Supp. 3d 354, 371 (S.D.N.Y. 2014) (NYLL can only be violated for purposes of overtime liability in "weeks in which an employee worked more than forty hours"); *Lundy v. Catholic Health Systems of Long Island, Inc.*, 711 F.3d 106 (2d Cir. 2013) (in order to state a plausible claim for overtime under the FLSA, a plaintiff must sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours).[17]

Finally, and contrary to Plaintiffs' claim, this central liability determination cannot be "calculated utilizing Defendants' payroll records" because no records exist of the hours each putative class member worked above the hours they claim to have been paid for.  *See* Allen Dep. at 183:21-23, 189:25-190:6, 195:11-12 (testifying that Humana does not keep records of when Live-In HHWs sleep or how long they slept); Kinkead Dep. at 62:11-14, 86:10-23 (admitting has no records of the amount of time she spent working for Humana, what tasks she performed each day or how long any such tasks took); Morant Dep. at 41:2-6 (admitting no records of how much time worked during each Live-In shift); Mathieu Dep. at 50:1-7 (conceding that amount of work actually performed would vary, though insisting that "They paid eight hours").  The determination of the number of hours each Live-In HHW actually worked can therefore only be determined anecdotally and individually, by asking each Live-In HHW (or their clients) about the hours that they actually worked.  The answer to this central question

---

[17] The overtime requirements established by NYLL are consistent with the FLSA. *See* 12 N.Y. Codes R. & Regs. § 142-2.2; *see also Kim v. 511 E. 5th St., LLC*, 133 F. Supp. 3d 654, 659 (S.D.N.Y. 2015); *Williams v. Bier Int'l, LLC*, 2015 U.S. Dist. LEXIS 94609, at *1-2 (S.D.N.Y. July 21, 2015).  The CMWA parallels the requirements of the FLSA. *See Hendricks v. J.P. Morgan Chase Bank, N.A.*, 677 F. Supp. 2d 544, 559-560 (D. Conn. 2009) (citing Conn. Gen. Stat. § 31-76c ("No employer, except as otherwise provided herein, shall employ any of his employees for a workweek longer than forty hours, unless such employee receives remuneration for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.").)  Indeed, Plaintiffs concede that "Connecticut and New York law incorporate FLSA coverage regulations."  *See* Plaintiffs' Brief at 2.

will vary based on incredibly individualized facts such as: the sleeping habits of each Live-In HHW's clients, the amount of time each Live-In HHW took for breaks, each client's living arrangements, the extent each Live-In HHW was asked to perform work outside of their job description, whether each Live-In HHW lived in Defendant's client's homes, and each Live-In HHW and each client's other idiosyncrasies, preferences and habits.  Plaintiffs' apparent position that the number of hours worked during the Effective Date period can or should be calculated by reference to the number of shifts worked for overtime purposes is erroneous.  *Dudley*, 2018 U.S. Dist. LEXIS 8112 at *8-10 (questions of fact regarding hours of work by Live-In aid).  The answers to these questions vary not only from each HHW to each HHW but also by the day for each specific HHW.

Where, as here, the litigation is likely to devolve into mini-trials, "a class action is not a feasible, let alone superior, method for the fair, efficient, and manageable adjudication of the putative class's claims." *Dunnigan v. Metro Life Ins. Co.*, 214 F.R.D. 125, 142 (S.D.N.Y. Jan. 2, 2003).

     v.     <u>*Kinkead* Is Not the Superior Action to Resolve the New York Labor Law Claims, *Green* Is</u>

