UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - - - x
                                 :
DAVERLYNN KINKEAD, Individually :   No. 3:15CV1637(JAM)
and on behalf of all others     :
similarly situated,             :
                                 :
                Plaintiff        :
                                 :
          v.                     :
                                 :
HUMANA, INC., HUMANA AT HOME,   :
INC., and SENIORBRIDGE FAMILY   :
COMPANIES (CT), INC.,           :
                                 :   New Haven, Connecticut
                Defendants       :   November 15, 2018
                                 :
- - - - - - - - - - - - - - - - x


MOTIONS HEARING

B E F O R E:

     THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.


Diana Huntington, RDR, CRR
Official Court Reporter

1  A P P E A R A N C E S:

2

3      FOR THE PLAINTIFFS:

4          GETMAN SWEENEY & DUNN, PLLC
               260 Fair Street
               Kingston, New York 12401
5          BY:  MICHAEL J.D. SWEENEY, ESQ.
               ARTEMIO GUERRA, ESQ.

6

7          BOHRER BRADY, LLC
               8712 Jefferson Highway, Suite B
               Baton Rouge, Louisiana 70809
8          BY:  PHILIP BOHRER, ESQ.

9

10     FOR THE DEFENDANTS:

11         JACKSON LEWIS PC
               90 State House Square, 8th Floor
               Hartford, Connecticut 06103-3708
12         BY:  DAVID R. GOLDER, ESQ.
               ALEXA M. FARMER, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **2:07 P.M.** |
| 2 | THE COURT:  We're here today for argument on |
| 3 | motion in Kinkead v. Humana, the class certification. |
| 4 | May I have appearance of counsel, please, for |
| 5 | plaintiff. |
| 6 | MR. SWEENEY:  Mike Sweeney here from Getman |
| 7 | Sweeny & Dunn.  I'm here with Artemio Guerra, also from |
| 8 | our office, on behalf of the plaintiffs. |
| 9 | MR. BOHRER:  Philip Bohrer for plaintiffs. |
| 10 | MR. GOLDER:  Good afternoon, Your Honor.  David |
| 11 | Golder for the defendants. |
| 12 | THE COURT:  Okay. |
| 13 | MS. FARMER:  Good afternoon.  Alexa Farmer for |
| 14 | the defendants. |
| 15 | THE COURT:  Okay.  So welcome. |
| 16 | It looks like we've got lots of briefing, lots |
| 17 | of going back and forth on both the class cert. and the |
| 18 | motion to amend. |
| 19 | I guess maybe I'll hear from you first, |
| 20 | Mr. Sweeney or Mr. Bohrer or Mr. Guerra. |
| 21 | MR. SWEENEY:  Very good, Your Honor. |
| 22 | So, Your Honor, I'd like to address the motion |
| 23 | to certify the class first. |
| 24 | THE COURT:  Certainly.  I think they're a little |
| 25 | bit interrelated. |

1          MR. SWEENEY:  They are interrelated.  And if you

2     want me to move over to the motion to amend at any point,

3     just let me know.  I'm happy to address that as well.

4          Your Honor, the plaintiffs have asked this Court

5     to certify four claims.

6          THE COURT:  Four classes.

7          MR. SWEENEY:  Four classes, yes, for class

8     treatment pursuant to Federal Rule of Civil Procedure 23.

9          The classes challenge two Humana policies in

10    New York and same two in Connecticut.

11         The first policy was Humana's decision not to

12    pay overtime beginning on January 1st of 2015, as the

13    plaintiffs allege was required by amendment to the federal

14    regulations.

15         THE COURT:  Right.  So let me look at your first

16    two.  Do you have your briefing handy?

17         MR. SWEENEY:  I have my reply briefing.

18         THE COURT:  I want to look at your class

19    definitions.  At the end of the day, I write a ruling in a

20    case, I've got to say what the class definition is.

21         MR. SWEENEY:  Very good, Your Honor.

22         THE COURT:  Let's just take a look at the

23    effective date classes.

24         MR. SWEENEY:  The first one is "All current and

25    former home healthcare workers employed in Connecticut by

```
 1    Humana, Humana at Home, Inc., or SeniorBridge Family
 2    Companies" --
 3              THE COURT:  No, it's okay.  I can read.
 4              MR. SWEENEY:  Oh, I'm sorry, I thought you were
 5    asking me to --
 6              THE COURT:  I'm good with reading.  I'm reading
 7    it here.
 8              So I guess the question I have is:  It includes
 9    every single home health care worker then?
10              MR. SWEENEY:  Yes, it does, who was employed by
11    Humana in the state of Connecticut.
12              THE COURT:  And so even if they only worked five
13    hours?
14              MR. SWEENEY:  Yes, Your Honor.  Everyone who was
15    subject to the policy, the policy of not paying overtime,
16    yes.
17              THE COURT:  Right.  If they worked for five
18    hours, would they be entitled to overtime?
19              MR. SWEENEY:  No, Your Honor, they would not.
20              THE COURT:  Am I supposed to certify a class
21    that includes people who have no standing and have no
22    injury?
23              MR. SWEENEY:  No, Your Honor, you're not.
24    Although there is a complication with the class.  And that
25    goes to the unpaid hours claim.  One of the things that
```

1    went on here --

2            THE COURT:  Can I stop for just a second?

3            MR. SWEENEY:  Absolutely, Your Honor.

4            THE COURT:  I'm going to get to the unpaid

5    hours.  I want to keep on effective date.

6            MR. SWEENEY:  Yes, Your Honor.

7            THE COURT:  You've given me a definition of a

8    class.  All the workers, right?

9            MR. SWEENEY:  Yes, Your Honor.

10           THE COURT:  People who worked for one hour,

11   people who worked 60 hours, right?

12           MR. SWEENEY:  Theoretically, Your Honor, yes.

13           THE COURT:  My question is, at least as I

14   understood your theory -- and I'm sure you've thought

15   about this deeply -- I thought you were seeking only

16   overtime payments.  So why is it that somebody who works

17   only one hour is entitled to overtime or they're not?

18           MR. SWEENEY:  So practically speaking,

19   Your Honor, there would be nobody who only worked one

20   hour.  Although there may be people that didn't work

21   overtime hours, that's correct.

22           THE COURT:  Should I include people who did not

23   work overtime?

24           MR. SWEENEY:  Two ways to approach that.  One

25   way is to say no, and that could be limited to people who

1    worked overtime.  The second way is that that's a damages

2    issue.  And because of the complications of the way the

3    hours were recorded, it may be the better way to go

4    forward to have the home health care workers who worked in

5    the state of Connecticut, and once the hours issues are

6    determined, to determine who worked overtime or not.

7              So again --

8              THE COURT:  But at the end of the day, right,

9    anybody within the effective date classes, the two

10   effective date classes, has to have worked overtime no

11   matter how you calculate it, right?

12             MR. SWEENEY:  Yes, Your Honor.

13             THE COURT:  And therefore it would be obvious

14   error for me to certify a class, wouldn't it, that

15   includes people who do not have standing or injury in fact

16   from the claimed violation, right?

17             MR. SWEENEY:  Well, I may put that differently.

18   It may be prudent to limit it to people that --

19             THE COURT:  It wouldn't be obvious error to you?

20             MR. SWEENEY:  Again --

21             THE COURT:  You do class actions all the time.

22             MR. SWEENEY:  I do, Your Honor.

23             THE COURT:  Is it not a fundamental principle of

24   class action law that in order for somebody to be a member

25   of a class, it has to be ostensibly somebody who has

1   standing?

2           MR. SWEENEY:  It is, Your Honor.

3           THE COURT:  I can't just, you know, define

4   classes willy-nilly in ways that include all sorts of

5   people who don't have an injury in fact.

6           MR. SWEENEY:  I would agree, Your Honor.

7           THE COURT:  So would you agree, then, that the

8   class just as you framed it in your papers at a minimum

9   for the effective date has to be reformulated to include

10  people who actually worked overtime?

11          MR. SWEENEY:  Yes, Your Honor, I would agree

12  with that.

