UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVERLYNN KINKEAD, SHIRLEY CAILLO, and CLAUDE MATHIEU, individually and on behalf of all others similarly situated, | ) ) ) ) ) | |
| | ) | Case No.: 3:15-cv-01637(JAM) |
| Plaintiffs133, | ) | |
| vs. | ) | Jury Trial Demanded |
| | ) | |
| HUMANA, INC., HUMANA AT HOME, INC., and SENIORBRIDGE FAMILY COMPANIES (CT), INC. | ) ) ) | |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFFS' MEMORANDUM IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Philip Bohrer (*pro hac* vice)
phil@bohrerbrady.com
Scott E. Brady (*pro hac vice*)
scott@bohrerbrady.com
BOHRER BRADY, LLC
8712 Jefferson Hwy., Suite B
Baton Rouge, LA  70809
Telephone: (225) 925-5297
Facsimile: (225) 231-7000

*Counsel for Plaintiffs*

Dan Getman (ct22515)
dgetman@getmansweeney.com
Michael J.D. Sweeney, Esq.
msweeney@getmansweeney.com
GETMAN, SWEENEY & DUNN, PLLC
260 Fair Street
Kingston, NY  12401
Telephone: (845) 255-9370
Facsimile: (845) 255-8649

*Counsel for Plaintiffs*

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

STATEMENT OF UNDISPUTED FACTS ..................................................................... 4

ARGUMENT .................................................................................................................. 4

   I.  SUMMARY JUDGMENT STANDARD ........................................................... 4

   II.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR
      FLSA OVERTIME CLAIMS ............................................................................. 5

      A.  Plaintiffs Became Eligible for FLSA Overtime on January 1, 2015 ................... 5

      B.  Humana Did Not Pay FLSA Overtime Between January 1 and
         October 15, 2015 ................................................................................................. 6

      C.  The FLSA Mandates that Workers Assigned 24-Hour Shifts Be
         Credited with a Minimum of 24 Hours of Work Per Day ................................... 6

      D.  The Regular Rate For Live-in Shift Plaintiffs Is An Hourly Rate
         Equal To Their Daily Wage Divided by 8 hours ............................................... 14

      E.  Summary Judgment on FLSA Claim .................................................................. 17

   II.  CONNECTICUT EFFECTIVE DATE CLASS CLAIMS ............................... 18

      A.  The Connecticut Class Became Eligible for State Overtime on
         January 1, 2015 ................................................................................................... 18

      B.  Live-in Shifts Require Payment for 24 Hours ................................................... 18

      C.  The Regular Rate For Purposes of Connecticut State Law Overtime
         Is the Same As the FLSA Regular Rate ............................................................ 19

      D.  Overtime Owed .................................................................................................. 20

      E.  Gap Time Owed ................................................................................................. 20

   III.  CONNECTICUT UNPAID HOURS CLASS CLAIM ..................................... 21

      A.  Connecticut Unpaid Hours Class Members Are Entitled To Pay For
         Uncompensated Hours During 24-hour shifts .................................................... 21

   IV.  NEW YORK EFFECTIVE DATE OVERTIME CLAIMS ............................. 22

      A.  New York Class Members Are Entitled to Time and a Half Their
         Regular Rate During the Effective Date Period. ................................................ 22

B.  Minimum Hours per 24-Hour Shift..................................................................... 22

C.  The Regular Rate for New York ...................................................................... 25

D.  Overtime Owed ............................................................................................. 25

E.  Gap Time Owed ............................................................................................. 26

V.  NEW YORK UNPAID HOURS CLASS CLAIM ........................................................ 27

CONCLUSION............................................................................................................. 29

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) .......................................................... 5, 23

*Andryeyeva v. New York Health Care, Inc.,* No. 11, 2019 WL 1333030 (N.Y. Mar.
    26, 2019) ............................................................................................. 10, 22, 24, 25

*Animas v. Balcon Quiteno, Inc.,* 14CV3763CBAVVP, 2015 WL 13731359
    (E.D.N.Y. Sept. 14, 2015), *report and recommendation adopted as*
    *modified,* 14CV3763CBAPK, 2016 WL 1271478 (E.D.N.Y. Mar. 30, 2016) ................ 25

*Barvinchak v. Indiana Regional Medical Center,* CIV.A. 3:2006-69, 2007
    WL2903911 (W.D. Pa. Sept 28, 2007) ............................................................................. 21

*Blue v. Finest Guard Services, Inc.,* 09 CV 133 (ARR), 2010 WL 2927398 (EDNY
    Jun. 24, 2010), *report and recommendation adopted,* 09-CV-133
    (ARR)(CLP), 2010 WL 2927403 (E.D.N.Y. July 19, 2010) ............................................ 25

*Bowen v. Baldwin Union Free School Dist.,* CV156829JMAGRB, 2018 WL
    4560726 (E.D.N.Y. Aug. 31, 2018), *report and recommendation*
    *adopted,* 15CV6829JMAGRB, 2018 WL 4558403 (E.D.N.Y. Sept. 21, 2018).............. 26

*Brecher v. Republic of Argentina,* 806 F.3d 22 (2d Cir. 2015) ..................................................... 5

*Brittmon v. Upreach, LLC* 285 F.Supp.3d 1033 (S.D. Ohio 2018) ............................................... 6

*Burnison v. Memorial Hosp., Inc.,* CIV. A. 91-1072-B, 1992 WL 321608 (D. Kan.
    Oct. 7 1992) ...................................................................................................................... 10

*Carmack v. Park Cities Healthcare, LLC,* 321 F.Supp.3d 689 (N.D. Tex. 2018)......................... 6

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ............................................................................. 4

*Coley v. Vannguard Urban Improvement Assn. Inc.,* 12CV5565PKCRER, 2018 WL
    1513628 (E.D.N.Y. Mar. 27, 2018), *as amended* (Mar. 29, 2018)............................ 26, 27

*Denoyer v. PMI Sec. Prot. Inc.,* 15CIV4834KMKJCM, 2018 WL 1738217
    (S.D.N.Y. Jan. 23, 2018) *report and recommendation adopted,*
    15CV4834KMKJCM, 2018 WL 1737154 (S.D.N.Y. Apr. 9, 2018)................................ 28

*Donovan v. Crisostomo,* 689 F.2d 869, 876 fn 13 (9th Cir. 1982) ............................................... 21

*Edwards v. Jet Blue Airways, Corp.,* 873 NYS2d 233 (Sup. Ct. 2008)....................................... 28

*Evans v. Tiger Claw, Inc.,* 163 A.3d 1282 (Conn. App. 2017).................................................... 21

*Felker v. Southwestern Emergency Medical Service Inc.,* 581 F.Supp.2d 1006 (S.D. Ind. 2008) ........................................................................................................ 9

*Giguere v. Port Resources, Inc.,* 2:16-CV-58-NT, 2018 WL 1997754 (D. Me. Apr. 27, 2018) ....................................................................................................... 7

*Hendricks v. J.P. Morgan Chase Bank, N.A.,* 677 F.Supp.2d 544 (D. Conn. 2009) ................... 20

*Home Care Assn. of America v. Weil,* 76 F.Supp.3d 138 (D.D.C. 2014) ...................................... 6

*Hypolite . Health Care Servs. Of NY Inc.,* 256 F.Supp.3d 485 (S.D.N.Y. 2017) ......................... 6

*Kinkead v. Humana, Inc.* 206 F.Supp.2d 751 (D. Conn. 2016) .................................................... 6

*Lamon v. City of Shawnee,* 754 F.Supp. 1518 (D.Kan. 1991) *aff'd in relevant part,* 972 F.2d 1145 (10th Cir. 1992) ...................................................................... 21

*Lundy v. Catholic Health Care Sys. of Long Island,* 711 F.3d 106 (2d Cir. 2013) ................... 21

*Mack v. Talasek,* CIV.A. V-09-53, 2009 WL 4825205 (S.D. Tex. Dec. 4, 2009) ...................... 10

*Mendez v. The Radec Corp.,* 260 F.R.D. 38 (W.D.N.Y. 2009) .................................................... 5

*Monahan v. Co. of Chesterfield, Va.,* 95 F.3d 1263 (4th Cir. 1996)............................................ 21

*Public Citizen v. Fed. Motor Carrier Safety Admin.,* 374 F.3d 1209 (D.C. Cir. 2004)............... 11

*Reich v. Midwest Body Corp.,* 843 F.Supp. 1249 (N.D. Ill. 1994) .............................................. 21

*Roto-Rooter Servs. Co. v. Dept of Labor,* 219 Conn. 520 (1991)............................................... 20

*Salazar v. Life Ambul. Serv., Inc.,* CIV.A.EP-99-CA-361EP, 2001 WL 685755 (W.D. Tex. Feb. 23, 2001) .............................................................................. 10, 11