As discussed at length in Defendants' Opposition to Plaintiffs' Motion to Amend, *Green* was and remains the first-filed action relative to the complicated and unsettled New York issues raised in both matters.  Plaintiff Green filed first under the New York Labor Law, and filed the first motion for class certification of those claims.  The *Green* action is proceeding solely as a New York class action, as Plaintiff Green has abandoned her putative collective action claims.  Thus, the class action proceedings in that New York federal court will not prejudice (or needlessly complicate the claims) of an FLSA collective to whom they do not relate.  While the Court granted Plaintiffs here leave to amend based on a perceived absence of prejudice and satisfaction of the "futility" standard (Dkt. 180), that standard no longer attaches, and the Court should deny Rule 23 certification here, deferring such ruling to the *Green* court.  As discussed below, Plaintiffs' argument that their New York class is broader (and thus somehow superior) due to their 24-hour "Unpaid Hours" assertion is incorrect, as federal courts have uniformly rejected this theory.

      c.   <u>Plaintiffs Cannot Satisfy Rule 23 for The "Unpaid Hours" Classes</u>

Plaintiffs' proposed "Unpaid Hours" classes depend upon an equally individualized set of facts—whether each Live-In HHW was denied the required sleep and break time such that they should be paid for all 24 hours (or some other set minimum number of hours) of their shifts under New York law.[18]  As with Plaintiffs' "Effective Date" classes, each of the hundreds of New York HHWs must also show that if they were not able to take the sleep and rest breaks, they notified Defendant of the issue and no appropriate remedy was implemented.  Like the analysis for the "Effective Date" Classes, these inquiries of whether each New York HHW actually received eight hours of sleep time, five hours of continuous sleep as well as three hours for meal breaks and/or notified Defendant of the issue  and what action was taken are completely individualized based on each HHW's experiences.[19]

      i.   <u>Individualized Issues Predominate the Liability Determination</u>

As discussed above, whether each Live-In HHW actually received their expected sleep, rest and meal time vary for each HHW, and even for the same HHW each shift.  *See* pages 16-18 above.  It is difficult to imagine a more individualized inquiry.  Indeed, in *De Carrasco*, the court denied certification of the exact same claim as Plaintiffs' "Unpaid Hours" claim.  After deferring to the NYDOL Opinion Letter, the court held that:

> an employee should only be paid twenty-four hours if she, in fact, is not receiving the appropriate meal and sleep breaks.  As a result, individualized and not common questions predominate—and thus, class action is not the superior method of adjudication for the 24 Hour Claims.

2017 U.S. Dist. LEXIS 206682, *23 (S.D.N.Y. Dec. 15, 2017).

---

[18] As noted before in this brief, the NYSDOL and many federal courts have made clear, requiring payment for 24-hours irrespective of break time must be rejected.

[19] These same individualized inquiries are necessary to determine whether each Connecticut Live-In HHW must be credited with any minimum of hours of work per shift.  However, Plaintiffs' contention that the "CMWA required that HHWs working live-in shifts be credited with a minimum of 13 hours of work per live-in shift," citing Conn.Gen.Stat. §31-76(b)(2)(A) and (D) is incorrect.  Nowhere does this section of the statute contain such a requirement.

Similarly, in *Shillingford*, the court concluded that common issues did not predominate over questions affecting only individuals of an identical claim under the NYLL.  2018 U.S. Dist. LEXIS 29576, *30.  The court held that whether the employer was permitted to not pay for three hours of break and eight hours of sleeping time depended upon whether the aide was in fact provided five hours of uninterrupted sleep and three hours of breaks for meals, which are individualized factual issues.  2018 U.S. Dist. LEXIS 29576, *29-30.

The Southern District of New York recently came to the same result on identical claims in *Heredia*.  The *Heredia* court held that:

> [w]hether a 24-hour shift consists of 13 hours or 24 hours [of work] is integral to whether [the employer] properly paid the overtime rate or minimum wage.  And that analysis turns on whether an employee received eight hours of sleep per night (as long as five of those hours were uninterrupted) and three hours of meal breaks.  This requires a tailored review of each Plaintiff's meal breaks and hours slept, varying down to the particular shift.