13          THE COURT:  All right.  That's the question I

14  had.

15          MR. SWEENEY:  Very good.

16          THE COURT:  Please continue.

17          MR. SWEENEY:  Would you like me to continue?

18          THE COURT:  Yes, please.

19          MR. SWEENEY:  Very good.

20          So there are two claims that -- there are two

21  classes that -- two Humana policies that we're challenging

22  in New York and we're challenging the same policies in

23  Connecticut.  Within each of the classes, the class

24  members were subject to the same practices and policies.

25  And they were compensated in the same manner.  We believe

1   that once the Court determines the legality or the

2   illegality of the policies and practices, the class

3   members' damages, if any, can be determined by applying

4   those legal rulings to Humana's wage and hour records.

5   Those records show what shifts people worked when they

6   punched in and when they punched out, how many hours they

7   were compensated for, and what were they compensated.

8            THE COURT:  For your two effective date classes

9   that's distinguished from the unpaid hours classes --

10            MR. SWEENEY:  Yes, Your Honor.

11            THE COURT:  -- you're seeking to include in

12   those classes both live-in and non-live-in.

13            MR. SWEENEY:  We are, Your Honor, yes.

14            THE COURT:  Okay.  And if I'm correct,

15   Ms. Kinkead was a live-in --

16            MR. SWEENEY:  So the --

17            THE COURT:  -- only; is that right?

18            MR. SWEENEY:  So the live-in and non-live-in

19   distinction goes by shift; it doesn't go by worker.  So a

20   home health aide who is hired may work both live-in and

21   non-live-in shifts, indeed may work them in the same week.

22            THE COURT:  Okay.

23            MR. SWEENEY:  So when we talk about live-in and

24   non-live-in, it's not the individual home health care

25   worker is classified in that matter; it's the very shifts

1    that they worked.

2                    THE COURT:  I see.

3                    So for Ms. Kinkead, what is the answer?

4                    MR. SWEENEY:  For Ms. Kinkead, she worked

5    live-in shifts, that's correct.

6                    THE COURT:  Only or both?

7                    MR. SWEENEY:  I'm trying to remember if she

8    worked a non-live-in shift.  I think it's only live-in.

9                    THE COURT:  Only live-in.

10                   MR. SWEENEY:  Yes.

11                   THE COURT:  How is it that Ms. Kinkead is a

12   proper class representative for --

13                   MR. SWEENEY:  This --

14                   THE COURT:  Just let me finish the question.

15                   MR. SWEENEY:  I'm sorry, Your Honor.

16                   THE COURT:  I'll give you plenty of time to

17   answer.

18                   How is it that Ms. Kinkead is a proper class

19   representative for non-live-in class members who are part

20   of the effective date class?

21                   MR. SWEENEY:  Because our claim is that all the

22   home health aides who worked for Humana, none of them who

23   worked in Connecticut, none of them were paid overtime for

24   the overtime hours they worked in the effective date

25   period regardless of whether they were live-in or

1    non-live-in home health aides.

2              THE COURT:  I see.  Okay.

3              So for folks who are non-live-ins, are there

4    differences between the way that hours were calculated for

5    a non-live-in versus a live-in?

6              MR. SWEENEY:  Yes, there were.

7              THE COURT:  And as I understand it, your claim

8    in the case is for the live-ins -- just the live-ins -- at

9    least as to Connecticut class members, 13 hours is the

10   rule?

11             MR. SWEENEY:  Yes, Your Honor.

12             THE COURT:  You don't want 14 hours, you don't

13   want 15 hours, right?

14             MR. SWEENEY:  That's correct.

15             THE COURT:  You don't want to look at one by one

16   by one how much they slept or that kind of thing, right?

17   You just want flat 13 hours that you would derive from

18   just the work records that show they worked a shift that

19   day or not.

20             MR. SWEENEY:  That's correct, Your Honor.

21             THE COURT:  That's for the live-ins.

22             MR. SWEENEY:  Yes, Your Honor.

23             THE COURT:  For the non-live-ins, what are you

24   basing it on?  What are you basing the calculation on?

25             MR. SWEENEY:  The hours worked calculation,

1  we're basing on the wage-and-hour records, Your Honor.

2          THE COURT:  So straight records claim again.

3          MR. SWEENEY:  Straight records claim,

4  Your Honor.

5          THE COURT:  All right.

6          MR. SWEENEY:  So we are bringing these --

7  challenging these policies in both states.  We believe

8  that once you rule on these policies, that what the

9  damages are are easily determined, completely and

10  objectively determined by the records.  We believe that

11  those are -- those legal questions are the common

12  questions that provide the common answers that make this

13  really appropriate for class treatment.

14          Moreover, we believe that its class-wide

15  treatment of it is the superior way to work with the

16  class.

17          I'm happy to go over the facts of the case, if

18  you'd like or I can move --

19          THE COURT:  Whatever you think.

20          MR. SWEENEY:  To be quick, I think Your Honor is

21  pretty well-versed in these, but the home health care

22  workers at issue here are people that worked caring for

23  the ill and the elderly in the community.  They were work

24  shifts, as Your Honor pointed out, either a 24-hour shift

25  known as a live-in shift, or an hourly shift, it could be

1  four, eight, twelve hours.  They were compensated for the

2  hourly shifts by the hour.  So if they worked one hour,

3  they were compensated an hourly rate.  They were

4  compensated for the live-in shifts, the 24-hour shifts, in

5  what was a flat rate.  So there was a caregiver employment

6  agreement that explained that they were compensated a flat

7  rate for eight hours' worth of work.

8              THE COURT:  Only eight hours.

9              MR. SWEENEY:  Only eight hours' worth of work.

10             Indeed, what the contract says is that if you

11  work more than that, you're supposed to let us know.  And

12  the testimony on the 30(b)(6) testimony was that if people

13  did work more than that, that Humana would compensate them

14  for more.

15             The payroll records indicate that they were

16  compensated for eight hours and that the pay was based on

17  eight hours.  And the pay stubs and the pay advices that

18  the home health care workers received were based on eight

19  hours and show the calculation based on eight hours.

20             Prior to January 1st of 2015, the Fair Labor

21  Standards Act did not require overtime payment or create

22  an exemption for overtime payment for home health care

23  workers.  That regulation was amended back in 2013 to

24  become effective on January 1st of 2015, was challenged in

25  the district court --

1          THE COURT:  Just so you know, I wrote a whole

2   ruling on that.

3          MR. SWEENEY:  Yes, you did, Your Honor.  Yes,

4   you did.

5          THE COURT:  You can probably assume my

6   familiarity with that.

7          MR. SWEENEY:  Very good.

8          And Humana began paying -- regardless of the

9   effective date of the regulation, Humana began paying

10  overtime on October 13th of 2015.

11         The first claim that we bring is that during

12  that period from January 1st of 2015 until October of

13  2015, Humana should have paid overtime wages and we're

14  seeking overtime wages on behalf of both the Connecticut

15  class and the New York class.

16         THE COURT:  Now, as I understand it, Humana --

17  and I'm sure I'll hear this from Mr. Golder or

18  Ms. Farmer -- I think they contend that they were paying

19  overtime for the non-live-ins?  I may have that wrong.

20         MR. SWEENEY:  There is a contention, I believe,

21  that they were paying overtime for the non-live-ins in

22  New York.  So there is conflicting evidence with respect

23  to that.

24         The first piece of evidence with respect to that

25  is that there was a stipulation that was so ordered by

1    Your Honor with respect to the FLSA conditional

2    certification and notice.  As part of that, they

3    represented they were giving us a list of people who were

4    classified as exempt under the Fair Labor Standards Act

5    and were not paid overtime.  In that list were people that

6    worked live-in shifts and people that worked non-live-in

7    shifts.  They have since come and made the allegation in

8    both states, I believe, that non-live-in shifts were paid

9    overtime during the effective date period.

10            The records don't reflect that for Connecticut.

11   The records reflect in Connecticut that people were not

12   paid overtime regardless of what kind of shifts that they

13   worked.