*Scheck v. Maxim Healthcare Services, Inc.,* 333 F.Supp. 751 (N.D. Ohio 2018) ........................ 6

*Shortt v. New Milford Police Dept.,* 212 Conn. 294 (1989) ....................................................... 21

*Sierra v. New Eng. Personnel of Hartford, LLC,* 3:15-CV-1520 (JAM), 2017 WL 3711579 (D. Conn. Aug. 28, 2017) ................................................................ 5

*Smith v. Superior Casing Crews,* 299 F.Supp. 725 (E.D. La. 1969) ........................................... 10

*Soto v. Armstrong Mgt. Corp.,* 15CIV9283AJNJCF, 2016 WL 7396687 (S.D.N.Y. Dec. 21, 2016) *report and recommendation adopted,* 15CIV9283AJNJCF, 2017 WL 2191625 (S.D.N.Y. May 17, 2017) ................................................ 28

*Villar v. Prana Hosp., Inc.,* 14civ8211RAJ CF, 2017 WL 1333582 (S.D.N.Y. Apr. 11, 2017) ..................................................................................................... 27

iv

*Walling v. Halemerich & Payne, Inc.,* 323 U.S. 37 (1944) .......................................................... 16

*Williams v. General Nutrition Centers, Inc.,* 166 A.3d 625 (Conn. 2017) ................................... 19

**Statutes**

12 N.Y.C.R.R. § 142 ........................................................................................................... passim

29 U.S.C. § 216(b) ...................................................................................................................... 1, 6

Conn. Gen. Stat. § 31-68 ................................................................................................. 2, 3, 21, 22

Conn. Gen. Stat. § 31-72 ...................................................................................................... 3, 21, 22

Conn. Gen. Stat. Ann. § 31-76 .......................................................................................... 2, 18, 19, 20

Conn. Gen. Stat. Ann. §§ 31-60(a) ................................................................................................. 2

Conn. Gen. Stat. Ann. §§ 31-58(e) ............................................................................................... 18

N.J. Stat. Ann. § 34:11-56a4 ........................................................................................................... 6

NYLL Art. 19 § 663 .................................................................................................... 3, 22, 26, 28

**Rules**

Fed. R. Civ. P. 56(c) ..................................................................................................................... 4

**Regulations**

20 C.F.R. § 778.501 ..................................................................................................................... 16

29 C.F.R. § 552.109 ............................................................................................................... passim

29 C.F.R. § 778.315 ..................................................................................................................... 21

29 C.F.R. § 785.22 ................................................................................................................. passim

29 C.F.R. § 778.108 ..................................................................................................................... 15

29 C.F.R. § 778.109 ..................................................................................................................... 15

## INTRODUCTION

Plaintiffs move for partial summary judgment with respect to the following issues:

**CLAIMS OF FLSA OPT-INS:**

1. Opt-in Plaintiffs were entitled to receive FLSA overtime beginning January 1, 2015, the effective date of 29 C.F.R. § 552.109.

2. During the period January 1 to October 15, 2015 (the "Effective Date Period") Defendants did not pay FLSA overtime to opt-in Caregivers[1] for which they are entitled to damages pursuant to 29 U.S.C. §216(b).

3. The regular rate for Opt-in Caregivers who worked hourly shifts was their hourly rate and for those who worked "live-in" shifts was an hourly rate equal to their daily rate divided by the 8 hours of work for which the daily rate was intended to compensate.

4. Opt-in Caregivers who worked live-in shifts are entitled to credit for 24 hours of work per shift.

5. Opt-ins who worked hourly assignments are entitled to .5 times their regular rate for all unpaid overtime hours during the January 1 - October 15, 2015 period. Opt-ins who worked live-in shifts during that period are entitled to .5 times their regular rate for overtime hours for which they previously received straight time pay, and 1.5 times their regular rate for overtime hours for which they have not previously been compensated.

---

[1]  With the exception of hourly shift caregivers in New York and a few other states who, as a result of applicable state overtime laws, received overtime during the effective date period.

1

**CLAIMS OF CONNECTICUT EFFECTIVE DATE CLASS:**

6.  Connecticut Effective Date Class members were entitled to overtime at time and a half their regular rate beginning January 1, 2015 pursuant to Conn. Gen. Stat. Ann. §§ 31-60(a), and 31-76b.

7.  Defendants failed to pay Connecticut Effective Date Class members state law overtime during the period January 1 to October 15, 2015 for which the Class members are entitled to damages pursuant to Conn. Gen. Stat. §31-68.

8.  Class members' regular rate for purposes of Connecticut overtime is the same as their FLSA regular rate.

9.  Class members who worked live-in shifts are entitled to be paid for 24 hours of work per shift during the Effective Date class period.

10.  Class members are entitled to .5 time their regular rate for overtime hours worked during hourly shifts and .5 or 1.5 times their regular rate for overtime hours worked during live-in shifts depending on whether those hours were previously compensated at the worker's straight-time rate.

11.  Class members who worked unpaid straight-time hours in overtime weeks as a result of being credited with 24 hours work per live-in shift are entitled to their regular rate for the unpaid straight-time hours pursuant to Conn. Gen. Stat. §31-68.

**CLAIMS OF CONNECTICUT UNPAID HOURS CLASS**

12.  Connecticut Unpaid Hours Class Members were entitled to be paid for 24 hours of work per live-in shift during the period January 1, 2015 through January 25, 2016 pursuant to Conn. Gen. Stats. § 31-76b(2)(D).

13.  Defendants failed to pay Connecticut Unpaid Hours class members 24 hours per shift between January 1, 2015 and January 25, 2016 for which class members are entitled to damages pursuant to Conn. Gen. Stat. §31-72.

14.  Class members are entitled to their regular rate for unpaid straight time hours, .5 times their regular rate for overtime hours for which they previously received straight-time pay, and 1.5 times their regular rate for overtime hours for which they were not previously compensated. Conn. Gen. Stat. §§ 31-68, 31-72.

**CLAIMS OF NEW YORK EFFECTIVE DATE CLASS MEMBERS**

15.  New York Effective Date class members were entitled to overtime at time and a half their regular rate beginning January 1, 2015 pursuant to 12 N.Y.C.R.R. 142-2.2.

16.  Defendants failed to pay New York Effective Date class members New York overtime during the period January 1 to October 15, 2015 for which class members are entitled to damages pursuant to New York Labor Law (NYLL) Art. 19 § 663.

17.   The regular rate for New York Effective Date class members was the same as their regular rate for purposes of the FLSA.

18.  New York Effective Date class members were entitled to be paid for 24 hours of work per live-in shift.

19. Class members who worked unpaid straight-time hours in overtime weeks as a result of being credited with 24 hours of work per live-in shift are entitled to their regular rate for the unpaid straight-time hours pursuant to NYLL Art. 19 § 663

20. Class members are entitled to .5 or 1.5 times their regular rate for each overtime hour they worked depending on whether they were previously compensated straight time wages for those hours.

**CLAIMS OF NEW YORK UNPAID WAGES CLASS**

21.  Pursuant to 12 NYCRR §142-2.1(b), New York Unpaid Wages class members were entitled to be compensated for 24 hours per 24-hour shift during the period November 11, 2009 through the January 25, 2016.

22.  Defendants failed to pay New York Unpaid Wages class members for 24 hours of work per live-in shift between November 11, 2009 and January 25, 2016.  Class members are entitled to damages for these unpaid hours of work pursuant to NYLL Art 6 §§191, 198 and Art. 19 §663.

23.  New York Unpaid Hours Class Members are entitled to pay at their regular rate for all unpaid straight-time hours pursuant to NYLL Art 6 and 19.  Unpaid overtime hours worked during the period November 11, 2009 through December 31, 2014 must be paid at the higher of 1.5 times the NY minimum wage or the Class members' regular rate. 12 NYCRR § 142-2.2.  Unpaid overtime hours worked during the period January 1, 2015 through January 25, 2016 must be paid at .5 or 1.5 times their regular rate depending on whether they were previously paid for those hours. *Id.*

## STATEMENT OF UNDISPUTED FACTS

See Plaintiffs' Local Rule 56(a)(1) Statement of Undisputed Material Facts filed herewith ("Statement of Facts").