2018 U.S. Dist. LEXIS 86918, *7-8 (S.D.N.Y. May 23, 2018) (citations omitted).  The *Heredia* court provides a perfect example: a HHW has been paid:

> the proper minimum wage for 24-hour shifts if each shift counted as 13 hours, but her pay would fall below minimum wage if that shift were counted as 24 hours.  That determination requires an analysis of the breaks the employee took during each shift.  Plaintiffs cannot ignore the need for these individualized assessments.  As a result, common questions do not predominate.

*Id.* at 8 (citations omitted).

The *Heredia* court went on to conclude that the same individualized analysis is required to determine whether each HHW is entitled to overtime pay based on the plaintiffs' theory that they are entitled to be paid for all 24 hours.  *Id.*  As a result, the court held that common questions do not predominate for either a minimum wage or an overtime claim based on the 24 hours of work theory, which is precisely the theory Plaintiffs advance here.

Similarly here, the Court would have to analyze whether or not each HHW actually received eight hours of sleep time and five hours of continuous sleep as well as three hours for meal breaks and/or notified Humana of the issue if he or she could not, and what action if any was taken, are inherently fact-specific inquiries that are likely to hinge heavily on the characteristics of

particular clients to whom Live-Ins were assigned.  Resolving each Plaintiffs' claims will require, at a minimum, establishing the truth or falsity of her sleep and meal break deprivation contentions, the frequency with which the issue arose, whether she reported the problem to Humana, and Humana's response.  Answering these questions cannot possibly "generate common answers apt to drive the resolution of" class litigation, or "resolve . . . issue[s] that [are] central to the validity of each one of the [class] claims in one stroke."  *Severin*, 2012 U.S. Dist. LEXIS 85705 (quoting *Wal-Mart*, 131 S.Ct. at 2551.)

Each plaintiff must also show that if she could not obtain such breaks or get the required uninterrupted sleep, she notified Defendants of the issue and no appropriate remedy was taken.[20]

ii.   The New York "Unpaid Hours" Class is Temporally Overbroad

Finally, even if the Court certifies the New York "Unpaid Hours" class of Live-in HHWs, Plaintiffs' proposed scope is overbroad because it includes the pre-January 1, 2015 time period when the HHWs clearly were exempt from overtime, and the day rates they received well in excess of the then-applicable New York minimum wage.  To defeat the exemption under New York law, each HHW would have to show they spent more than 20% of their time performing general household work.  It is difficult to conceive of a more individualized determination.  *See Severin*, 2012 U.S. Dist. LEXIS 85705, at *19-*20.

**V.      CONCLUSION**

For all of these reasons, Defendants urge the Court to deny Plaintiffs' Motion and to permit each HHW's claims they worked more hours they claim for to rise and fall on their own merits.

---

[20] And in this case, each HHW would have to prove that they worked 24 hours despite Humana's position that it "would never assign somebody to go to a client for 24 hours and be awake and engage with the client."  Allen Dep. at 94:11-13.  If a client required such coverage, Humana's standard practice would be to have the HHW work 12 hours and get relieved by another HHW for the other 12 hours.  *See id.* at 94:15-19.

Respectfully submitted,

DEFENDANTS,
HUMANA INC., HUMANA AT HOME, INC.,
AND SENIORBRIDGE FAMILY COMPANIES
(CT), INC.

By:    */s/ David R. Golder*
        David R. Golder (ct 27941)
        golderd@jacksonlewis.com
        Noel Tripp (pro hac vice)
        trippn@jacksonlewis.com
        Kristi Rich Winters
        kristi.winters@jacksonlewis.com
        Jackson Lewis P.C.
        90 State House Square, 8th Floor
        Hartford, CT 06103
        P: (860) 522-0404

## CERTIFICATION OF SERVICE

The undersigned hereby certifies that, on this 20th day of June 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties of record by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

*/s/ David R. Golder*
David R. Golder

4821-3920-5227, v. 2

32