14            THE COURT:  Okay.

15            MR. SWEENEY:  The records in New York are a

16   little bit mixed.  There were 42 opt-ins, I believe, in

17   New York that we got.  We have records that were produced

18   in discovery for the 42 opt-ins.  Of those, only two

19   worked non-live-in shifts.  The others worked live-in or a

20   mix of live-in and non-live-in.

21            It appears from those records that the

22   non-live-in shifts, when they were worked by themselves

23   without live-in shifts, were compensated, were paid

24   overtime.

25            THE COURT:  In New York.

1          MR. SWEENEY:  In New York, yes, Your Honor.

2    That appears to be the case.  We don't know that for the

3    entire class, but it appears to be the case with the

4    records that were produced in discovery.

5          THE COURT:  So what you have now, facts that you

6    have now suggest that for the New York -- for your

7    New York class representatives who had non-live-in shifts,

8    that they were being paid overtime.

9          MR. SWEENEY:  So what the records show is that

10   for people that worked in weeks in which they worked

11   exclusively non-live-in shifts and the hours for those

12   shifts were over 40 hours, that they were paid overtime

13   for those hours.

14         THE COURT:  I guess then I wonder if the class,

15   again, needs to be reformulated for the New York effective

16   date class to be limited simply to the live-ins.

17         MR. SWEENEY:  Your Honor, at this point we'd be

18   comfortable with that.  In one of our briefs, we raised

19   the issue.  We've looked at the records and we're

20   comfortable from the records we see.  Although there's an

21   important distinction for that, I think.

22         In weeks in which home health care workers

23   worked both live-in and non-live-in shifts, they may well

24   have, combined, worked over 40 hours.  But they were only

25   paid overtime if the non-live-in shift hours added up to

1    overtime.

2            And I can give you an example.  And that's

3    Ms. Caillo.  Ms. Caillo worked two 24-hour shifts in a

4    week and she worked two 12-hour hourly shifts.  So she was

5    paid on an hourly rate for the 24 hours of the two 24-hour

6    shifts, but for the live-in shifts, the live-in shift

7    hours were not added to determine whether she should be

8    paid overtime or not.  The live-in shift hours were

9    treated separately.

10            Maybe a better example would be if we had

11    somebody who worked three 12-hour shifts, 36 hours of

12    non-live-in shifts, and somebody who worked three live-in

13    shifts so they would have, even under the 8-hour

14    calculation, worked 24 hours.  That person would not have

15    been paid overtime.

16            THE COURT:  But just for class definitional

17    purposes, it would be sufficient, I think, even

18    understanding that for folks who had these kind of mixed

19    schedules, some live-in, some non-live-in, the class

20    definition would still be limited to those who were

21    live-in workers who worked in a live-in capacity during

22    some weeks, and then it's a question of computation.

23            MR. SWEENEY:  Yes.

24            We have a suggestion for that.  In the class

25    definitions that we give for the unpaid hour shifts, we

 1   actually have that limitation.  So it's limited to home

 2   health workers who worked 24-hour or live-in shifts at any

 3   time.

 4          THE COURT:  Well, my definition, or at least the

 5   definition I have in my briefing, it doesn't refer to

 6   24-hour, but you mean that by live-in, right, 24 hours?

 7          Maybe we're looking at different documents.

 8          MR. SWEENEY:  I'm looking at the notice of

 9   motion --

10          THE COURT:  I'm looking at 204-1, your

11   memorandum for your unpaid hours classes.

12          MR. SWEENEY:  Excuse me, Your Honor.

13              (Pause.)

14          THE COURT:  Let me just -- when you use the word

15   "live-in," you mean 24 hours?

16          MR. SWEENEY:  I do.

17          THE COURT:  It's a 24-hour shift.

18          MR. SWEENEY:  I do, Your Honor, yes.

19          What I was referring to was the notice of

20   motion, Document Number 204, in the class definition C and

21   B, we limit both of those to home health workers, if you

22   look at the last part of those definitions, who worked

23   24 -- or live-in hour shifts at any time between -- and

24   then they have the class periods.

25          THE COURT:  I see.  Okay.  All right.

1          MR. SWEENEY:  That just ensures that if someone

2    worked both live-in shifts and non-live-in shifts that

3    they're still included in the class.

4          THE COURT:  Okay.

5          MR. SWEENEY:  So we believe that these four

6    classes meet the requirements of the Federal Rule of Civil

7    Procedure 23.

8          We believe that they meet numerosity.  We

9    believe that for New York because the class list that was

10   provided for the Fair Labor Standards Act notice is

11   greater than 40, substantially greater than 40, and in

12   fact we have 42 people from New York who opted in.

13         We believe with respect to the Connecticut

14   class, because even though the Connecticut class -- even

15   though the Connecticut class numbers are lower than 40, we

16   believe that, given who these folks are and given the

17   efficiencies of litigating the class, that at 33 people,

18   that that should be sufficient.  Moreover, for the unpaid

19   wages claim, there's a period of time that was not covered

20   by the Fair Labor Standards Act notice list.  The payment

21   for eight hours was in effect January 1st of 2015, but it

22   remained in affect even after Humana began paying overtime

23   pursuant to the change in the federal regulations in

24   October.  That is from October through January of 2016,

25   October of 2015 through January of 2016, they continued to

1    pay and account for just eight hours for a 24-hour shift.

2    And so people in the unpaid wages claim were entitled to

3    additional payment, eight hours that were credited, should

4    have been credited with at least 13 hours under

5    Connecticut law.  So we believe that numerosity is met in

6    that context.  I would say that Humana has not challenged

7    numerosity.

8         We also believe that commonality is met here.

9    We believe that there are common claims.  There are common

10   questions, if you will, to which the answers are common to

11   the class.  In this case, it is the legality of the

12   policies regarding the payment of eight hours for a

13   24-hour shift and it's the legality of Humana's decision

14   to not pay overtime beginning on January 1st of 2015.

15   Once Your Honor answers those questions, those questions

16   apply to the entire class.  And at that point we're able

17   to determine who has damages and the extent of those

18   damages from the payroll records.  The information is in

19   the payroll records.  And as Your Honor noted, we're not

20   claiming anything outside of those records.

21        We believe there's typicality as well.  We meet

22   typicality as well in the sense that the claims that are

23   being brought are the same for everyone.  Everybody in the

24   class was effected by these policies, the policies applied

25   to everybody in the class, and therefore the claims of

1    everybody in the class are typical.

2            We believe we meet adequacy.  I will say that

3    Humana has not challenged class counsel, although I'm

4    happy to address that if you'd like.  They have not

5    challenged Kinkead.  They have challenged Ms. Mathieu.

6            We believe that Ms. Mathieu is an adequate

7    representative.  The basis of the challenge, the main

8    basis of the challenge that Humana raises is that if this

9    Court determines that in New York the minimum amount of

10   hours that must be compensated for a 24-hour shift is 13,

11   as opposed to the 24 hours the plaintiffs allege, that

12   Ms. Mathieu would not have overtime claims and therefore

13   could not be an adequate representative for the affective

14   date claim and she wouldn't have standing.

15           As I believe Your Honor's aware, there is a

16   split in the law in New York.  There is New York state

17   courts, including the first and second --

18           THE COURT:  The appellate division, sure.

19           MR. SWEENEY:  -- appellate departments have

20   decided that, yes, it is 24 hours.  Some federal courts

21   have decided no, it's 13.

22           THE COURT:  All of them.

23           MR. SWEENEY:  I think all of them.  I'm not

24   aware of any that have gone the other way.

25           That issue is currently briefed before the

1  New York Court of Appeals, the highest court in the state

2  of New York.  There has not been argument scheduled at

3  this point, but we expect it to be scheduled in January or

4  February and we would expect to have the answer to that

5  question by the summer.

6           THE COURT:  Are you counsel on that?

7           MR. SWEENEY:  I am counsel on that, Your Honor,

8  yes.

9           Once that question is answered by the New York

10 State Court of Appeals, it's final.  There's no appeal to

11 that, as it's a state court issue, issue of state law.