## ARGUMENT

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) ; *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). Substantive law determines

which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

At this stage, as Your Honor previously explained, the function of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Sierra v. New Eng. Personnel of Hartford, LLC*, 3:15-CV-1520 (JAM), 2017 WL 3711579, at *2 (D. Conn. Aug. 28, 2017) (citing *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)). As fully explained below, there are no genuine triable issues as to the material facts and Plaintiffs are entitled to summary judgment on their FLSA overtime claims, their New York and Connecticut effective date claims, and their New York and Connecticut claims for unpaid work hours.[2]

## II.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR FLSA OVERTIME CLAIMS

### A.  Plaintiffs Became Eligible for FLSA Overtime on January 1, 2015

Although Caregivers were, for many years, exempt from FLSA overtime, the U.S. Department of Labor (DOL) extended FLSA overtime protections to Caregivers with the promulgation of 29 C.F.R. §552.109(a).  The effective date of that regulation was January 1, 2015, but a legal challenge brought by employer trade associations resulted in a judgment

---

[2] To avoid any claim by Defendants of one-way intervention, Plaintiffs urge the Court to refrain from entering an order on this summary judgment motion prior to the issuance of notice to the class. The rule of one-way intervention "bars potential class members from waiting on the sidelines to see how the lawsuit turns out and, if a judgment for the class is entered, intervening to take advantage of the judgment." *Brecher v. Republic of Argentina,* 806 F.3d 22, 26 (2d Cir. 2015). It should be noted that Defendants have asked this Court to delay the issuance of notice during the pendency of their 23(f) appeal and have thus waived any protections under the rule of one-way intervention. *See e.g., Mendez v. The Radec Corp.,* 260 F.R.D. 38, 45 (W.D.N.Y. 2009) ("defendants should not be permitted to wait and see how the Court will rule on plaintiff's summary judgment… and then, after the Court rules against defendants, belatedly seek to decertify the class on the ground that the Court should never have followed that procedure in the first place.").

vacating the regulation. *Home Care Assn. of America v. Weil,* 76 F.Supp.3d 138 (D.D.C. 2014).

That *vacatur* judgment was reversed on appeal. *Home Care Assn. of Am. v. Weil,* 799 F.3d 1084

(D.C. Cir. 2015).  This Court previously determined that, as a result of the Court of Appeals

decision upholding 29 C.F.R. §552.109(a), the effective date of the regulation remained January

1, 2015.  Thus Caregivers like Plaintiffs were eligible for FLSA overtime from that date forward.

Doc. 57. *Kinkead v. Humana, Inc.* 206 F.Supp.2d 751 (D. Conn. 2016).  The vast majority of

courts that have addressed the issue since then have followed this Court's ruling.[3]  Rather than

rehash matters that have been thoroughly considered by the Court, Plaintiffs move the Court,

based on its opinion at Doc. 57, to enter summary judgment in favor of the opt-in Plaintiffs that

the effective date of 29 C.F.R. § 552.109(a) was January 1, 2015 and that they became eligible

for FLSA overtime on that date.

**B.  Humana Did Not Pay FLSA Overtime Between January 1 and October 15, 2015**

It is undisputed that Humana did not pay its Caregivers FLSA overtime during the period

January 1 to October 15, 2015 (the "Effective Date Period"), with the exception of hourly shift

workers in states like New York where state law required overtime wages independent of the

FLSA.[4] Statement of Facts at ¶¶ 26, 27. Thus opt-in Plaintiffs who worked more than 40 hours in

a week between January 1, 2015 and October 15, 2015 (with the exception of hourly shift

workers in states like New York) are entitled to FLSA overtime pursuant to 29 U.S.C. §216(b).

**C.  The FLSA Mandates that Workers Assigned 24-Hour Shifts Be Credited with a
      Minimum of 24 Hours of Work Per Day**

---

[3]  *See, e.g., Scheck v. Maxim Healthcare Services, Inc.,* 333 F.Supp. 751 (N.D. Ohio 2018); *Carmack v.
Park Cities Healthcare, LLC,* 321 F.Supp.3d 689, 704 (N.D. Tex. 2018); *Brittmon v. Upreach, LLC* 285
F.Supp.3d 1033, 1039 (S.D. Ohio 2018); *Hypolite . Health Care Servs. Of NY Inc.,* 256 F.Supp.3d 485,
492 (S.D.N.Y. 2017).

[4]  *See, e.g.,* 12 NYCRR § 142-2.2 (requiring overtime pay for employees exempted from FLSA overtime
requirements); N.J. Stat. Ann. § 34:11-56a4 (requiring overtime wages without exception for caregivers).

The undisputed facts show that Opt-ins who worked live-in shifts were required to be on duty on the premises of their assigned clients 24-hours a day and could not leave the premises during their shift. Statement of Facts at ¶¶ 21, 22.  The Caregiver Manual makes clear that "[l]eaving a work assignment during scheduled hours of work or overtime hours without the approval of the supervisor" is cause for immediate termination.  *Id.,* Doc. 66-2 at 12.  Under these circumstances, Caregivers are entitled to pay for the full 24-hours of their shift unless Humana carries its burden of proving that it complied with the 29 C.F.R. § 785.22 exemption. *See Giguere v. Port Resources, Inc.,* 2:16-CV-58-NT, 2018 WL 1997754 (D. Me. Apr. 27, 2018) (employer bears burden of proving § 785.22 exemption).  That exemption requires Humana to demonstrate that it had "an express or implied agreement" with its Caregivers to exclude from the work day "bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours." 29 C.F.R. § 785.22.  If such an agreement exists the employer may treat up to 11 hours per day as non-compensable and pay for only 13 hours of the 24 hour shift.  29 C.F.R. § 785.22. In the absence of such an agreement, the employer must pay for the full 24-hour shift. *Id.* The full regulation provides as follows:

> Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep. If sleeping period is of more than 8 hours, only 8 hours will be credited. Where no expressed or implied agreement to the contrary is present, the 8 hours of sleeping time and lunch periods constitute hours worked.

29 C.F.R. §785.22.

Humana cannot claim this exemption because it did not establish "bona fide meal periods and a bona fide regularly scheduled sleeping period" as required by § 785.22.  To the contrary, Humana's 30(b)(6) witness candidly admitted that, rather than establishing regularly scheduled

7

breaks, Humana expected its Caregivers to negotiate sleep and meal times with their clients each

shift:

> Q: . . . when a caregiver is assigned to a 24-hour shift, are they given a
> regularly scheduled sleep time?
> A: No.
> Q: So how do they know when they're supposed to get their eight hours sleep?
> A: That's at their – their discretion what they're working out with the client. . .
> Q . . . So there's no regular schedule for that.  They just need to work out with
> the client when they can get eight hours; is that right?
> A: Yes.
> Q: And might change from day-to-day
> A: Possibly.

Allen 181:3-20.  Humana's 30(b)(6) witness elaborated on this catch-as-catch-can approach to

sleep times later in his deposition:

> Q:  Well, if they have a scheduled sleep time regardless of whether they are
> sleeping or not  . . they could call in when . . they took off to go to sleep, and
> they could call in when they were going back to work, is that correct?
>
> A:  . . . You're saying their scheduled time as if it's pre-set[,] that this is a
> factory setting.  <u>It may differ.  It may get moved because the client has a need
> today that they didn't have yesterday or may not tomorrow.</u>  So it's not, okay,
> we're – the factory whistle is blowing off and we're off duty for the next eight
> hours.  That isn't how it works.  . . . . I'm taking your question as implying
> they're scheduled time, they're on, they're off, and it's preset.  That – that's
> not the nature.

Allen 196:22-198:2 (emphasis added).  Humana took the same position with respect to meal

breaks:

> Q: [W]hat steps does Humana take to ensure that a caregiver on a 24-hour shift
> gets 3 hours of meal breaks?
> A: They're relying on the caregiver to alert them if they're not getting it, as
> they are instructed.

Allen 192: 14-19.  Humana's policy of not providing regularly scheduled sleep and meal breaks

is reflected in the language of the Caregiver Agreement which states Caregivers are "paid for 8

hours of intermittent work per day" and that "[a]s the actual work hours are irregular and

intermittent it may not be feasible to account for all hours actually on duty." *See, e.g.,* Doc. 234-9 (Mathieu Agreement).  Plainly, if the work hours are intermittent, irregular, and difficult to account for, the time for sleep and meals must, of necessity, be irregular and intermittent as well.[5]

Case law construing 29 C.F.R. § 785.22 confirms that Humana's catch-as-catch-can approach to sleep and meal times does not comply with the "regularly scheduled" requirement of the regulation.  For example, in *Felker v. Southwestern Emergency Medical Service Inc.,* a case involving a sleep policy similar to Humana's, the court granted summary judgment for 24 hours of pay per 24-hour shift because there was no evidence that the employer established regularly scheduled sleep breaks. *Felker v. Southwestern Emergency Medical Service Inc.,* 581 F.Supp.2d 1006, 1010 (S.D. Ind. 2008).  To the contrary, like Humana's policy, "[t]he evidence from all witnesses was consistent that the employees were allowed to sleep when time was available and take meal breaks during such times as were available, depending upon the schedule of duties for a particular evening." *Id.*  Similarly in *Smith v. Superior Casing Crews,* the court held that §785.22 is not satisfied when workers "had no regular sleeping period" and "were completely under Superior's direction whenever they were on the job site, even though they were permitted during periods when they were not needed to sleep or eat a meal." *Smith v. Superior Casing*

---

[5] The Agreement provides that, apart from the 8 hours of intermittent work, the "remainder of your daily schedule will be allocated into the following hours:  3 hours for meals (on site), 8 hours sleep time (on site) and 5 hours for free time (on site)." Doc. 234-9 (Mathieu Agreement).   While this leaves enough free time to take 8 consecutive hours for sleep, and three one-hours meal periods, simply having time available when sleep and meals *could take place* is not the same thing as establishing a regularly scheduled sleep and three scheduled meal periods. *Felker v Southwestern Emergency Medical Services, Inc ,* 581 F.Supp.2d 1006, 1010 (S.D. Ind. 2008).  Moreover, if the 8 hours of actual work time is as "intermittent" as the Agreement suggests, it may not even be possible to schedule 8 consecutive hours of sleep during the allotted "free time." *See, e.g.,* Kinkead 78:11 -81:18 (describing typical day waking client at 7:00 am and putting her to bed at 11:30 or 12:00 am – leaving less than 8 consecutive hours for sleep even without the interruptions that occurred at night 30% of the time).