12          And so we believe at this point, for

13 Ms. Mathieu, she has a viable claim.  It's the claim that

14 the class has pled, that she worked three 24-hour shifts a

15 week.  And if she was entitled to 24 hours' worth of

16 compensation for each of those shifts, she should have

17 been paid for 72 hours or 32 hours of overtime.

18          THE COURT:  Did she work sometimes more than

19 three of those shifts?

20          MR. SWEENEY:  She did not.  That was the most

21 that she did.

22          THE COURT:  Okay.

23          MR. SWEENEY:  And the argument on the other

24 side, if it's found to be 13 hours, she only worked 39

25 hours.

1            In support of that, they cite a number of cases

2    that all kind of come out of Judge Cote's decision in the

3    *Severin* case that are federal courts that deny class

4    certification in instances where the plaintiffs are

5    seeking class claims for 24 hours as opposed to 13.  And

6    courts in the federal context have regularly denied class

7    certification there.  They've looked at the merits because

8    they have to to evaluate the Rule 23 standards, and they

9    found that they think that the New York State Court of

10   Appeals will find that only 13 hours have to be

11   compensated.  But this case is different than that.  This

12   case is not you compensated for 13, should have paid for

13   24; this case is you compensated for 8, and whether you

14   have to pay for 13 or you have to pay for 24, you still

15   have to pay.  So those cases that they cite from *Severin*

16   on up into the future are cases that don't apply in this

17   context because the class claims here still exist

18   regardless of how the New York Court of Appeals finds.

19            THE COURT:  Is the 24 rule that's at issue

20   subject itself to discount for individual specific

21   reasons?

22            MR. SWEENEY:  No, Your Honor.  No.  The New York

23   state -- the New York state law, which is a regulation,

24   12 CRR-NY 142-2.1 states that employers must pay for all

25   hours of a shift that someone is required to be somewhere

1    and available for work.

2         THE COURT:  So even if they're sleeping.

3         MR. SWEENEY:  Even if they're sleeping.

4         And the way that we know that, Your Honor, is

5    that there is an exception for residential employees.  And

6    it says, well, if you have a residential employee, well,

7    then you can account for sleep time.  So that we know if

8    it's not a residential employee, you don't get to account

9    for sleep time.  And in New York, the law is clear -- and

10    it tracks what is now the federal law -- that a home

11    health care worker who is hired by a third party to serve

12    the third party's client is not a residential employee.  A

13    residential employee is someone, for instance, if you

14    had an au pair who worked at the house that you employed,

15    that's somebody who is a residential employee who lives

16    with you.  The home health care worker would not fit that

17    if they're employed by Humana to work there.

18         So Ms. Mathieus' claims, her adequacy, certainly

19    hinge on that merit decision that the Court of Appeals is

20    going to make.  But the claims of the class don't.  There

21    is still commonality for those claims.  And because the

22    claims are pled for the 24-hour minimum, Ms. Mathieu is an

23    adequate representative.  At this point, that decision is

24    going to be made by the Court of Appeals shortly.

25         THE COURT:  What do you recommend I do, then, in

1    terms of the Southern District of New York cases like

2    *Severin* or *Shillingford*, Judge Failla's decision?  They

3    denied certification, as I recall.

4            MR. SWEENEY:  They denied certification,

5    Your Honor, that is correct.

6            THE COURT:  Are they distinguishable or they're

7    just wrong?

8            MR. SWEENEY:  They're distinguishable.

9            THE COURT:  Tell me why.  How are they --

10           MR. SWEENEY:  In those courts, the claims of the

11   class depended on interpretation of New York state law

12   that you had to compensate for 24 hours of a 24-hour

13   shift.  And what those courts found is, well, we don't

14   think that the New York state courts are going to find

15   that.  We think they're going to follow the Department of

16   Labor that says you only have to pay for 13 hours.

17           This case, whether it's 13 or 24, Humana paid 8.

18   So they either owe 5 or they owe 16, but they owe.  So the

19   question of 13 or 24 is not a question as to whether

20   there's liability here.  The question of whether they owe

21   13 or 24 is a damages question:  How much do we owe them?

22   And that's how they're distinguishable.

23           And for that very reason, Mathieu is adequate.

24   There is a merits determination that may affect whether or

25   not she has overtime claims under the effective date, but

1    that's a decision that's going to be made in the future.

2    At this point, the way the class is pled, Ms. Mathieu has

3    the class claims and we believe has the adequacy to be a

4    class representative.

5         We also believe that this case meets the

6    predominance requirements.  For the reasons that we

7    discussed in commonality, there are common questions here.

8    Once Your Honor determines the answers to those common

9    questions, they apply across the class.  And once those

10   decisions are made, they can be applied to the payroll

11   records to determine who had damages, what the measure of

12   the damages are.  In fact, this is a case well-suited for

13   class treatment.

14        We also believe it meets superiority.  These are

15   two issues of law that need to be decided.  And by doing

16   that on a class-wide basis, the Court avoids any risk of

17   inconsistent adjudications.  Once that determination is

18   made, it applies across the class.  That's not just to the

19   benefit of the plaintiffs; it's to the benefit of the

20   defendants.  If Your Honor rules that Humana did

21   everything right, everybody in the class is bound by that.

22   And Humana has its peace.

23        We also believe it meets superiority because the

24   class claims that are here, you're going to have to

25   determine anyway.  We've got 42 opt-ins that are here from

1    New York state that worked in New York that are part of

2    the Fair Labor Standards Act case.  Their claims are in

3    the case.  Moreover, the Fair Labor Standards Act claims

4    that are being pled here and the legal issues are the same

5    as New York.  New York looks to the Fair Labor Standards

6    Act for things like how do you determine regular rate,

7    what's a day rate as opposed to a flat rate.  And it's

8    those standards that will apply to New York law; New York

9    incorporates that law.  So Your Honor is going to make the

10   decisions one way or the other.  And we think it makes

11   sense, if you're going to make the decisions, that they

12   should apply broadly across the class.

13         We also believe that this meets superiority

14   because of the nature of the workers.  These are low-wage

15   workers.  They're paid $130 a day in New York City to work

16   24 hours.  Many of them work seven 24-hour shifts a week

17   to put food on the table.  These are not people that have

18   the ability to litigate these claims on an individual

19   basis.  Even if they wanted to, they would not have the

20   time to.  And they probably wouldn't be able to find

21   counsel to litigate it on their behalf.  And we believe

22   that that goes to the superiority analysis as well.

23         And so Your Honor, we believe that this is an

24   appropriate case for Rule 23 treatment.

25         THE COURT:  Do you want to address the

1    complaint?

2            MR. SWEENEY:  The motion to amend the complaint?

3            THE COURT:  Yes.

4            MR. SWEENEY:  Yes, I do want to address that,

5    Your Honor.

6            So the first thing I would say with respect to

7    the motion to amend the complaint is that we believe --

8    and I don't think that Humana is raising anything

9    differently -- that this is within your discretion.

10   You're not bound to deny it; you're not bound to grant it.

11   Although we do think that this falls within the Rule 23

12   policies.

13           To the extent that Rule 23 looks to efficiency,

14   we believe that adding Ms. Caillo is most efficient way

15   forward.  We still believe that Ms. Mathieu is a

16   legitimate and an adequate representative.  That may

17   change in the future.  And if it does, rather than try to

18   substitute or add a class representative at that point, we

19   believe it makes sense to do it now.

20           Ms. Caillo, even by the standard that Humana

21   applied to Ms. Mathieu, is an adequate representative.

22   She worked two 12-hour shifts a week, 24 hours, and she

23   worked two live-in shifts a week, 26 hours even under the

24   13-hour calculation.  She worked 50 hours a week.  And she

25   wasn't paid overtime.  And therefore no matter how the

1    Court of Appeals decides the 24-hour issue, she's an

2    adequate representative.

3           We believe it also makes sense --

4           THE COURT:  Essentially, you would propose to

5    have her become a co-class representative.

6           MR. SWEENEY:  Yes, Your Honor, have her added as

7    a class representative.