*Crews*, 299 F.Supp. 725, 730 (E.D. La. 1969). *See also Salazar v. Life Ambul. Serv., Inc.,* CIV.A.EP-99-CA-361EP, 2001 WL 685755 at *2-3 (W.D. Tex. Feb. 23, 2001) ("The plain language of this regulation belies any suggestion that a 'regularly schedule' period of sleep is not required. In fact that is exactly what the regulation requires. . . . The regulation by its express terms, anticipates that a regularly scheduled period of time that, at the very least, the employer and employee intend *in good faith* to be used for sleep, may be deducted from the employee's wages.") (emphasis in original); *Mack v. Talasek,* CIV.A. V-09-53, 2009 WL 4825205 *2 (S.D. Tex. Dec. 4, 2009) (allegation that "Defendants did not establish. . . any fixed schedule of time off for meals and sleeping," if true, would preclude defendant from deducting time for meals and sleep pursuant to 29 C.F.R. §785.22); *Andryeyeva v. New York Health Care, Inc.,* No. 11, 2019 WL 1333030 at *8-9 (N.Y. Mar. 26, 2019) (discussed *infra* Section IV.B). To satisfy the regulation, meal periods must also be regularly scheduled. *Burnison v. Memorial Hosp., Inc.,* CIV. A. 91-1072-B, 1992 WL 321608 *6 (D. Kan. Oct. 7 1992) ("To be non-compensable, the meal periods must be scheduled, occur at a regular time, and normally be thirty minutes or more").

    As the above cases make clear, regularly scheduling sleep and meal times ensures that the employer (or in this case the elderly client) clearly understands that there are specific, scheduled "off duty" times when the employee is not "on call," periods of time that must be treated differently from the rest of the shift and only disturbed for emergencies. Regularly scheduled break time give an employee, such as a caregiver, a measure of assurance that, if he or she is not going to be paid for sleep and meal times, that the time will at least be respected as "off duty" time by the client. Just as importantly, regularly scheduling meal and sleep times permits a caregiver to utilize the "off duty" time productively: A caregiver whose sleep and meal periods

occur at regularly scheduled times each day can plan for such breaks and maintain a reasonably normal circadian rhythm.  If there is no schedule and a caregiver's sleep and meal times "get moved because the client has a need today that they didn't have yesterday or may not tomorrow," Allen 196:22-198:2, sleeping and eating times become unpredictable causing stress, loss of sleep and other health problems.[6] *See, Public Citizen v. Fed. Motor Carrier Safety Admin.,* 374 F.3d 1209, 1213 (D.C. Cir. 2004) ("research showed that people are much more alert and have better reaction times when they are on regular, twenty-four-hour circadian schedules, as humans are 'programmed' to function best when the go to sleep and wake up around the same time every day."). *See also,* Associate Handbook, Ex. 1 at 19 (lost sleep tends to cause insomnia which "can seriously affect your health.").

Humana not only failed to comply with the letter of §785.22 by failing to schedule regular sleep and meal breaks, its catch-as-catch can approach to sleep and meal times also violated the spirit of the §785.22 exemption by giving clients the impression that caregivers were "on call" to respond to whatever needs they might have, large or small, throughout the 24-hour shift.  Humana's policy meant that there was no specific block of time during the day that clients had to treat as off- limits personal time for the caregiver, even though Humana was deducting pay on the theory that caregivers had such off-duty time.  Humana encouraged clients to think of caregivers as "on call" 24 hours a day in other ways as well.  The Welcome Book, which Humana provided to new clients, pointedly says nothing about regularly scheduled sleep and

---

[6]  Where there are no regularly scheduled sleep and meal times, a Caregiver could arrive at work to find the client asleep and have to take some or all of her 8 hours of sleep immediately even though she just started her day and is not tired, or she may find that the sleep time is constantly changing, wrecking havoc with her circadian rhythm and making sleep all the more difficult. *See Salazar,* CIV.A.EP-99-CA-361EP, 2001 WL 685755 at *3 (noting this problem with unscheduled sleep time).

meal times and simply echoes the statement in the Caregiver Agreement that "[t]he typical 24-hour live-in day consists of 8 hours of intermittent work," thereby implying that clients should feel free to demand "work" from a caregiver any time during the 24-hour period. Statement of Facts at ¶ 16, D035971.  Humana also encouraged live-in clients to think of their caregivers as "on call" 24-hours a day by charging clients a flat day rate for a live-in Caregiver rather than by the hour.  Statement of Facts at ¶ 20, Allen: 143: 13-18.   If the hours set forth in the Welcome Book were meaningful, Humana would have made clear to the client that it was billing for 8 hours of "on call" time and that additional hours would be extra.

Plaintiff Mathieu was quite perceptive about the way that Humana encouraged clients to view caregivers as on-call all 24 hours:

> A:  . . . [The agencies], they don't make it eight hours.  They don't make it, like 13 hours.  **They make it look to the clients that you're there for 24 hours.  They're there for 24 hours.  So, you know, if you need help the aides have to be there 24 hours to assist you at all times.**

Mathieu 140:15-141:6 (emphasis added).  Far from protecting Mathieu's personal time by scheduling sleep and meal periods that the client (and her family) would have to respect, Humana did exactly the opposite:

> Q:  Did you ever, did anyone from Humana, that you're aware of, ever communicate to a client, principally the [X's], but any client that you were available to work for 24 hours?
> A:  Yes.
> Q:  Okay who made that communication?
> A:  The nurse that came into the home, she told, you know, Mrs. [X], they're here to help you.  They're here to help you at all times.  And she said, so, I can call them at any hours? She said, of course, if you need assistance.
> You know I guess they were trying to be pleasant and nice to her saying, no, they're here, no matter what.  If you need assistance, they're here to help you.

Mathieu 140:15-141:6; 142:12-143:9; Statement of Facts at ¶¶ 17, 18, 19.

Humana's catch-as-catch-can approach to sleep and meal times had predictable consequences.  Plaintiff Mathieu testified that her client "didn't know night from day . . . she'd be up walking through the [apartment].  She was always alert to get up." As a result Mathieu rarely if ever got five hours uninterrupted sleep.  Mathieu 51:23-53:5; Statement of Facts at ¶ 18. The client's sleeping habits depended on her medication, "some of the effects would cause her not to sleep as much, or sleep and not be as active . . . So, they're constantly changing the different variations in dosages of the medication." *Id.* at 52:17-53:5; s*ee also,* Antwi 32:10-33:13 (the amount of sleep caregiver could expect depended on the patient), 44:2 -46:6 (Antwi couldn't get sleep because the client would get up at night and wander around the house; he complained to Humana but nothing changed); Keller 31:11-20 ("Q:  So when you said you worked three or four days consecutively, you stayed up that entire period? A:  You can rest when – if you get the opportunity to, when your client rests.  You can sit and you can kind of doze for, you're hoping ten, 15 maybe a half-an-hour, but you cannot full out sleep."); Kinkead: 32:2-33:1 (30% of the time she did not get 8 hours of sleep because she was doing "bathroom chores, reading, just sitting up with her.").

It may be that not all live-in clients were as unpredictable as these, but the above examples illustrate why, if Humana did not want to pay for all 24 hours, it had a duty to insist on regularly scheduled sleep and meal times and impress on the client the importance of respecting those times.  If the client's condition could not accommodate a regular schedule, or if the client simply wanted the comfort of being able to call on a caregiver whenever needed, then it was Humana's duty to pay the Caregiver for all 24-hours or pay two Caregivers to work 12-hour shifts.[7]  What Humana could not legally do was promise clients 24-hour "on-call" care with no

---

[7]  In fact, Mathieu testified that her client had previously been on 12-hour shifts because of her needs but "she was very difficult as a client" so Humana switched her to live-in shifts "[b]ecause they said, they

clearly delineated "off-duty" sleep and meals times, impose that arrangement on Caregivers, and simultaneously claim the right to deduct 8 hours of sleep time, 3 hours of meal times, as well as other "free time"[8] from Caregivers' wages.