8           We also believe it's consistent with the policy

9    of protecting the class.  This litigation is about the

10   class; it's not about Ms. Mathieu.  To the extent that

11   Ms. Mathieu becomes inadequate for some reason, it's not

12   the class that should suffer for that.  And in fact,

13   courts regularly add class representatives or substitute

14   class representatives much later in the litigation,

15   sometimes even after the class has been certified, because

16   it is the protection of the class that matters.  We think

17   adding Ms. Caillo at this point solves that.

18          We also believe that there is no prejudice here.

19   Humana has raised the issue that we did this late and we

20   should have done it earlier and it's changed their

21   litigation strategy.  This is a difficult group of people

22   to deal with.  I'm trying to contact people that are

23   literally working seven days a week, 24 hours a day, and

24   aren't supposed to take my call while they're working.

25   It's not as if we have class representatives that we can

```
 1    just easily trade in.  And we worked very hard -- when the
 2    issue came up with Ms. Mathieu, we worked very hard to try
 3    to find somebody who would meet the complaint that Humana
 4    raised.  Ms. Caillo has the exact same claims.  If the
 5    Court of Appeals finds 24 hours, her claims and
 6    Ms. Mathieu's claims are the exact same, there's no
 7    difference to them.  There's no change in litigation
 8    strategy here.  There's nothing different about the case.
 9    Your Honor gave Humana the chance to depose Ms. Caillo,
10    they had a full deposition of her.  They haven't raised
11    issues with her personally having a conflict or not being
12    personally adequate in any way.
13            And so we think it makes sense, for efficiency's
14    sake, to protect the class to amend the complaint to add
15    Ms. Caillo.  We don't believe there's prejudice here.  We
16    don't believe Humana has shown prejudice.  They've got to
17    prove their case.
18            THE COURT:  Thank you very much.
19            MR. SWEENEY:  Thank you, Your Honor.
20            THE COURT:  Mr. Golder.
21            MR. GOLDER:  Thank you, Your Honor.
22            I'm just going to pick up something that
23    plaintiffs' counsel said towards the end of the colloquy
24    with the Court which was saying that the New York class
25    members are paid $130 a day.
```

1          THE COURT:  I saw you writing something down as

2     soon as he said that.

3          MR. GOLDER:  Yes.  So I wanted to bring it up

4     with the Court, and we've argued that in our briefs,

5     Your Honor, that is what they were paid.  They were paid

6     $130 a day, that's what the agreement says.  And to the

7     extent that plaintiffs are saying that the agreement is

8     unclear, their new proposed class representative,

9     Ms. Caillo, has said that she contacted Humana

10    SeniorBridge as soon as she started working a live-in

11    shift and she was informed specifically you're paid $130 a

12    day.  They weren't paid 8 hours a day.  They were paid --

13    they weren't paid for eight hours of work; they were paid

14    $130 a day.  They were paid a day rate, Your Honor.  So

15    they were intended to be working for work eight hours,

16    although we pointed out to Your Honor that the deposition

17    testimony about how much they thought they were going to

18    be working and how much they thought they were getting

19    paid is kind of all over the map in terms of whether or

20    not they thought they were getting paid a day rate,

21    whether they thought they were getting paid for 13 hours,

22    and whether they thought they were paid for 8 hours.

23    That's the first --

24          THE COURT:  So help me connect the dots there.

25    I'm sorry if I'm not picking up on this.  You say that

1   simply because it was a day rate, no matter the amount,

2   that that has an impact?  Essentially, it makes it that

3   there's no hours calculation?

4           MR. GOLDER:  Yes.  And let me try to --

5           THE COURT:  Explain that.

6           MR. GOLDER:  -- give context to the Court.  I'm

7   talking really about the New York class here, Your Honor.

8           THE COURT:  Okay.

9           MR. GOLDER:  And in New York, unlike

10  Connecticut, which tracks the FLSA exemption, in New York,

11  it wasn't as though before the effective date happened,

12  before the new rule was changed, that there was no

13  limitations in terms of -- or no protections to these

14  workers.  The New York law was clear.  If these workers

15  were exempt under the FLSA, then under New York law all

16  they needed to be paid was New York minimum wage and

17  New York minimum wage overtime for all hours worked.  As

18  long as you were above that amount, there is no claim

19  under New York law.  There's no claim to this Court that

20  they were misclassified as exempt prior to January 1,

21  2015, because they were doing too much personal care or

22  anything like that.  So before that, they don't have a

23  claim.

24          THE COURT:  So is this an argument about the

25  unpaid hours class then for New York or is it an argument

1    about effective date, or both?

2            MR. GOLDER:  It's both, Your Honor.  Because

3    under -- the unpaid class before January 1, 2015, there

4    are no claims.  They got a day rate and they made more

5    than minimum wage and minimum wage overtime, assuming 13

6    hours.  If Your Honor is going to disagree with every

7    single New York federal court and hold that New York law

8    says 24 hours, not 13, then that would be a different

9    story, Your Honor.

10           THE COURT:  I see.

11           MR. GOLDER:  And that was the other point I

12   wanted to raise, Your Honor -- did you have questions

13   before I --

14           THE COURT:  No, go ahead.

15           MR. GOLDER:  That was the other point I wanted

16   to raise, Your Honor, about the New York class.  I think

17   Your Honor was touching on this in the very beginning of

18   the argument which is how the Court is going to define the

19   class.  It's not as simple as this is just a records

20   class.  That sounds simple, it sounds easy, and it sounds

21   like something that can be certified by class, but that's

22   not the case.  If it was the case, then all these New York

23   federal courts that have analyzed this issue would have

24   granted class certification as to the 24-hour piece, but

25   they have not.  They denied class certification across the

1      board.  You know, if you look at the courts in New York

2      that have handled these same kind of cases, at most they

3      are certifying effective date classes for a 13-hour day

4      work --

5                 THE COURT:  Maybe I misunderstood those cases in

6      New York.  I understood the cases in New York were

7      concerned in part with doing kind of worker-by-worker

8      tabulations of how many hours were done, how many hours

9      they'd slept and all that; is that right?

10                MR. GOLDER:  That's right, Your Honor.

11                THE COURT:  Is that part of what the concern

12     was?

13                And that was because plaintiffs had claimed, I

14     think, in those cases, essentially were seeking

15     compensation for the total hours worked.

16                I understand plaintiffs here to be framing their

17     claim a bit differently to say we will be bound by either

18     the 24-hour rule, we think that the 24-hour rule is the

19     right rule, but if we're wrong about the 24-hour rule,

20     then we agree it's just 13 hours, and we're not going to

21     be coming up and saying for any one of our particular

22     class members, well, this person should get 16 and that

23     person should get 18.  If I have misunderstood that, let

24     me know.  I hope counsel will let me know.  I thought that

25     that was what was going on in this case in terms of the

1    plaintiffs' strategic position here.

2              Is that right?

3              MR. GOLDER:  I don't want to speak for

4    plaintiffs, Your Honor.

5              THE COURT:  It seems to be what they've said

6    they'll do.  Is that incorrect?  Is this the first time

7    you're hearing this?

8              MR. GOLDER:  Again, Your Honor, I don't want to

9    speak for the plaintiffs.  I don't think that's incorrect,

10   Your Honor, but I don't want to speak for the plaintiffs.

11             THE COURT:  So does that mean then that the

12   New York cases are distinguishable in the sense that in a

13   worst-case scenario for plaintiffs, they'll settle for

14   just 13?

15             MR. GOLDER:  Again, I think what plaintiffs are

16   doing here, cleverly, is trying to have their cake and eat

17   it too.

18             THE COURT:  They're trying to have some of their

19   cake, right?  Not the whole cake, right?

20             MR. GOLDER:  Well, they're essentially putting a

21   marker on the 24 issue.  And I don't know how specifically

22   it was pled in every single one of those New York federal

23   cases, but --

24             THE COURT:  If I adopted the 24-hour rule,

25   though, that would be -- essentially if I follow the

1    appellate division's rulings on this and did not follow

2    the New York federal courts, that would be just a

3    categorical rule, right?  I wouldn't have to get into

4    trying to do worker-by-worker tabulations, right?