The live-in system set up by Humana and sold to its clients was the antithesis of the system of "bona fide regularly scheduled" sleep and meal periods required by 29 C.F.R. § 778.22.  Having failed to comply with the requirements of 29 C.F.R. § 785.22, Humana could not lawfully deduct sleep and meal times or any other time.  Summary judgment should be granted to Opt-in Plaintiffs who worked live-in shifts that they were entitled to be paid for 24 hours of work per live-in shift. [9] [10]

### D.  The Regular Rate For Live-in Shift Plaintiffs Is An Hourly Rate Equal To Their Daily Wage Divided by 8 hours

The FLSA "regular rate" is an hourly rate that "is determined by dividing [an employee's] total remuneration for employment . . . in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid."  29

---

[8]  think if she saw the same person consistently, that her mood would kind of lessen, she wouldn't be so agitated." Id. 56:7-57:3.  Humana's attempt to accommodate this client's preference for a single caregiver is understandable, but the law is absolutely clear that Humana cannot have it both ways, promising the client uninterrupted 24-hour care with no regularly scheduled breaks, which is what the client previously had with two 12-hour shifts,  while simultaneously paying Caregivers for only 8 hours.

[8]  From prior to January 1, 2015 to January 2016, Humana actually deducted a total of 16 hours from a 24-hour shift.  That was clearly an FLSA violation even if Humana had complied with 29 C.F.R. § 785.22 since that regulation only allows, at most, 11 hours of deductions.

[9]  It is important to stress that Plaintiffs are not claiming a right to pay for 24 hours because they did not get five hours of uninterrupted sleep, although many, like Mathieu, probably did not.  The issue here is not the total hours of sleep a Caregiver did or did not get during a 24-hour shift.  The issue presented by 29 C.F.R. §785.22 is whether Caregivers had regularly scheduled sleep and meal times, which they did not.

[10]  In the event the Court concludes that there is an issue of fact as to whether Humana accorded Caregivers "regularly scheduled" sleep and meal periods, Plaintiffs move the Court to grant summary judgment that Humana owed a minimum of 13 hours per live-in shift, the minimum number of hours that must be paid if an employer proves compliance with §785.22, leaving the question of whether 24-hours is owed for the jury.

C.F.R. §778.109. It is an "actual fact" that "must be drawn from what happens under the contract." *Id.* §778.108.

Opt-in plaintiffs who worked "hourly shifts" were paid by the hour and that hourly rate is their regular rate for purposes of the FLSA. *Id.* § 778.110.  Opt-ins who worked live-in shifts were also paid by the hour. Prior to 2012 Caregiver Agreements explicitly stated that live-in shifts were paid at a rate of "$xx/hour for 10 hours of work." *See,* Statement of Facts at ¶¶ 10-14; Doc. 66-7 (Kinkead's Caregiver Agreement) ($13.50/hour for 10 hours); Ex. 3, D030435, p.3 (Tara Mansaram's Caregiver Agreement) ("$12.50/hour for 10 hours work").  On or about January 2012 Humana changed the description of the live-in rate to read as follows: "Live-in Pay Rate: $xx per day (see #3 below for details)." *See, e.g.* Doc. 234-9 (Caillo's Caregiver Agreement); Statement of Facts at ¶¶ 12, 13.  But this was a change in wording, not a change in the method of payment, as is evident from the reference to "see #3 below".  Paragraph #3 of the Agreement clarifies that the "$x/day" is "paid for 8 hours of intermittent work per day." *Id.* In other words, the stated daily rate is simply an hourly rate multiplied by 8 hours. *Id.* There is no material difference between a pre-2012 Agreement offering, for example, "$13 per hour for 10 hours of work," and a post-2012 Agreement offering a daily amount of "$104 per day" for 8-hours of intermittent work:  Both offer an hourly rate of $13.00/hour.[11]

The Agreements used in states with state overtime requirements, like New York, were even more explicit that the "$x per day" was just an hourly rate of pay multiplied by specific

---

[11]   The equivalence of the two is made explicit on the face of Plaintiff Kinkead's 2010 contract which recites her live-in shift pay rate as "$13.00/hour for 10 hours work" after which a supervisor has written in by hand "$130/day." Other hand-written changes indicate that the rate was increased to "$13.50/hour" or "$135/day." Doc. 66-7.

hours of work.  Paragraph #3 in these agreements contains the following explanation of the day rate:

> You will receive 5.7 hours of straight time and 2.3 hours of overtime to make up your total daily rate.  For example: a daily rate of $100.00 per day is paid $10.93 for 5.7 hours = $62.30 and $16.40 for 2.3 hours = $37.70 which is a total of $100.00 for the day.

Doc. 234-9 ¶ 3 (NY Agreement ¶3); *see also,* Ex. 6, Examples of New York Caregiver Agreements. Thus, in states like New York the daily rate was in reality two hourly rates: a straight time rate ($10.93/hour in the example), and an overtime rate ($16.40/hour in the example).  Of course, paying "split-day" hourly rates that label one hourly rate "straight time" and another "overtime" does not constitute payment of FLSA overtime. *See, Walling v. Halemerich & Payne, Inc.,* 323 U.S. 37, 42 (1944) (split-day pay systems that artificially divide the work day into straight time and overtime portions violate the FLSA); 20 C.F.R. § 778.501 (same).[12] To the contrary, for purposes of the FLSA, a split-day pay system composed of two hourly rates is treated as pay by the hour and constitutes a "regular rate" equal to the total pay at each of the two hourly rates divided by the hours worked at the two rates.  *Id.*  Thus, in the Caregiver Agreement example, the regular rate is the sum of $62.30 (5.7 hours at $10.93/hr.) +

---

[12]  In *Halemerich* the Court noted, "[t]he vice of [the split day] plan lay in the fact that the contract regular rate did not represent the rate which was actually paid for ordinary, non-overtime hours, nor did it allow for compensation to be paid for true overtime hours." 323 U.S. at 39. To the contrary, the workers received contract "overtime" payments for straight time hours – e.g. if they worked only one 8 hour shift per week, that is, no overtime hours, they nevertheless received 4 hours of "overtime."  The Court went on to note that,

> [i]t is no answer that the artificial regular rate was a product of contract or that it was in excess of the statutory minimum.  The Act clearly contemplates the setting of the regular rate in a bona fide manner through wage negotiations between employer and employee, provided that the statutory minimum is respected.  But this freedom of contract does not include the right to compute the regular rate in a wholly unrealistic and artificial manner so as to negate the statutory purpose.

*Id.* at 42.

$37.70 (2.3 hours at $16.40/hr.) = $100.00 divided by 8 hours (5.7 hrs + 2.3 hrs), which yields a regular rate of $12.5/hour.

Not surprisingly, the wage receipts provided to live-in Caregivers post-2012 show pay by the hour.  For example, in states like Connecticut, the wage receipts showed the number of hours worked and the pay, not the number of days worked. *See, e.g.,* Statement of Facts at ¶ 14, Ex. 7 (Kinkead receipt for period ending 8/10/14 showing "Live-in Wages" of "$945" for "56 hours"). In New York wage receipts showed hours worked at the "straight-time" hourly rate and the hours worked at the "overtime rate." *See. e.g.,* Plaintiff Mathieu' pay receipt for week ending July 5, 2015 shows a "Live-in Wage Rate" of $14.89/hr and a "Live-in OT Rate" of $7.11/hr. Doc. 170-5; *see also,* Statement of Facts at ¶ 14; Maxwell Antwi's pay receipts, Ex. 8.

### E.  Summary Judgment on FLSA Claim

Accordingly, in calculating the hours worked per week for purposes of FLSA overtime, live-in shift opt-ins must be credited with 24 hours of work per shift during the Effective Date period.  The regular rate for hourly shift caregivers is their hourly rate of pay, and for live-in workers is their daily rate divided by the eight hours of work (or, what is the same thing, their total remuneration for a week divided by 8 x the number of shifts in a week).  Opt-in Plaintiffs are entitled to unpaid FLSA overtime wages of .5 times their regular rate for overtime hours that have already been paid at straight time (as would be the case for all of the hours worked on hourly shifts), and 1.5 times their regular rate for overtime hours that have not been compensated at all (as is the case with some or all of the overtime hours of live-in workers).