5              MR. GOLDER:  I agree with that, Your Honor.

6              THE COURT:  All right.  That's the questions I

7    had.

8              MR. GOLDER:  Okay.

9              But again, if Your Honor were to do that,

10   Your Honor, as I know Your Honor knows, would be

11   disagreeing with every other New York federal court that

12   has examined the issue.

13             THE COURT:  Sure.

14             MR. GOLDER:  And again, it's not as though --

15             THE COURT:  And they've looked at it basically

16   from the perspective of deferring to the administrative

17   regulation there?

18             MR. GOLDER:  They are deferring to New York

19   Department of Labor's --

20             THE COURT:  That's why they essentially have

21   taken a different tact than the appellate division has.

22             MR. GOLDER:  Yes, Your Honor.

23             And again, these federal courts, some of them

24   really very recent decisions, Your Honor, didn't say let's

25   hold this issue in abeyance, let's see what the Court of

1    Appeals say.  It's not as though this issue is going to be

2    decided in a month; this is something that might drag on

3    into the summer.  Those courts, those New York federal

4    courts, didn't feel the need to do that; instead just

5    denied it and focused on the claims that, quite frankly,

6    Your Honor, are the most consistent with this Court's

7    order on the effective date, the motion to dismiss that

8    was filed in this Court.

9              THE COURT:  Okay.

10              MR. GOLDER:  That's what tracks the closest with

11    this Court's prior decision.

12              THE COURT:  I see.

13              MR. GOLDER:  But in terms of the unpaid hours

14    claims in New York before and after, it all depends on

15    whether or not a live-in got the right amount of sleep

16    time, uninterrupted, five hours in a night and meals and

17    the like.  And plaintiffs are trying to kind of tiptoe

18    past that graveyard by saying we're not going to look at

19    that issue, why don't we just hold on to that until the

20    summer when the Court of Appeals decides that issue.  At

21    this point, the way the law is today, that's what this

22    Court is deciding class certification on, not what may or

23    may not happen in the summer.  And that's what those other

24    New York federal courts have done.

25              THE COURT:  But if the choice is a binary one

1      between 13 or it's 24, but not something in between, is

2      there anything to say that the Court couldn't in that

3      situation then say essentially there's no kind of

4      individual worker-by-worker determination to be made here?

5              MR. GOLDER:  Potentially, Your Honor.  But it's

6      not even as simple as a binary choice.  This is not

7      something that is easy for the Department of Labor and for

8      the legislature to figure out how to pay these workers.

9      These are people who work in other people's homes, often

10     considering them their own homes for limited or extended

11     periods of time.  Again, we've pointed this out to

12     Your Honor, if you look even at the Federal Regulations

13     785.23, it specifically says it's very difficult to figure

14     out how much these people are working, when they're

15     working, when they're doing things for their own

16     personal --

17             THE COURT:  Is it necessary for me at this point

18     to make a choice between the 13- or the 24-hour rule?

19     Could I essentially certify a class saying it's going to

20     be one of those two and not something in between or not

21     something worker by worker and then wait until when we

22     actually have resolution of merits issues in the case?  At

23     that point in time I get briefing and I look at all those,

24     as you say, you believe to be persuasive cases from the

25     federal courts of New York on the regulation and I look at

1  plaintiffs' viewpoint of probably the New York Appellate

2  Division cases at that point.  I think you would agree

3  that if the Court of Appeals decided the issue, that's

4  pretty much it.  So I don't really have to decide at this

5  stage, do I, between who is right on the 13 and who is

6  right on the 24?

7       MR. GOLDER:  Again, Your Honor, every other

8  New York federal --

9       THE COURT:  I know they have.  I know they have.

10  But it's not a requisite for the class certification

11  determination, which is not supposed to be inherently and

12  ultimately a merits determination of the case of the

13  disputed legal issues, right?

14       MR. GOLDER:  It's not a merits issue,

15  Your Honor, but the Supreme Court and the Second Circuit

16  is clear that the merits overlap with the class issues.

17  And this is definitely one of those circumstances when it

18  does.

19       THE COURT:  I think I understand your point on

20  that.

21       MR. GOLDER:  Thank you, Your Honor.

22       And again, this dovetails into the issues with

23  the named plaintiff in New York who does not have a viable

24  class claim.  Maybe a viable individual claim under

25  New York law at this point, because if she wanted to bring

1  an individual case and say I know I only work three days a
2  week and I know New York law says, or these federal
3  courts, 13 hours a day, but I didn't sleep every night, so
4  some weeks I was working, you know, 20 hours that day, so
5  I was over 40 hours into overtime.  But, Your Honor,
6  without that individualized inquiry, you can't get there
7  for the class.

8              And the same issue exists not just for
9  Ms. Mathieu but exists within the entire putative class.
10 Even if this Court narrows some focus to live-in -- and
11 again, it's hard to really put exactly, you know, what the
12 definition plaintiffs are looking for here for the
13 New York class, but there are thousands of home health
14 workers and the vast majority of them never worked any
15 live-in shifts, and then there are folks who, like
16 Ms. Mathieu, only worked three live-in shifts, and then
17 there might be folks who only worked one live-in shift.
18 You know, these workers, it varies across the board in
19 terms of their schedules and what they're working and the
20 like.  And those folks exist within the putative class.
21 So even with the definitions that plaintiffs have, even if
22 this Court is going to say 24 hours is the rule in
23 New York, it still doesn't necessarily cure the issue of
24 having a putative class with no Article III standing.

25             And plaintiffs pointed out the *Strauch* decision

1   issued by Judge Arterton on the issue of a fail-safe class

2   and the way that it was -- and by the way, just as a

3   preliminary matter, that case is up on appeal.  But in any

4   event, the issue there was they were folks within the

5   putative class that had no viable Article III standing.

6   And the way that the Court fixed the class definition was

7   in that case there were records that said exactly how much

8   the folks worked.  But unlike here where there's an issue

9   of, well, the records may not necessarily tell you the

10  whole story because if they're working live-in shifts and

11  working non-live-in shifts, it's not necessarily minute by

12  minute, hour by hour; in that case, it was.  So it was

13  very clear you could look at the records and say, okay,

14  this person worked more than 40 hours this week, this

15  person worked more than 40 hours that week.

16          THE COURT:  So is your argument then at this

17  point -- I know you have lots of arguments, but is your

18  argument that the class definitions are defined in such a

19  way that they sweep in people who do not have an injury in

20  fact?

21          MR. GOLDER:  Yes, Your Honor.

22          THE COURT:  So let's just start with the

23  effective date --

24          MR. GOLDER:  Yes, Your Honor.

25          THE COURT:  -- classes.  You heard me suggest

1    that that has to be reformulated in a way that actually

2    includes people who have worked overtime.  If that's done,

3    and knowing that you don't agree that the regulation was

4    effective during the period of time until October 12,

5    2015, but if you're not correct about that pure legal

6    issue and the class is redefined to include only people

7    who worked overtime or more than 40 hours in the week, in

8    what way would that class definition include people who do

9    not have Article III constitutional standing?

10                 MR. GOLDER:  Again, sticking to the New York

11   class, Your Honor, where does that leave Ms. Mathieu?  She

12   worked -- maybe she worked 30 hours a week.

13                 THE COURT:  Where that leaves Ms. Mathieu is not

14   within the scope of the class definition if and only if

15   the 13-hour rule is ultimately adopted in the case.

16                 So a class definition, as I understand it,

17   doesn't have to identify each person by name.  It needs to

18   have a class representative who has standing for sure for

19   themselves, I understand that.  But apart from the

20   Ms. Mathieu issue, is there something about the way that

21   that class -- just for the effective date classes both in

22   Connecticut and New York are defined that you believe I'm

23   somehow including people who don't have constitutional

24   standing.

25                 MR. GOLDER:  In other words, how are we

1    determining who is in that?

2              THE COURT:  Right.  If I included people who

3    didn't work overtime, that would be obvious error.

4              MR. GOLDER:  Correct.

5              THE COURT:  Because then I'm including people

6    who have not been injured.  Okay.