## II.  CONNECTICUT EFFECTIVE DATE CLASS CLAIMS

### A.  The Connecticut Class Became Eligible for State Overtime on January 1, 2015

The Connecticut Minimum Wage Act (CMWA) requires payment of overtime to covered workers at time and a half their regular rate. Conn. Gen. Stat. Ann. §31-76c. Covered workers include workers covered by FLSA overtime provisions. *Id.* Conn. Gen. Stat. Ann. §§31-58(e). Thus on the effective date of 29 C.F.R. § 552.109(a), January 1, 2015, the members of the Connecticut Effective Date Class became eligible for state law overtime. It is undisputed that Defendants did not pay overtime to hourly and 24-hour shift workers in Connecticut during the Effective Date period. Statement of Facts at ¶¶ 26, 27, 29.  Accordingly, class members are entitled to summary judgment on their claim for overtime wages pursuant to Conn. Gen. Stat. §31-68.

### B.  Live-in Shifts Require Payment for 24 Hours

Although the CMWA follows the FLSA in many respects, it contains its own definition of hours of work for workers, like Plaintiffs, who are "employed by a third-party provider to provide 'companionship services,' as defined by FLSA regulations," and who are "required to be present at a worksite for a period of not less than twenty-four consecutive hours" Conn. Gen. Stat. Ann. § 31.76b(2)(D). That statute provides that "such individual and his or her employer may agree **in writing** to exclude a **regularly scheduled** sleeping period of not more than eight hours from hours worked" provided they have adequate sleeping facilities and get a minimum of five hours sleep time.[13] Conn. Gen. Stat. Ann. § 31-76b(2)(D) (emphasis added).

---

[13]   This provision governing hours of work for caregivers working 24-hour shifts is stricter than the FLSA provision at § 778.22 because it does not allow for deductions for meal periods.  Meal periods are only mentioned as being excludable in § 31-76b(A).  Section 31-76b(2)(D) defines hours of work for caregivers "notwithstanding the [other] provisions of this subsection," and it only mentions deductions for sleep time, not meal times.  Even if the meal time exclusion in §31-76b(2)(A) were applicable to caregivers, it allows deductions for meals "unless the employee is required or <u>permitted</u> to work."

Here again, Defendants cannot, as a matter law, carry their burden of proving that they had such an agreement, let alone one in writing.  The only written agreement between Humana and the Caregivers is the Caregiver Agreement and it says nothing about regularly scheduled sleep times.  To the contrary it states that Caregivers will be paid for 8 hours of "intermittent" work, thereby implying that sleep time may be intermittent as well. That reading of the agreement is confirmed by the testimony of Humana's 30(b)(6) witness, quoted above, which makes clear that Humana studiously avoided setting up regularly scheduled sleep and meal periods for Caregivers, choosing instead to leave it  up to each individual Caregiver to negotiate sleep and meal time with his or her client on a daily basis. Thus, the Connecticut Effective Date class members who worked 24-hour shifts are entitled to summary judgment crediting them with 24 hours of work per live-in shift. [14]

### C.  The Regular Rate For Purposes of Connecticut State Law Overtime Is the Same As the FLSA Regular Rate

The Connecticut Minimum Wage Act calculates the regular rate for purposes of overtime in the same way as the FLSA. Conn. Gen. Stat. § 31-76b(1). *See Williams v. General Nutrition Centers, Inc.,* 166 A.3d 625, 630 (Conn. 2017) (concluding that, with respect to the calculation of the regular rate, "[w]e see no reason to interpret §31-76c differently from its federal counter-part."). As explained above, all Caregivers were paid hourly rates whether they worked hourly

---

Caregivers were clearly permitted to, and often did, work during meals.  *See, e.g.,*59:20-60:9 (Caillo would prepare breakfast for the client and "would carry the conversation with [the client] while eating." 63:5-65:9 (even when client's children came for lunch Caillo would sit with them because that was what the family requested).  Thus meals could not be excluded even if § 31-76b(2)(A) applies to caregivers.

[14]   In the event the Court concludes that there is an issue of fact as to whether Humana had an agreement in writing giving Caregivers "regularly scheduled" sleep periods, or whether meal times were deductible, Plaintiffs move the Court to grant summary judgment that Humana owed Connecticut Effective Date Class Members a minimum of 13 hours per live-in shift, leaving for the jury the question whether Humana satisfied the requirements for excluding sleep and meal time.

shifts or live-in shifts.  Their hourly rates are their "regular rates" for purposes of calculating overtime damages.

### D.  Overtime Owed

Accordingly, to the extent the overtime hours have already been paid at straight time (as would be the case for all of the hours worked on hourly shifts), overtime should be paid at .5 times the regular rate.  To the extent that overtime hours have not been paid at all (as is the case with some or all of the overtime hours of live-in workers) overtime should be paid at 1.5 times the regular rate.

### E.  Gap Time Owed

A certain number of the 24 hours per shift credited to Connecticut class members who worked live-in shifts will likely be unpaid straight time hours. [15] The CMWA entitles class members to compensation for those hours when they fall in overtime weeks.  These so-called "gap-time" hours are compensable because CMWA §§31-68 & 31-76b are interpreted in light of the analogous provisions of the FLSA, *Roto-Rooter Servs. Co. v. Dept of Labor,* 219 Conn. 520, 528 n.8 (1991); *Hendricks v. J.P. Morgan Chase Bank, N.A.,* 677 F.Supp.2d 544, 560 (D. Conn. 2009), and the U.S. Department of Labor has interpreted the FLSA to require payment of all unpaid straight time hours occurring in overtime weeks.  The DOL requires these payments because "[the] extra compensation for the excess hours of overtime work under the Act cannot be said to have been paid to an employee unless all the straight time compensation due him for

---

[15]  If a live-in shift worker worked four 24-hour shifts per week, she was entitled to pay for 96 hours (40 straight time and 56 overtime).  Humana paid workers who worked four 24-hour shifts for 32 hours of straight time (4 shifts x 8 hours).   Thus such a worker would be entitled to an additional 8 hours of straight time and 56 hours of overtime.  Even if the worker were only entitled to 13 hours per shift, Humana would still owe 8 hours of straight time and 12 hours of overtime.

the non-overtime hours under his contract (express or implied) or under any applicable statute have been paid."[16] 29 C.F.R. § 778.315.

## III.  CONNECTICUT UNPAID HOURS CLASS CLAIM

### A.  Connecticut Unpaid Hours Class Members Are Entitled To Pay For Uncompensated Hours During 24-hour shifts

For the reasons set forth above, Connecticut Unpaid Hours Class members, i.e. Connecticut Care Givers who worked 24-hour shifts between January 1, 2015 and January 25, 2016, were entitled to be credited with a minimum of 24 hours of work per live-in shift. The undisputed evidence shows that they were in fact paid for 8 hours per shift. Statement of Facts ¶¶ 10, 14, 12, 29. Thus, the members of the Connecticut Unpaid Hours Class worked a total of 16 uncompensated hours per shift in violation of their rights under Conn. Gen. Stats. §§ 31-68 (overtime), and 31-72 (civil action for failure to pay wages when due).

Depending on the number of shifts worked per week, some of those unpaid hours will be straight time hours and some will be overtime hours.  Damages for the uncompensated straight time hours is authorized by Conn. Gen. Stat. §31-72.  *See Shortt v. New Milford Police Dept.,* 212 Conn. 294 (1989) (§31-72 "provide[s] an employee with a statutory right to collect unpaid wages): *Evans v. Tiger Claw, Inc.,* 163 A.3d 1282, 1288 (Conn. App. 2017) ("§31-72 create[s] a

---

[16]  Plaintiffs recognize that the Second Circuit rejected this interpretation of the FLSA. *Lundy v. Catholic Health Care Sys. of Long Island,* 711 F.3d 106, 118 (2d Cir. 2013).  Nevertheless, *Lundy* is not binding on the Supreme Court of Connecticut and does not interpret the CMWA.  Indeed, Lundy itself recognizes that NYLL may allow for such gap time claims even if the FLSA does not.  In addition, the Second Circuit's opinion is far from persuasive even with respect to the proper interpretation of the FLSA.  At least two other Circuits and numerous district courts have upheld gap time claims as proper under the FLSA. *See Monahan v. Co. of Chesterfield, Va.,* 95 F.3d 1263, 1273 (4th Cir. 1996); *Donovan v. Crisostomo,* 689 F.2d 869, 876 fn 13 (9th Cir. 1982); *Barvinchak v. Indiana Regional Medical Center,* CIV.A. 3:2006-69, 2007 WL2903911 at *4-8 (W.D. Pa. Sept 28, 2007); *Reich v. Midwest Body Corp.,* 843 F.Supp. 1249, 1252 (N.D. Ill. 1994); *Lamon v. City of Shawnee,* 754 F.Supp. 1518 (D.Kan. 1991) *aff'd in relevant part,* 972 F.2d 1145, 1155 (10th Cir. 1992).

civil cause of action for an employee to collect unpaid wages"). Damages for the overtime hours at .5 or 1.5 the regular rate (depending on whether the overtime hours have already been compensated at the regular rate) are recoverable pursuant to Conn. Gen. Stats. §§31-68, 31-72.