7              But if I do that, it strikes me that the

8    class -- the class may be assailable for all sorts of

9    other reasons, you can go down the list in Rule 23.  But

10   one of those requirements is that there be standing of

11   each of the class members.  That's what I'm trying to make

12   sure that I'm understanding if there's an argument that

13   somehow the proposed class definitions here, both for

14   effective date and for unpaid hours, are overinclusive and

15   sweep in people who don't have standing.

16             MR. GOLDER:  Right.

17             And Your Honor, in a typical case, stating it

18   that way like in the *Strauch* case would have been fine.

19   But here, subsumed within that definition, Your Honor, is

20   the issue of whether or not an individual -- and really

21   New York is the bigger problem -- is whether or not that

22   individual worked a live-in shift and was compensated for

23   unused meal breaks or sleep time and the like.  In other

24   words, how are we getting to what's overtime.  That is

25   baked into the class definition.  And again, that's where

```
 1    there is a potential fail-safe issue that overlaps with

 2    the merits here.  So that's why we think that class

 3    definition, although a lot closer to something that's

 4    ascertainable, still is unascertainable.  And that's the

 5    same reason why these federal courts in New York are

 6    denying class certification on the 24-hour issue because

 7    subsumed within that issue is an individualized issue.

 8              THE COURT:  Okay.

 9              MR. GOLDER:  So does the Court have --

10              THE COURT:  Not on that point.

11              MR. GOLDER:  Okay.

12              Does the Court have questions on some of the

13    other arguments that we have?

14              THE COURT:  I think you've contended as a matter

15    of fact you believe that the -- and you heard Mr. Sweeney

16    describe it.  Did you agree with his recitation

17    essentially that it sounds like as to the New York

18    non-live-ins, that they were in fact paid overtime?

19              MR. GOLDER:  That's my understanding,

20    Your Honor.

21              THE COURT:  But it's an open issue as to the

22    Connecticut non-live-ins.

23              MR. GOLDER:  It's an open issue whether they

24    were paid overtime?

25              THE COURT:  Whether they were paid overtime even
```

1   during the effective date period.

2          MR. GOLDER:  They were compensated in a way that

3   was going to -- during the effective date period -- yes,

4   Your Honor, I see the question you're asking me.

5          THE COURT:  I assume you didn't pay them

6   overtime during that period because you thought they were

7   FLSA exempt.

8          MR. GOLDER:  Correct, Your Honor.

9          THE COURT:  That was a question I had.

10          MR. GOLDER:  Okay.

11          THE COURT:  Do you want to address the other

12   requisites for class certification, why you don't think

13   they're met, if you'd like?

14          MR. GOLDER:  And again, Your Honor, we can focus

15   our arguments on adequacy.  I think we've talked about

16   Ms. Mathieu.  I don't know how much more the Court wants

17   to talk about --

18          THE COURT:  What about Ms. Caillo?  There's some

19   overlap here in terms of the two motions.  But if I were

20   to allow Ms. Caillo to be a co-class representative, why

21   doesn't that solve the problem?

22          MR. GOLDER:  It doesn't solve the problem for

23   the reasons that we argued in our opposition to the motion

24   to amend.  It is far too late for Ms. Caillo to join this

25   case was a class representative.  Rule 16 is very clear

1    that they need to establish good cause.  And it's not

2    about our prejudice that's flipping it on its head, that's

3    not what's going on here.  To the extent this Court -- and

4    again, the Court's role is to protect the interests of the

5    class, not necessarily class counsel in this case.  There

6    is another class action going on here in federal court,

7    not this court but in New York court --

8              THE COURT:  How would it protect the interests

9    of the class if essentially I kind of bifurcate them and

10   multiply the legal proceedings by doing that?

11             MR. GOLDER:  Well, if this Court denies Rule 23

12   class certification in New York because of inadequate

13   class representative, then there is a class representative

14   in the *Green* matter who does not suffer from the same

15   problems of Ms. Mathieu.  So the same arguments are going

16   to be made in that case, and Judge Nathan is going to hear

17   those arguments and decide those arguments.  That's how

18   the class would be protected.

19             THE COURT:  I understand.  Okay.

20             And if I decided that I need to look at

21   prejudice, you've now deposed Ms. Caillo, what's your

22   prejudice?

23             MR. GOLDER:  Well, we outlined a lot of areas of

24   prejudice for Your Honor.  I'm not aware of any case that

25   has proceeded like this where this late in the game after

1    class certification the Court allowed a new class

2    representative to walk in and be the named representative.

3    The fact that we're even standing here having to do

4    additional briefing, and we outlined to the Court we

5    looked at Ms. Mathieu within the guise of the law and what

6    federal courts were saying and understood her claims to be

7    what they were and understood the weaknesses to be what

8    they were, and we developed our litigation strategies.

9    You can't put that genie back in the bottle.  We've

10   already done all of that.  And now we're here.  And on the

11   eve of class certification, plaintiffs have added someone

12   else to cure that.  And that is something that we didn't

13   take into account when we did our class discovery, didn't

14   take into account how many folks we wanted to depose or

15   any of that, Your Honor.  So that's extreme prejudice, in

16   our view.

17            THE COURT:  You're not opposing class

18   certification in the *Green* matter then, I take it?

19            MR. GOLDER:  I'm sorry, Your Honor?

20            THE COURT:  You're not opposing class

21   certification in the *Green* matter?  Because they already

22   have the other representative in the *Green* case down in

23   New York before Judge Nathan, so I'm sure that you're not

24   opposing class certification.

25            MR. GOLDER:  Not opposing?

1          THE COURT:  You're not going to oppose it there?

2     You're saying, hey, you know, you can hold off, don't let

3     them amend the complaint here, there's another matter

4     going on in New York, different plaintiff there.  So I

5     assume that you're not opposing class certification.

6          MR. GOLDER:  We are opposing class certification

7     in that --

8          THE COURT:  In front of Judge Nathan.

9          MR. GOLDER:  Yes, Your Honor.  But we're not

10    opposing class certification on the grounds that we are

11    here with the adequacy of the class representative.

12         THE COURT:  I see.

13         So is this having your cake and eating it too,

14    then, that way?  In the sense that you're basically trying

15    to get me to say, well, everything is fine because the

16    New York person can handle this and be the representative,

17    but then it turns out that you'll be working against the

18    New York action as well.

19         MR. GOLDER:  I don't think it's the case of

20    everything will be fine.  It's very possible that we go in

21    front of Judge Nathan and Judge Nathan says the same thing

22    that you're saying, Your Honor, or to the extent that you

23    are.  It's not as though -- I know plaintiffs have tried

24    to convey to the Court that we are doing something under

25    the color of night and we're litigating two cases secretly

1  without knowledge of the other judge knowing what's going

2  on.  And we've been very up front with both Courts about

3  the status of the case and what's happening in those

4  cases.  We were citing your opinion to Judge Nathan when

5  we moved to dismiss the case.  We are not doing anything

6  that we're hiding from either Court.  So we're not really

7  having our cake and eating it too.  We're just going to

8  have to have that fight in front of Judge Nathan.

9          THE COURT:  Okay.

10          So when we talk about protecting the class, and

11  you told me -- I thought I heard you say you protect the

12  case here because the class is protected by the fact that

13  there's an action going on in New York before Judge Nathan

14  in the *Green* case.  But if you have your way, there won't

15  be an action going on in New York before Judge Nathan with

16  the *Green* case.  So if I am to look at what you've told me

17  the value I should be protecting here, which is protecting

18  the class, then the remedy you're promising me seems a bit

19  illusory.

20          MR. GOLDER:  Well, Your Honor, it's protecting

21  the class in that the same claims and the same class is

22  going to be heard in front of Judge Nathan is going to be

23  heard in front of this Court.  So if there was a situation

24  where this was the only case, then if you denied class

25  certification because of lack of an adequate named

1   representative, then the class would have nothing else,

2   right?