## IV. NEW YORK EFFECTIVE DATE OVERTIME CLAIMS

### A. New York Class Members Are Entitled to Time and a Half Their Regular Rate During the Effective Date Period.

New York labor law has long required employers to pay overtime at time-and-a-half the regular rate for workers covered by FLSA overtime, and at time-and-a-half the NY minimum wage rate for workers who are exempt from overtime pursuant to Section 13 of the FLSA. 12 NYCRR §142-2.2. Thus, when Caregivers became eligible for FLSA overtime on January 1, 2015, the effective date of 29 C.F.R. §552.109(a), the members of the New York Effective Date Class became eligible for state law overtime at time-and-a-half their regular rate. NYLL Art. 19 § 663, 12 NYCRR §142-2.2.

### B. Minimum Hours per 24-Hour Shift.

NYLL requires payment for "the time an employee . . . is required to be available for work at a place prescribed by the employer . . ." 12 NYCRR §142-2.1(b). Plaintiffs had argued that this provision always required Caregivers assigned to live-in shifts to be paid for the full 24 hours of their assignment. However, the New York Court of Appeals recently held that the regulation, properly construed, permits an employer to pay such workers for 13 hours per shift, instead of 24, *if, and only if,* the employer establishes "regularly scheduled substantial periods of assignment-free personal time." *Andryeyeva v. New York Helath Care, Inc.,* No. 11, 2019 WL 1333030 at *8-9 (N.Y. Mar. 26, 2019) (emphasis added). Like the FLSA regulation at 29 C.F.R. §785.22, the *Andryeyva* Court recognized that regularly scheduling sleep and meal time is of critical importance if an employer is going to lawfully pay for 13 instead of 24 hours. As the

22

Court explained, it is the fact that such time is regularly scheduled that allows the worker to be viewed as "unavailable" for work and free to engage in personal activities. "[New York] DOL has given meaning to the complete phrase ["required to be available for work at a place prescribed by the employer"] by interpreting 'available for work' in the context of a 24-hour shift to exclude the hours when the employee is not working because the employee is on a scheduled sleep and meal break." *Id.* at *8 (emphasis added).  When sleep time is scheduled it is analogous to periods when a worker is "subject to call"—i.e. not working because he is relieved of duty and can engage in personal activities. *Id.* at *9. When it is not regularly scheduled, a worker is effectively always "on call" and "considered to be working even when they do not actually perform any duties."  *Id.*  The point of requiring sleep time to be "regularly scheduled" is "to protect employees' ability to engage in a significant degree of personal activity during their breaks by imposing strict rules that employers must comply with if they wish to exclude such breaks from compensable time." *Id, quoting* NY DOL 2010 Opinion Letter at p. 3 (emphasis added).  Section §142-2.1(b) only allows an employer to exclude 8 hours of sleep and 3 hours of meal time based on the "presumption that the employer will in fact structure the work assignment to provide [eating and sleeping breaks] for a home health care aid." *Id,* at *10 (emphasis added).

As set forth above, the undisputed evidence shows that Defendants never provided "regularly scheduled" meal and sleep breaks for Caregivers working 24 hour shifts and, in fact, adopted the opposite policy:  Defendants scheduled nothing and simply expected Caregivers to negotiate their sleep time with clients each day.[17]

---

[17] Not only do Defendants not schedule sleep and meal times, they do not attempt to record whether Caregivers received the breaks despite having a remote time keeping system. Allen, 198:3-200:21.

This case illustrates why a "regularly scheduled" sleep time is so critical. Humana's system of requiring Caregivers to constantly negotiate sleep and meal time with their client –a client who is focused on his or her own needs not those of the Caregiver, Allen: 183:7-3; 197:4-198:2 – puts Caregivers in a delicate position. After all, the Caregiver's livelihood is dependent on maintaining a good relationship with the client since a dissatisfied client can insist that Humana provide a different and more accommodating Caregiver. This puts pressure on Caregivers to compromise his or her own needs in order to maintain good relations with their client – precisely the kind of pressure that the requirement of "regularly scheduled" sleep and meal times is designed to avoid. *See, e.g.,* Mathieu 34:8-35:5; 51:11-57:24; Statement of Facts at ¶ 18. It is for that reason that New York (and FLSA and Connecticut) law puts the onus on the employer to specify regularly scheduled sleep and meal times with the client before work begins. If the client balks at such rigidity and needs the flexibility of having a caregiver on call throughout the day, Humana has the duty to explain that such services are available but only by paying a live-in caregiver for all 24-hours of work or hiring two caregivers to fill rotating 12 hour shifts. It is Humana's obligation to protect its Caregivers by making clear to clients that those are the only available options if sleep and meals are not going to be regularly scheduled. Humana cannot lawfully sell caregiver services by giving clients the impression that they can have Caregivers "on call" 24-hours a day for all needs large and small while only paying for 8 hours of services. As *Andryeyeva* recognizes, in those circumstances the Caregiver is effectively on call for the entire shift and must be paid accordingly.

Thus, pursuant to the interpretation of 142-2.1(b) upheld by the New York Court of Appeals in *Andryeyeva,* the New York Effective Date Class members are entitled to pay for all 24 hours of their live-in shift because Humana failed to comply with the "strict rule" that

Caregivers be afforded "regularly scheduled" sleep and meal times. *Andreyeva,* 2019 WL 1333030 at \*9-10. There is nothing unfair about this conclusion. As the Court of Appeals pointed out it in its opinion, the New York Department of Labor's interpretation imposing "strict rules" regarding the need for sleep time to be "regularly scheduled" if it is to be excluded from work time has been consistent for nearly five decades. *Id.* at 9. For example, the 1972 version of NY DOL's enforcement manual stated that to exclude sleep time a "bona fide, regularly scheduled 'sleeping period' must be established." *Id.* at \*18. Humana did not establish such periods and, accordingly, owes Caregivers who worked live-in shifts for 24-hours of work per shift. [18]

### C. The Regular Rate for New York

NYLL provides that "[a]n employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided" in the FLSA. 12 NYCRR § 142-2.2. *See, Animas v. Balcon Quiteno, Inc.,* 14CV3763CBAVVP, 2015 WL 13731359  \*3 (E.D.N.Y. Sept. 14, 2015), *report and recommendation adopted as modified,* 14CV3763CBAPK, 2016 WL 1271478 (E.D.N.Y. Mar. 30, 2016); *Blue v. Finest Guard Services, Inc.,* 09 CV 133 (ARR), 2010 WL 2927398 \*10 fn 17 (EDNY Jun. 24, 2010), *report and recommendation adopted,* 09-CV-133 (ARR)(CLP), 2010 WL 2927403 (E.D.N.Y. July 19, 2010). Accordingly, the regular rate for members of the New York Effective Date Class is the same as their FLSA regular rate.

### D. Overtime Owed

---

[18]   In the event the Court concludes that there is an issue of fact as to whether Humana accorded  N.Y. Caregivers "regularly scheduled" sleep and meal periods, Plaintiffs move the Court to grant summary judgment that Humana owed New York Effective Date Class Members a minimum of 13 hours per live-in shift, leaving the question of whether 24 hours are owed for the jury.

The N.Y. Effective Date class is entitled to summary judgment that Defendants violated their rights to overtime under 12 NYCRR §142-2 entitling them to relief pursuant to NYLL Art. 19 § 663(1). Their work hours must be recalculated based on 24 hours per live-in shift.  They are then entitled to back pay of .5 times their regular hourly rate for any overtime hours during the Effective Date Period for which they have already received straight time pay and 1.5 times their regular rate for each overtime hour for which they have not previously been compensated.

### E.  Gap Time Owed

Some of the 24 hours per live-in shift for which Class Members are entitled to compensation may be gap time hours – unpaid straight time hours occurring in overtime weeks. Class members are entitled to compensation for those hours at their regular hourly rate pursuant to NYLL Art 19 and 12 NYCRR §142-2.2. Those provisions have been interpreted to permit the recovery of unpaid "gap time" in order to ensure the overtime owed for those weeks is meaningfully paid. *See Coley v. Vannguard Urban Improvement Assn. Inc.,* 12CV5565PKCRER, 2018 WL 1513628 (E.D.N.Y. Mar. 27, 2018), *as amended* (Mar. 29, 2018) (finding gap time recoverable under NYLL Art. 19 § 663 because that statute provides that "[i]f any employee is paid by his or her employer less than the wage to which he or she is entitled . . . he or she shall recover in a civil action *such* underpayments . . ."); *Bowen v. Baldwin Union Free School Dist.,* CV156829JMAGRB, 2018 WL 4560726 (E.D.N.Y. Aug. 31, 2018), *report and recommendation adopted,* 15CV6829JMAGRB, 2018 WL 4558403 (E.D.N.Y. Sept. 21, 2018) (same).