3                THE COURT:  I see the point, okay.

4                MR. GOLDER:  But that's not the case here.

5   There is another class.  I'm not saying to this Court that

6   we're not going to oppose it in *Green*.  I'm not saying to

7   this Court that if you deny New York class, that means

8   Judge Nathan is going to grant the New York class.  The

9   class is going to be in the same exact position as it is

10  now, which is a motion for class certification in front of

11  a federal court who is going to decide whether or not this

12  meets the Rule 23 requirements.

13               THE COURT:  Okay.

14               MR. GOLDER:  So that's how the class is

15  protected.

16               THE COURT:  I understand.

17               MR. GOLDER:  So in addition, I know we filed

18  something late with the Court about the New York

19  Department of Labor in terms of the effective date.  I

20  don't know if the Court had a chance to look at that.

21               THE COURT:  I did look at that.  You think I

22  should defer to that?

23               MR. GOLDER:  We only -- and by the way, we only

24  got that late last week.

25               THE COURT:  I know that.  But I looked at the

1    document, I couldn't figure out quite the argument.  It

2    looked to me like it's dated the end of 2015.  So the

3    agency there didn't have the benefit of any kind of later

4    court decisions that look at this issue.  Right?  Of the

5    effective date.  Basically, just made their call.  They

6    don't have any kind of reasoning or much reasoning there

7    about the effective date, do they?

8            MR. GOLDER:  Well, it made their call, and we

9    don't know what their reasoning was.  Just because it

10   doesn't exist on the paper does not mean that they did not

11   engage in an analysis.  And that is the agency that has

12   the police power to enforce New York law.  So presumably

13   they are not making these determinations willy-nilly.  We

14   got this document through a FOIA request.  So we got what

15   we got.  And the reason why -- it's unclear why we got it

16   so late, but we got it when we got it.  But the Department

17   of Labor charged with enforcing the specific New York law,

18   that's the determination they made about when the

19   effective date happens.  And we appreciate that it

20   contradicts this Court's analysis that's been followed by

21   a lot of other courts, but I would just -- I'm not going

22   to retread old ground, Your Honor.

23           THE COURT:  No, I get that.  But usually I think

24   when I look at administrative regulations or

25   interpretations of some sort, there's usually an

```
 1   explanation of why they've chosen a particular rule.  So
 2   that's -- and this isn't even a regulation.  It's a staff
 3   memo.  I'm looking at, just for record's sake, it's
 4   Doc. 289.  It's just a staff memo, right?
 5            MR. GOLDER:  It's a staff memo, but a memo
 6   drafted by the administrator of the New York --
 7            THE COURT:  The acting director.
 8            MR. GOLDER:  Yeah.
 9            THE COURT:  It doesn't go in and explain this is
10   why, kind of as a matter of reasoned interpretation why
11   this date is being chosen versus the earlier date, right?
12            MR. GOLDER:  Yes, your Honor.
13            THE COURT:  And for all I know -- do we know
14   anything about whether this is still effective?  In other
15   words, has the -- has Ms. McCann or the acting director or
16   other personnel at the New York Department of Labor
17   actually looked at this issue in light of the tsunami of
18   cases that have come down now explaining why the effective
19   date should have been when the DOL said it should be
20   effective?
21            MR. GOLDER:  I don't know that standing here,
22   Your Honor.
23            THE COURT:  So I should blindly defer to this
24   staff memo?  That's the position?
25            MR. GOLDER:  The Court should take it into
```

 1    account.

 2              THE COURT:  Well, no.  Should I take it into

 3    account or am I bound by it?

 4              MR. GOLDER:  I wouldn't say this Court is bound

 5    by it.  I don't think a court is ever bound by a

 6    regulation from --

 7              THE COURT:  So I give it *Auer* deference, an

 8    administrative agency has authority to construe its own

 9    regulations if the regulations are ambiguous in some

10    manner?

11              MR. GOLDER:  Yes, Your Honor.

12              Did Your Honor have any other questions?

13              THE COURT:  I don't think so at this point.  I'd

14    love to hear from you if you have other major points.

15    There's a lot of points that are made in the briefing

16    here.  And if you have major ones that you want to make

17    sure I'm focusing on looking at, that would be helpful to

18    me.

19              MR. GOLDER:  Yes, Your Honor.

20              I think the most major argument that counsels

21    against granting class certification in New York -- and I

22    will say candidly that our arguments against class

23    certificate are far stronger in New York than they are in

24    Connecticut and conditional certification.  I'm not just

25    saying to this Court about the named plaintiff having a

1    problem, that's one of the issues.  But the biggest issue,

2    Your Honor, is the way the class is defined by plaintiffs.

3    And this Court can sua sponte reform the class if this

4    Court, in its discretion, decides to do that.  But it's

5    not the Court's obligation to do that.  It's the

6    plaintiffs' obligation to come forward with a class

7    definition that can be certified under Rule 23.  And

8    plaintiffs have not done that.

9         As I've said to Your Honor, the biggest problem

10   is within this group there are folks who don't have

11   standing.  And within this group is subsumed within any

12   definition this Court comes up with, assuming -- well,

13   I'll get to that point in a minute -- subsumed within the

14   definition that this Court has discussed this afternoon is

15   the issue of whether or not this individual should be

16   getting paid 13 hours under New York law or 24 hours under

17   New York law.  And the state of New York law right now,

18   pursuant to the six federal judges, is that it's 13.  So

19   there is an individualized issue that's always going to be

20   baked into that if we're looking at 24 hours.  If we were

21   looking at a 13-hour class, that would be a different

22   story.  But if we're looking at a 24-hour class, that's

23   the problem.  And there's -- I know Your Honor has read

24   the cases.  There are other cases where plaintiffs have

25   moved for a number of classes, a 24-hour class and an

1   effective date class for 13 hours.  And across the board,

2   the certified class, if there's any, there's some cases

3   like *Heredia* and *Shillingford* that have denied Rule 23

4   class certification in its entirety.  But the only classes

5   that survive are the 13-hour effective date classes.

6               THE COURT:  Do you want to say anything else

7   about the complaint?  I think you've made your point.

8   It's governed by Rule 16, it has to be just cause, and you

9   believe also there's prejudice.

10               MR. GOLDER:  Yes, Your Honor.  We outlined all

11   the arguments in our papers.  If the Court has any

12   questions, I'm happy to answer any of those questions.

13               THE COURT:  I don't right now, thank you.

14   Appreciate it.

15               Mr. Sweeney, anything else?

16               MR. SWEENEY:  Very briefly, Your Honor.

17               I just wanted to address -- I just wanted to

18   address Counsel's opening argument regarding the day rate.

19               Of course that's a hotly disputed argument, and

20   whether this was a day rate or this was a flat rate for

21   eight hours is a question of law.  It is an

22   extraordinarily good reason to certify this class so that

23   it can be applied class-wide.

24               The only other thing was with the New York

25   Department of Labor enforcement memo, plaintiffs would

1   argue that's not even due *Auer* deference, maybe not even

2   *Skidmore* deference.  It is an enforcement manual.  It's

3   not intended to be something that interprets the law for

4   purposes of adjudication.

5              Thank you, Your Honor.

6              THE COURT:  Thank you.

7              So I appreciate the parties' arguments.  I'm

8   going to take the motions under advisement.

9              We'll stand in recess.  Thank you.

10                 (Proceedings adjourned at 3:18 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T E

3

4  RE: DAVERLYNN KINKEAD, Individually and on behalf of all
       others similarly situations v. HUMANA, INC., ET AL.
5                     No. 3:15CV1637(JAM)

6

7           I, Diana Huntington, RDR, CRR, Official Court

8  Reporter for the United States District Court for the

9  District of Connecticut, do hereby certify that the

10  foregoing pages 1 through 56 are a true and accurate

11  transcription of my shorthand notes taken in the

12  aforementioned matter to the best of my skill and ability.

13

14

15

16

17                      _____/s/_____

18                      DIANA HUNTINGTON, RDR, CRR
                        Official Court Reporter
19                      United States District Court
                        141 Church Street, Room 147
20                      New Haven, Connecticut 06510
                        (860) 463-3180
21

22

23

24

25