## V.  NEW YORK UNPAID HOURS CLASS CLAIM

From November 11, 2009 until on or about January 1, 2012,[19] Humana paid New York

Class Members for 10 hours per live-in shift. Statement of Facts ¶¶ 11, 28.  Thereafter until

January 26, 2016, Humana paid class members for 8 hours per shift. Statement of Facts ¶¶ 12,

13,14, 25, 27, 29.  As explained above, pursuant to 12 NYCRR §142-2.1(b), class members were

entitled to compensation for 24 hours per shift throughout both of these periods. Thus, the

members of the N.Y. Unpaid Hours Class were under-compensated 14 hours per live-in shift

from November 11, 2009 to on or about January 1, 2012 and 16 hours per live-in shift from then

until January 26, 2016.

Some of these uncompensated hours may constitute straight time hours.  Compensation

for unpaid straight time hours is recoverable pursuant to NYLL Art 6 §191, 198 and Art. 19

§663. [20] Section 198 allows employees to recover damages "for a claim of straight time at a rate

higher than the minimum wage if the parties previously agreed to the rate . . ." *Villar v. Prana*

*Hosp., Inc.,* 14civ8211RAJ CF, 2017 WL 1333582 at *4 (S.D.N.Y. Apr. 11, 2017) *report and*

*recommendation adopted,* 2018 WL 3579841 (SDNY July 25, 2018).  *See also, Coley v.*

*Vannguard Urb. Improvement Assn., Inc.,* 12CV5565PKCRER, 2018 WL 1513628 at * 10

(E.D.N.Y. Mar. 27, 2018) *as amended* (Mar. 29, 2018) (employees are entitled to recover their

---

[19]   The exact date of the change from 10 to 8 hours may vary from worker to worker depending on when they signed a new contract.  The exact date for each caregiver will be determined from the wage records when damages are determined.

[20] NYLL Art. 6 is entitled "Payment of Wages."  Section 191d provides that workers "shall be paid the wages earned in accordance with the agreed terms of employment, but not less frequently than semi-monthly . . .; §193 prohibits deductions from wages except for certain enumerated deductions;  § 198 provides that "In any action instituted in the courts upon a wage claim by an employee . . . in which the employee prevails, the court shall allow such employee to recover the full amount of any underpayment, all reasonable attorney's fees, prejudgment interest and . . . an additional amount of liquidated damages equal to 100 percent of the total amount."

"full wages" under NYLL Art. 6 §198); *Denoyer v. PMI Sec. Prot. Inc.,* 15CIV4834KMKJCM, 2018 WL 1738217 at *3 (S.D.N.Y. Jan. 23, 2018) *report and recommendation adopted,* 15CV4834KMKJCM, 2018 WL 1737154 (S.D.N.Y. Apr. 9, 2018) ("pursuant to NYLL, a prevailing plaintiff is entitled to recover the full amount of wages owed, not just the statutory minimum wage for the hours worked."); *Soto v. Armstrong Mgt. Corp.,* 15CIV9283AJNJCF, 2016 WL 7396687 at *2 (S.D.N.Y. Dec. 21, 2016) *report and recommendation adopted,* 15CIV9283AJNJCF, 2017 WL 2191625 (S.D.N.Y. May 17, 2017) ("The NYLL provides . . . for a claim of straight time at a rate higher than minimum wage if the parties previously agreed to the rate, and the courts have awarded straight time rates higher than minimum wage under a variety of NYLL sections. [citing cases]").

Compensation for unpaid overtime hours is recoverable pursuant to NYLL Art 6 §§191, 193, and 198, and NYLL Art. 19 § 663; 12 NYCRR §142-2.2.  During the period November 11, 2009 through January 1, 2015, when Class Members were exempt from FLSA overtime, Class Members were entitled to either 1.5 times the applicable NY State minimum wage or their straight time pay for each hour of overtime, whichever was greater. *See Edwards v. Jet Blue Airways, Corp.,* 873 NYS2d 233 (Sup. Ct. 2008) (while the overtime provisions of 12 NYCRR §142-2.2 are satisfied if a worker's regular rate exceeds 1.5 times the minimum wage, an employer still must pay the regular rate for those overtime hours).   An employer cannot simply pay 1.5 times the NY minimum wage for overtime hours if the worker's straight time rate is higher.  As the NY State Department of Labor has noted, "an interpretation of 12 NYCRR §142-2.2 that would result in an employee being paid less for overtime than for straight –time must be rejected as a construction that would make [the regulation] absurd." N.Y. Dept. of Labor Opinion

28

Letter (April 17, 2008).  That opinion letter also holds that, reading §142-2.2 together with

NYLL Art. 6 §§191(1) and 193(1),

> it is the Department's opinion that an employee whose 'agreed terms of employment' are that he/she receive wages at the regular rate of $15.20 per hour must receive timely payment of wages at such rate for all hours worked. It is the Department's further opinion that to pay an employee at any lesser rate for any time worked would be an illegal deduction from wages….

> Accordingly, to pay an FLSA exempt employee whose regular rate of pay is $15.20 at such rate for all hours worked, straight-time or overtime, would constitute compliance with 12 NYCRR §142-2.2, but such employee may not be paid any less than that regular rate for any time worked.

NY State Dept. of Labor Opinion Letter, April 17, 2008) (emphasis added).

## CONCLUSION

For all of the foregoing reasons:

(1) The FLSA opt-in Plaintiffs are entitled to summary judgment on their unpaid FLSA overtime claim for all hours worked in excess of 40 hours during the period January 1 to October 15, 2015.  In calculating damages, workers assigned live-in shifts are to be credited for 24 hours of work per shift and their regular rate is their daily wage divided by 8 hours.

(2)  The Connecticut Effective Date Class is entitled to summary judgment on their claims for unpaid State overtime for hours worked in excess of 40.  In calculating damages, the regular rate shall be the same as the regular rate for purposes of the FLSA and Class members working live-in shifts are entitled to credit for 24 hours of work per shift.  In addition, if, as a result of crediting 24 hours per shift, Class Members have unpaid straight time hours occurring in overtime weeks, they are entitled to compensation for those hours at their regular rate.

(3)  The Connecticut Unpaid Hours Class is entitled to summary judgment on their claim for unpaid hours of work occurring between January 1, 2015 and January 25, 2016, that result from crediting class members with 24 hours of work per live-in shift.  Class members are entitled

to their regular rate for unpaid straight time hours and time-and-a-half for unpaid overtime hours. The regular rate for class members is the same as the regular rate for purposes of the FLSA.

(4)  The New York Effective Date Class is entitled to summary judgment on their claim for unpaid State overtime for hours worked in excess of 40.  In calculating damages, the regular rate shall be the same as the regular rate for purposes of the FLSA and Caregivers working live-in shifts are entitled to be credited with 24 hours of work per shift.  In addition, Class Members are also entitled to their regular rate for any unpaid straight time hours occurring in overtime weeks.

(5)  The New York Unpaid Hours Class is entitled to summary judgment on its claim for unpaid hours of work occurring between November 11, 2009 and January 25, 2016, that result from crediting class members with 24 hours per live-in shift.  Prior to January 1, 2015, class members are entitled to their regular rate for all unpaid straight time hours of work and their regular rate or 1.5 times the NY minimum wage for overtime hours, whichever is greater.  After January 1, 2015 class members are entitled to their regular rate for unpaid straight-time hours and time and a half that rate for unpaid overtime hours.  In calculating damages, the regular rate shall be the same as the regular rate for purposes of the FLSA.


May 17, 2019

Respectfully submitted:

By: */s/ Michael J.D. Sweeney*

Michael J.D. Sweeney, Esq.
msweeney@getmansweeney.com
GETMAN, SWEENEY & DUNN, PLLC
260 Fair Street Kinston, NY  12041
Telephone: (845) 255-9370
Facsimile: (845) 255-8649

-and-

Philip Bohrer
phil@bohrerbrady.com
BOHRER BRADY, LLC
8712 Jefferson Highway, Suite B
Baton Rouge, Louisiana  70809
Telephone: (225) 925-5297
Facsimile: (225) 231-7000

***Counsel for Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 17, 2019, I caused the foregoing to be electronically filed the Clerk of Court by using the CM/ECF system, which will send notice of electronic filing to all counsel registered in this case.  Any counsel not registered for electronic notice of filing with the Clerk of Court will be mailed a copy of the above and foregoing, First Class U.S. Mail, postage prepaid and properly addressed.

<u>/s/ Michael J.D. Sweeney</u>