UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


```
- - - - - - - - - - - - - - - x
                              :
DAVERLYNN KINKEAD, Individually : No. 3:15CV1637(JAM)
and on behalf of all others    :
similarly situated,            :
                               :
                Plaintiff      :
                               :
          v.                   :
                               :
HUMANA, INC., HUMANA AT HOME,  :
INC., and SENIORBRIDGE FAMILY  :
COMPANIES (CT), INC.,          :
                               : New Haven, Connecticut
                Defendants     : November 20, 2019
                               :
- - - - - - - - - - - - - - - x
```


MOTIONS HEARING

B E F O R E:

THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.


Diana Huntington, RDR, CRR
Official Court Reporter

```
 1   A P P E A R A N C E S:

 2

 3        FOR THE PLAINTIFFS:

 4             GETMAN SWEENEY & DUNN, PLLC
                    260 Fair Street
                    Kingston, New York 12401
 5             BY:  MICHAEL J.D. SWEENEY, ESQ.
                    ARTEMIO GUERRA, ESQ.
 6
               BOHRER BRADY, LLC
 7                  8712 Jefferson Highway, Suite B
                    Baton Rouge, Louisiana 70809
 8             BY:  PHILIP BOHRER, ESQ.

 9             EDWARD TUDDENHAM
                    228 West 137th Street
10                  New York, New York 10030

11
          FOR THE DEFENDANTS:
12
               JACKSON LEWIS PC
13                  90 State House Square, 8th Floor
                    Hartford, Connecticut 06103-3708
14             BY:  DAVID R. GOLDER, ESQ.

15

16

17

18

19

20

21

22

23

24

25
```

1                            **1:32 P.M.**

2              THE COURT:  We are here today for argument on

3    cross-motions for summary judgment in Kinkead v. Humana.

4              Appearance of counsel, please, for plaintiffs.

5              MR. TUDDENHAM:  Edward Tuddenham for the

6    plaintiffs.

7              MR. SWEENEY:  Mike Sweeney, Getman Sweeney &

8    Dunn, for the plaintiffs.

9              MR. GUERRA:  Artemio Guerra, Getman Sweeney &

10   Dunn, for the plaintiffs.

11             MR. BOHRER:  Philip Bohrer for plaintiffs.

12             THE COURT:  All alone.

13             MR. GOLDER:  All alone, Your Honor.  David

14   Golder for the defendants.

15             THE COURT:  So we obviously have plenty to talk

16   about.  I thought what I'd like to do is start with

17   plaintiffs' motion, hear argument on that, and then turn

18   to defendants' motion.  I have about an hour today to

19   spend with our arguments today, hopefully we'll be able to

20   cover in that time period.

21             If you'd like to proceed.

22             MR. TUDDENHAM:  Thank you, Your Honor.

23             I think the briefs cover in considerable detail

24   the issues here.  There are three issues I'd like to

25   address in addition to anything the Court would like to

1    hear about.

2             THE COURT:   Sure.

3             MR. TUDDENHAM:   The first are the statutorily

4    required hours of work for the live-in shift workers which

5    seems to be one of the major issues in the case.   And I

6    want to make clear that plaintiffs' claim is and always

7    has been for the minimum number of hours that the

8    defendants were statutorily required to pay for, given the

9    job that they assigned to the caregivers, assigned to the

10   class.   We're not here to talk about whether this worker

11   got eight hours of sleep or that worker was interrupted in

12   their sleep.   The issue is the job created by Humana, what

13   does the statute require them to pay as hours worked for

14   that job.   And the answer turns out to be fairly

15   straightforward.

16             The job, as set forth in the contract and the

17   handbook, requires these workers to be present in the

18   client's home for a 24-hour shift.   They are not allowed

19   to leave, they're not allowed to have visitors, they're

20   not even allowed to receive phone calls.   Their job is to

21   be physically present for the full 24 hours on duty ready

22   to assist the client with whatever their needs might be,

23   whether that's making them dinner or talking to them,

24   watching television with them, getting them to the

25   bathroom, whatever.   And that is undisputed.

1              It is also undisputed that under the FLSA,

2     New York law, and Connecticut law, when a worker is

3     assigned by the employer to be present at a particular

4     place of employment, I think the phrase in the *Anderson v.*

5     *Mt. Clemens* case is if you're assigned to be at the

6     employer's place on duty or at any other designated place,

7     that is work time.  As long as you're assigned to be there

8     by the employer, that is work time.

9              The Connecticut statute actually uses a little

10    clearer syntax.  It says hours worked include all time

11    during which an employee is required to be on the

12    employer's premise or to be on duty or to be at a

13    prescribed place.

14             THE COURT:  We can have this conversation, but I

15    remember pretty distinctly when you all were before me

16    when you were trying to get your class certified for your

17    four classes, you told me it's 13 or it's 24.  You

18    didn't -- I read your briefing and I said, wow, I guess

19    they want me to de-certify the classes on grounds because

20    now they would like to raise person HHW per specific.

21             MR. TUDDENHAM:  No.

22             THE COURT:  Are you asking me to do that?

23             MR. TUDDENHAM:  Absolutely not.

24             THE COURT:  Because it sounds to me like you

25    want me to get into the weeds --

1          MR. TUDDENHAM:  No, absolutely not, Your Honor.

2          THE COURT:  -- of particular issues.

3          MR. TUDDENHAM:  When we argued class

4    certification, what we made clear is this case is about

5    the minimum number of hours that they are required to pay

6    for the job --

7          THE COURT:  But you know, that's not really what

8    you said.  Because you said -- you said it's about the

9    minimum number of hours because for Rule 23 purposes and

10   for commonality and typicality and predominance you were

11   faced with an argument, well, we're going to have to start

12   getting into individual specific inquiries about what's

13   occurred here.  You said, well, presto-chango, we have the

14   solution to that.  I bit.  I guess maybe I shouldn't have

15   now, in light of what you're saying, but I went for it and

16   said, yeah, you're right, given this concession that not

17   simply that we're just asking for the number of hours as

18   legally required, but you were asking me for a rule or you

19   were suggesting advancing a rule that would be not be

20   individually fact specific.

21         MR. TUDDENHAM:  And that is precisely --

22         THE COURT:  And I don't understand how that's

23   true here and why, frankly, you didn't raise this at that

24   point in time.

25         MR. TUDDENHAM:  Let me address this, okay,

1    Your Honor?

2         The reason that we were entitled to class

3    certification was we are seeking the minimum number of

4    hours applicable to the job.  It has nothing to do with

5    what happened to any individual worker, how long any

6    individual worker worked.  It's the application of the

7    definition of hours worked to the job description, all

8    right?  And I will confess that at the time of the class

9    certification hearing, under New York law we thought that

10   the minimum number of hours applicable to the job

11   description was 24 hours.  And we turn out to be right

12   about that.

13        With respect to the FLSA and the Connecticut

14   law, we were focused on making clear that we were talking

15   about the definition of hours worked as applied to the job

16   description, no individual issues.  And to be perfectly

17   honest, we did not investigate as thoroughly as maybe we

18   could have what the minimum number of --

19             THE COURT:  Basically, it turns out your number

20   is 24, right?

21             MR. TUDDENHAM:  Yes, but --

22             THE COURT:  So if that had been your argument

23   before, you would have said, well, Your Honor, it turns

24   out things are even simpler than we thought because

25   actually you don't even have to choose between 13 and 24,

1    there's only one number, there's just 24.

2              MR. TUDDENHAM:  No, you do have to choose

3    between 13 and 24 because the definition of hours worked

4    under the FLSA, under the Connecticut law, and under

5    New York law, is if you're assigned to a place for 24

6    hours, that by definition is 24 hours of work, except an

7    employer can reduce that 24 hours of work if the employer

8    regularly schedules sleep time and break time.  If they

9    regularly schedule it --

10             THE COURT:  Are you relying on 29 CFR 785?

11             MR. TUDDENHAM:  785.22 it's 31-76b(2).

12             THE COURT:  Right.

13             So looking at the federal regulation, that's

14    what you're relying on.

15             MR. TUDDENHAM:  Right.  That they have -- at the

16    time we argued it, we thought they qualified for the

17    785.22 exemption which would make it 13 hours.

18             THE COURT:  And now you don't.

19             MR. TUDDENHAM:  Yes, it turns out that actually

20    when you look carefully at the law -- this is not a change

21    of facts, this is not a change of claim; it's the same

22    claim, minimum hours for the job description.  But if you

23    look at the law more carefully than I confess we had, it

24    turns out that regularly scheduled is a critical piece of

25    785.22.  And we came to that realization -- there actually

1    is a reason that we got confused.  Because going back when

2    we were worried about class certification, there were four

3    federal cases out of the Southern District of New York all

4    of which said that the claim for 24 hours requires

5    individual issues.  They -- without discussing it, the

6    plaintiffs in those cases apparently thought that 722 --

7    excuse me, 785.22, the regularly scheduled just didn't

8    mean anything.  And therefore if you were going to argue

9    that they didn't get to deduct for the sleep and meals,

10   that became an individual issue.  You had to figure out

11   did this worker get eight hours of sleep.

12            THE COURT:  What does "regularly scheduled"

13   mean?

14            MR. TUDDENHAM:  "Regularly scheduled," as

15   explained I think in the *Andryeyeva* case, which really was

16   the thing that woke us up, and in the cases we cite in our

17   brief, "regularly scheduled" means a set period of time

18   that the client is aware of, that the employer is aware

19   of, and that the worker is aware of that is set aside in

20   good faith as free time for the worker.

21            Now, look, we know they're there.  If the client

22   falls on the ground, they're going to have to get up and

23   help her, but it is made clear to everybody that this

24   regular period of time is protected, protected for the

25   worker.  Because the statute makes clear this is work

1    time.  Being present for 24 hours is work time.  And if

2    you don't do something -- if you're going to deduct and

3    not pay for work time, then you have to somehow do

4    something to protect the worker --

5               THE COURT:  So it's an agreement --

6               MR. TUDDENHAM:  Yes.

7               THE COURT:  -- by the employer --

8               MR. TUDDENHAM:  Yes.

9               THE COURT:  -- that the employee will have --

10              MR. TUDDENHAM:  Free time.

11              THE COURT:  -- free time, eight hours.

12              MR. TUDDENHAM:  But not just any old eight

13   hours.  That would be scheduled.  "Regularly scheduled"

14   means that there is some consistency in this so that the

15   worker can plan to use his free time, so that the worker

16   can maintain something of a consistent circadian rhythm,

17   so that the client knows when they can demand full

18   attention from the caregiver and when they're supposed to

19   leave them alone.  Everybody needs to know this in

20   advance.  That's why the regularly scheduled.

21              And one of the cases, I think it's the *Felker*

22   case that we cite, talks about if you don't regularly

23   schedule it, then the worker could come to work, they've

24   had a full night's sleep, they arrive at 7:00 a.m., and

25   the client says, well -- or the client is asleep and their

1   eight hours of sleep time has to be immediately after they

2   just had eight hours of sleep time.  And then they don't

3   sleep, and then they're on duty for the rest of the

4   24-hour period but they haven't had any sleep and it's a

5   mess.  That is why the job description that says this is a

6   job where you will do eight hours of intermittent work,

7   meaning a little bit here, a little bit there, a little

8   bit over there, is not a regularly scheduled anything.

9   Because even though there may be time to sleep, it's not a

10  block of time that anybody, the worker, the client, or

11  Humana, has clearly set aside and agreed is protected.

12          THE COURT:  So your argument is then the

13  agreement, the caregiver agreement had to essentially

14  specify the particular time period.  It had to say not

15  only eight hours, but it had to say from, you know,

16  7:00 p.m. until 3:00 a.m., that's what it had to say or

17  had to say midnight until 8:00 a.m.

18          MR. TUDDENHAM:  I don't know that it had to be

19  uniform with every caregiver agreement, but yes, when

20  Humana signed up a new client --

21          THE COURT:  Well, it had to specify -- your

22  argument I think is it would have to specify a specific

23  time period for each day.

24          MR. TUDDENHAM:  Yes.  And it doesn't have to be

25  exactly eight hours.  We cited in our brief a case where

1    the employer said, okay, the designated scheduled sleep

2    period is 6:00 p.m. to 6:00 a.m., which is 12 hours, they

3    only get to get credit for eight of that, but at least

4    it's a period of time that the worker, the client, the

5    employer all know that's it, that's what's set aside.

6         And it's important because when Humana signs up

7    a new client, they need to say to them, look, we're only

8    paying these workers for 13 hours.  We're going to deduct

9    for sleep, we're going to deduct for meals.  But in order

10   to be able to deduct for that, we have to in good faith

11   give them a scheduled block of time, a regularly scheduled

12   block of time where you, the client, will in good faith

13   say they will have free time.

14        THE COURT:  It has to --

15        MR. TUDDENHAM:  And if the client --

16        THE COURT:  Hold on a second.

17        It has to identify a specific time of day.

18        MR. TUDDENHAM:  Yeah.  It can be the middle of

19   the day, it can be the middle of the night.  Whatever it

20   is, it has to be a specific block of at least eight hours

21   for sleep.  And then the client has to make a decision.

22   Can I, in good faith, say that I'm healthy enough, I'm

23   well enough, I can --

24        THE COURT:  I don't see anything about a block

25   here.  The reg says a regularly scheduled sleeping period

1   of not more than eight hours.

2           MR. TUDDENHAM:  Well, right.  But the rest of

3   the reg makes clear they've got to get eight hours of

4   sleep time of which five cannot be interrupted.  So

5   clearly the reg is talking about a block of eight hours.

6   They're not talking about two hours here and two hours

7   there and two hours somewhere else.  It's got to be a

8   regularly scheduled block of time.  It can be eight hours,

9   it can be -- the one case allows 12 hours.  But it's got

10  to be a block of time when the client is required to

11  confront the fact that they have to leave the caregiver

12  alone for that period of time.  And if they can't, if

13  they're not well enough, or their son or daughter doesn't

14  feel they're well enough and wants somebody there

15  full-time, then they need to make a different arrangement.

16          The point is one of fairness.  This is work

17  time.  Since 1938, when you assigned somebody to be in a

18  place for 24 hours, that's work time.  And if you're going

19  to not pay them for all that time, you have to do

20  something to make that time you're not paying for --

21          THE COURT:  I think I've got your argument on

22  that.

23          MR. TUDDENHAM:  Actually, I think the *Andryeyeva*

24  case, speaking under New York law, makes that crystal

25  clear.

1            The Connecticut statute is actually a little

2    tougher than either New York or the FLSA, because the

3    Connecticut statute requires the agreement for a regularly

4    scheduled block of time to be in writing.  And in this

5    case, there is nothing.  The caregiver agreement says you

6    can have sleep time, but it doesn't say anything about it

7    being scheduled, let alone regularly scheduled.

8            THE COURT:  Well, if we look at the caregiver

9    agreement, I have it here, it says the remainder -- it

10   talks about being paid eight hours.  And then says, "the

11   remainder of your daily schedule will be allocated into

12   the following hours."  And it goes on, "three hours for

13   meals (on site)," and then it says "eight hours of sleep

14   time."

15           MR. TUDDENHAM:  But at the beginning it says for

16   pay purposes you are paid for eight hours of intermittent

17   work, the idea being that -- in the first place, Humana

18   seems to think that work is physical labor, and it may be

19   you will take them to the bathroom this hour and you will

20   make them lunch that hour and you deal with something else

21   the next hour.  If it's eight hours of intermittent work,

22   then the other time is equally intermittent.  There is no

23   schedule.

24           And their 30(b)(6) witness could not have been

25   clearer in his testimony:

1          "When a caregiver is assigned a 24-hour shift,

2    are they given a regularly scheduled sleep time?"

3          "No."

4          "So how do they know when they're supposed to

5    get their eight hours of sleep?"

6          "That's at their discretion, what they work out

7    with the client."

8          "So there's no regular schedule for that, they

9    just need to work it out with the client when they can get

10   their eight hours; is that right?"

11         "Yes."

12         "And it might change from day to day?"

13         "Yes."

14         THE COURT:  Okay.  I think I understand your

15   argument.  If you want to make another.

16         MR. TUDDENHAM:  So our position is if they

17   qualify for the 785.22 exemption, if the Court is

18   convinced that they did regularly schedule it, then they

19   owe for 13 hours and it doesn't matter with individuals if

20   they did or didn't get sleep.  Our position is they didn't

21   take that first step.  They don't qualify for it because

22   they did not regularly schedule anything.  And that is a

23   class wide -- it is as class wide as the fact that they're

24   on duty for 24 hours entitles them to pay.  We haven't

25   changed the claim an iota.  We have better understood what

1    the law is with respect to the reduction of hours.

2           Before, we thought the burden was on us to prove

3    it.  If we have to prove, then that's an individual case.

4    But in fact, it is clear that they have a preliminary

5    burden of showing that they at least attempted to

6    regularly schedule sleep time and meal time, and they did

7    not do that.  As a matter of policy, they did not do it.

8    And if that's the case, then they owe 24, not 13.

9           THE COURT:  Okay.

10           MR. TUDDENHAM:  On the regular rate, that's the

11   other issue I wanted to talk about.  Originally up through

12   2012, 24-hour caregivers were paid an hourly rate.  The

13   contract said $10 an hour, $12 an hour.  So there's no

14   question that it was an hourly rate prior to 2012.

15           In 2012, they changed the language of the

16   contract slightly to read that you will get X dollars per

17   day, see Number 3 below in the details.  But then the

18   contract explains that the X dollars per day is a standard

19   rate of pay based on eight hours of intermittent work --

20   again, intermittent work.  And it even goes on to say you

21   will receive 5.7 hours of straight time and 2.3 hours of

22   overtime to make up your total daily rate.  So this daily

23   rate is, in essence, it's an hourly rate.

24           In the example of Ms. Mathieu, it was $130 a

25   day, you divide by eight, and whatever -- I won't do the

1    math -- that is per hour.  It is not a day rate in the

2    sense of the federal regulation 778.112, which is a fixed

3    sum of money that is paid per day for however many hours

4    in the course of the day you may or may not work.  A day

5    rate, as defined by that regulation, means that whatever

6    we pay you, you've been paid for the whole day.  Whether

7    you work 2 hours or 24 hours, that's what you get.

8            But in this case, the contract is very clear

9    that this rate is not for all hours worked; it is for

10   eight hours of work.  Or more precisely, it's for 5.7

11   hours of straight time and 2.3 hours of overtime.  That's

12   what makes up -- and that's a quote -- that's what makes

13   up the daily rate eight hours.

14           And as if there were any further doubt about it

15   being an hourly rate, the wage receipts also show that

16   people are being paid an overtime rate for certain

17   overtime hours, straight time rate for certain

18   straight-time hours.  And the icing on the cake is the

19   30(b)(6) witness, when asked, well, what happens if

20   somebody works more than eight hours, responded that in

21   that case they would be paid extra, they would be paid

22   more.

23           Well, the whole point of the day rate, as

24   defined by the regs, is that this is the rate, it doesn't

25   matter how many hours you work.  When you pay by the hour,

1    whether you express it as $10 an hour or $100 for ten

2    hours of work, it doesn't make any difference.  If you do

3    more work and you get paid more, that's proof that it's an

4    hourly rate, not a day rate.

5            In fact, the only evidence they have for their

6    argument that it's a day rate is a couple of stray

7    comments from our client saying, yes, I was paid by the

8    day.  But when the attorney asked them that, they didn't

9    ask:  Are you being paid a day rate in the sense of the

10   federal regulation that says that amount for however many

11   hours you worked?  They were just -- they got paid --

12           THE COURT:  You want the day rate --

13           MR. TUDDENHAM:  -- treated as an hourly rate.

14           THE COURT:  -- as an hourly rate basically by

15   dividing by eight.

16           MR. TUDDENHAM:  Exactly.

17           THE COURT:  Okay.

18           MR. TUDDENHAM:  Because the definition of the

19   regular rate is the amount of money you pay divided by the

20   hours that it was intended to pay for.  And the contract

21   makes crystal clear it was intended to pay for eight

22   hours.  All right.

23           Finally, and very quickly, on gap time, this is

24   an issue that's been somewhat confused I think in the

25   briefing.  Gap time -- and it only applies to Connecticut

1    and New York -- it's when you work overtime hours, if you

2    have unpaid straight-time hours, as we would in this case

3    if the hours are 13 or 24, the question becomes:  Under

4    the overtime statute, can you recover that unpaid straight

5    time?  You're entitled to overtime, can you recover the

6    unpaid straight time?

7           The Department of Labor says, yes, you can

8    recover the unpaid straight time under the overtime law,

9    under 207, because if you don't get the straight time

10   paid, then essentially the employer is just moving the

11   extra wages, the penalty wages you pay for overtime.  It's

12   a bookkeeping thing to avoid the cost of overtime.  And

13   the purpose of overtime is to penalize an employer for

14   working workers too long by making them pay more.  Well,

15   if I have $15 of overtime that I owe and I make up for

16   that $15 by just not paying for three hours of straight

17   time, the statutory purpose of penalizing work over 40 is

18   lost.  So there is a Federal Department of Labor reg that

19   says in order to make overtime meaningful, you have to pay

20   all straight-time hours.

21          Now, the Second Circuit in a case called *Lundy*

22   said they would not enforce that in the Second Circuit.

23   The question for Connecticut is -- Connecticut follows the

24   FLSA on this question.  And the question is:  Would the

25   Connecticut Supreme Court follow the Department of Labor

1   regulation or would it follow *Lundy*?  And it's our

2   position that they would follow the Department of Labor,

3   number one, because the Department of Labor's argument

4   that the purpose of FLSA to penalize hours over 40 would

5   be completely lost if you didn't pay the straight time.

6   And the other thing is *Lundy* itself is based on a

7   misreading of the -- what's the name of the case?  Not

8   Hindenburg.

9          THE COURT:  *Klinghoffer*.

10         MR. TUDDENHAM:  They quote *Klinghoffer*, but what

11   they don't understand is *Klinghoffer* was a minimum wage

12   case.  And what *Klinghoffer* says is the purpose of minimum

13   wage is a living wage.  So if you only get paid for 35 out

14   of 40 hours you work, but your average wage over the full

15   40 hours is above minimum wage, then the purpose of the

16   Minimum Wage Act has been served and you don't get to

17   claim the straight-time wages or additional minimum wage;

18   you've gotten your minimum wage.

19         But *Klinghoffer* says the Overtime Act serves a

20   very different purpose.  The purpose of the Overtime Act

21   is, as I was saying, to penalize hours over 40.  That's

22   why you get time and a half straight time, not time and a

23   half minimum wage.  And so the whole discussion that *Lundy*

24   quotes out of *Klinghoffer* is a discussion of minimum wage,

25   of why it is that you don't get extra money for unpaid

1    straight-time hours if you made minimum wage.  *Klinghoffer*

2    makes very clear that the rule should be very different

3    under the Overtime Act because it serves a different

4    purpose.

5           So both because of the DOL analysis and the

6    error in *Lundy*, we submit that the Connecticut Supreme

7    Court would find gap time to be available.  And in

8    New York we cite in our brief several cases post-*Lundy*.

9    *Lundy* itself said, well, maybe you can get gap time under

10   New York minimum wage.  And we cite several post-*Lundy*

11   New York cases that do indeed grant gap time pay.

12           THE COURT:  Thank you.

13           MR. TUDDENHAM:  Any other questions?

14           THE COURT:  Not at this time.  Thank you.

15           Mr. Golder.

16           MR. GOLDER:  Thank you, Your Honor.

17           Just very briefly I wanted to address something

18   to the Court, and the Court can ask questions.

19           I just wanted to note that under the law the

20   remedy should be fitting and proportionate to the

21   violation of the issue.  That is a fundamental tenant of

22   our legal system.  While it's true that wage laws are

23   remedial, the Supreme Court has recently made clear in

24   *Encino Motors* --

25           THE COURT:  I know that case well.

1          MR. GOLDER:  Okay.

2          But this Court has noted that the core issue

3   here in this case is the new rule that went into effect

4   and what damages flow from that new rule.  And our

5   contention, Your Honor, is Humana's conduct in leading up

6   to that new rule and afterwards was at worst reasonable,

7   in good faith, and understandable.

8          THE COURT:  Let me do this.  Maybe you can focus

9   just on plaintiffs' arguments that they've made for

10  summary judgment.  And then I'll hear from you essentially

11  on your good faith arguments, okay?  Is that all right?

12         MR. GOLDER:  Sounds good, Your Honor.

13         THE COURT:  Great.

14         You I think it's fair to say are protesting

15  plaintiffs' claim for summary judgment to the extent it's

16  relying on this regulation with respect to the regularly

17  scheduled sleeping periods.

18         MR. GOLDER:  Yes, Your Honor.

19         THE COURT:  You argue that that was not properly

20  raised before, that they're doing a bait and switch on the

21  Court essentially, I don't think you used those terms, but

22  you say to the effect that they asked for class

23  certification on one ground without mentioning this, and

24  then they bring in this theory that -- or are ambushing

25  you, that is a term you use in your briefing.  So I guess

1      my question is, I can see your point about the certified

2      New York and Connecticut claims.  I'm a little less

3      certain on the FLSA opt-in claims whether they actually

4      have foreclosed themselves from making that argument.

5            MR. GOLDER:  Yes, Your Honor.  The nice thing

6      about the record is the record stays.  We can go back to

7      the record and see what plaintiffs have said on the

8      record, and I pointed the Court to a few of those points,

9      but one of them I'll just remind the Court.  In moving for

10     supplemental notice, the plaintiffs said that they are

11     going to -- according to plaintiffs -- and this is a

12     quote, according to plaintiffs -- strike that, Your Honor.

13     This is Connecticut law.  I'll find it.

14           Here it is.  Docket No. 218 at Page 12.  And

15     this is a direct quote from the plaintiffs' submission:

16     "The FLSA requires that class members be credited with at

17     least 13 hours of work for a 24-hour shift and Plaintiffs

18     are willing to accept that minimum for purposes of the

19     FLSA claims in this action."  That's the plaintiffs to the

20     Court.

21           Our point is, for judicial estoppel purposes,

22     these new claims should not even get out of the starting

23     gate.  To the extent they do, Your Honor, they also fail

24     on the merits.  This idea that you have to have a specific

25     time in a regularly scheduled sleeping break, that is

1  something that they're pulling out of thin air,

2  Your Honor.  That is not in the regulations, that's not in

3  any binding court decision on this Court.  The only cases

4  they're pulling it from are cases that aren't in the home

5  health worker context, not in this circuit, Your Honor.

6  And a couple of those cases, Your Honor, we pointed out to

7  the Court, don't even have a written agreement like we do

8  here.

9            THE COURT:  So the caregiver agreement certainly

10  provides for an eight-hour period of sleep time, right?

11            MR. GOLDER:  Yes, Your Honor.

12            THE COURT:  And your argument is it expressly

13  provides that in writing and that satisfies any

14  requirement that there be a regularly scheduled eight-hour

15  sleep period because in fact this is regularly scheduling

16  it, right?

17            MR. GOLDER:  Yes, Your Honor.

18            THE COURT:  Regularly providing for it.

19            MR. GOLDER:  Yes, Your Honor.

20            THE COURT:  You're saying this regulation does

21  not go further and say, well, you have to actually say the

22  precise periods of time of day when sleeping stops and

23  starts, but you have to have essentially regularly

24  scheduled means provided for in a regular manner --

25            MR. GOLDER:  Yes, Your Honor.

1          THE COURT:  -- that schedules it.  I get your

2    argument there.

3          MR. GOLDER:  Okay.  Again, there's nothing that

4    says there needs to be a specific time.  And regularly

5    scheduled, every single day you're getting eight hours of

6    sleep.

7          THE COURT:  Now, plaintiffs say, well, the

8    regulation talks about -- or the caregiver agreement talks

9    about intermittent work per day.  But, of course, when we

10   look at intermittent, we have to look at not just a

11   trade-off with respect to eight hours of sleep, but it

12   also has to do with the three hours of meal time provided,

13   right, with the five hours of free time on site, right?

14   So the fact I think, if I'm understanding your argument,

15   the fact that the caregiver agreement refers to something

16   being intermittent certainly doesn't mean or invite the

17   person not to have a regularly scheduled sleep time.

18         MR. GOLDER:  The fact that there is -- might be

19   intermittent work, Your Honor, does not lead to the

20   conclusion that the eight hours of regularly scheduled

21   sleep is not continuous.  And there's many other hours in

22   the day when they're doing intermittent work.  They might

23   be doing work during the day, they might stop for a few

24   hours.  And again, pursuant to this agreement, Your Honor,

25   there was five hours of free time.

1          THE COURT:  And the regulation itself, to put on

2   a point on that, Section 785.22 expressly says that "the

3   employee can usually enjoy an uninterrupted night's

4   sleep," right?  So this is not a regulation in that

5   context that suggests that it always has to be so in the

6   way that one would conclude would be the case if one said

7   that this regulation means it has to specify specific

8   hours of the day when the sleep occurs.

9          MR. GOLDER:  That's right, Your Honor.

10          And Plaintiff Kinkead testified that she got not

11   five hours of sleep, which is what the regulation

12   requires, uninterrupted, but eight hours 70 percent of the

13   time when she was a live-in.  She's the main plaintiff.

14   And to require some sort of specific time is unworkable in

15   the live-in context.  And going back to *Encino Motors*,

16   Your Honor, it's not a fair interpretation of the

17   regulations or the law.

18          THE COURT:  I have your argument on that.

19          MR. GOLDER:  Okay.

20          So when it comes to the second argument that

21   plaintiffs made about whether the amount of money that was

22   paid to the workers was a day rate or an hourly rate, the

23   facts here are very compelling in this case, Your Honor.

24   Humana thought it was a day rate.  The plaintiffs thought

25   it was a day rate.  The agreement says it's a day rate.

1   The only group that doesn't think it's a day rate,

2   Your Honor, is the lawyers in this case.  It's a lawyers'

3   argument and it's not -- it's contradicted by the facts of

4   the case.

5           The purpose of having agreements with employees

6   is to inform them of how they're going to get paid and

7   what they're going to be doing.  And it's clear from the

8   testimony from the named plaintiffs that they knew this

9   was a day rate.  And plaintiffs' counsel was flippant

10  about the admissions they made in the depositions, but

11  they're clear, Your Honor, and we cited them, but I'm

12  going to read them to Your Honor.

13          Plaintiff Caillo -- and I apologize, I'm

14  probably mispronouncing her name -- when she spoke to

15  Humana:

16          "She told me when one works live-in, the live-in

17  pays daily or per day.  That is why -- that is why

18  overtime is not paid."

19          Question:  "Did you discuss what that day rate

20  was?"

21          Objection omitted.

22          Answer, "Yes."

23          Question:  "And what did she say the day rate

24  was?"

25          Answer:  "$130."

1          Plaintiff Mathieu during her deposition:

2          Question:  "Did you understand that the live-in

3    rates, both the second and the third numbers, 130 and 150,

4    were day rates?"

5          Answer:  "Yes."

6          Question:  "And that you would receive that per

7    live-in shift?"

8          Answer:  "Yes."

9          THE COURT:  Can you remind me what turns on

10   this, the difference between day rate and hourly rate?

11         MR. GOLDER:  Sure.  There's a few things that

12   turn on this.  And it differs depending on whether it's

13   pre-January 1, 2015, in New York or not.  But I'll try to

14   make it clear by starting from kind of a general

15   proposition.

16         So if it is a day rate, then under New York law,

17   prior to January 1, 2015, they have been paid for all time

18   worked.  And if it's after January 1, 2015, what turns is

19   the amount of damages, right, because we're saying that

20   the 130 is a day rate so they are compensated for all time

21   worked for the unpaid hours claimed.  They're still going

22   to have an overtime claim regardless of whether this Court

23   finds it to be a day rate or an hourly rate for eight

24   hours.  They're still going to have that core case that

25   this case is all about.  They just won't have that

1  additional amount for the day rate because plaintiffs'

2  argument is you only paid for eight hours, I think the

3  statutory minimum is 13 hours.  13 hours, so you owe

4  additional five hours on top of all the overtime.

5          THE COURT:  Okay.

6          MR. GOLDER:  So that's how it's going to play

7  out, Your Honor.

8          THE COURT:  I understand.

9          MR. GOLDER:  And again, harkening back to *Encino*

10  *Motors*, we would ask the Court to look at this through the

11  prism of fairness, through the prism of the actions, and

12  the alleged violation at issue.

13          THE COURT:  Did you have anything to say on the

14  gap time issue?

15          MR. GOLDER:  Yes.

16          On the gap time issue, Second Circuit law is

17  clear there is no such thing as a gap-time claim.

18  Connecticut law, it's very clear, Connecticut Supreme

19  Court has consistently said we follow what the federal law

20  is on this issue.  I didn't quite follow the Department of

21  Labor regulation argument, but the Second Circuit has

22  issued I think three orders related to this issue.  So

23  it's pretty clear in the Second Circuit that there is no

24  such thing as a gap-time claim.

25          I will concede to the Court that the issue under

 1    New York law is not as clear.  There are some courts that

 2    have said gap-time claims, and others not.  The one thing

 3    I just wanted to make clear for the Court is prior to

 4    January 1, 2015, under New York law, this Court should

 5    look at the *Severin* case, that was another home health

 6    worker case, when it's determining what are the potential

 7    damages at issue.  And what the ceiling is -- I take that

 8    back.  What the floor is for New York claims prior to

 9    January 1, 2015, when all these folks were FLSA exempt is

10    these individuals just had to be paid New York minimum

11    wage and New York minimum wage overtime.

12            THE COURT:  Okay.

13            MR. GOLDER:  So they didn't have to be paid a

14    regular rate.

15            After January 1, 2015, that's when it turns into

16    regular rate for all these workers.

17            THE COURT:  All right.  Thank you very much.

18            Let me hear from plaintiffs one more time on

19    their motion, and then we'll turn to the defense motion.

20            MR. TUDDENHAM:  I just want to respond quickly,

21    Your Honor, on this question of ambushing the defendants.

22            In Your Honor's class certification order, you

23    wrote, "Here, plaintiffs seek to recover based on the

24    theory that Humana paid them for eight hours of work for

25    live-in shift when they were entitled to either 13 or 24,

1    and they only seek to recover up to whichever of those

2    levels constitutes the statutory minimum for all HHWs,

3    regardless of how many hours an HHW actually worked.  They

4    are not pursuing the sort of work-in-fact theory that

5    would have been necessary for plaintiffs to recover for

6    the 24 hours in *Severin*..."  Where *Severin* believed that

7    in order to get around the 722 provision, each worker had

8    to testify.  They simply wrote the regularly scheduled

9    provision out.

10            And so it's our position, we've always been

11   clear we wanted 24 hours in New York.  And we're not

12   changing any claims.  The fact that our understanding of

13   the law has improved is not a reason to throw us out and

14   say that somehow we've ambushed them or anything.  The law

15   is the law.  We aren't changing the facts at all.

16            Now, on regularly scheduled, just saying to

17   caregivers, yes, you work eight intermittent hours and

18   then you have free time and this and that, that's not

19   regularly scheduled.  That doesn't tell anybody --

20            THE COURT:  I got your argument on that.

21            MR. TUDDENHAM:  Okay.  And the case law we cited

22   is very clear on that.  The word "regularly" means

23   something.  And the *Andryeyeva* court I think in particular

24   made that point, that it is a strict requirement that it

25   be regularly scheduled.

1           On the day rate versus hourly rate, I mean, this

2     is critical.  If the 130 daily amount is read to be

3     payment for all hours worked, then all this discussion of

4     13 hours or 24 hours is completely moot.  Because their

5     position now, which I have to say is a pretty astonishing

6     post hoc rationalization, is that, oh, oh, the 130 paid

7     for all 24 hours.  That simply can't be the case in light

8     of the wording of the contract.  It cannot be the case in

9     light of the testimony of the 30(b)(6) witness who said if

10    they work more than eight, we will pay them more.  After

11    all, the DOL regulation at 778.112 defines a day rate as a

12    national sum for a day's work for doing a particular job

13    without regard to the number of hours worked in the day or

14    the job and if he receives no other form of compensation

15    for his services.  In other words, it's a day rate if

16    that's what you pay for however many hours.  But when they

17    testify if you work more than eight we're going to pay you

18    additional hourly wages, it's not a day rate.  It's an

19    hourly rate.  And they cannot now in 2019 rewrite the

20    contract that they gave these workers back in --

21           THE COURT:  And you're talking about the

22    caregiver agreement.

23           MR. TUDDENHAM:  Yeah, the caregiver agreement.

24           Could they have paid a day rate?  Yes.  But they

25    could have made -- they should have made that clear to the

1   worker if that's what they were doing.  But instead, they

2   said we're paying you this daily rate is composed of 5.3

3   hours of straight time, 2.3 hours of overtime.  That's

4   what the rate is composed of: hours.  And if you work more

5   than eight hours, you need to call us, it says that in the

6   contract.  And then in their testimony they say because

7   we're going to pay you more if you work more.  So it can't

8   possibly be a day rate in the technical legal sense.

9           If the Court still has questions about the

10  change from 13 to 24 --

11          THE COURT:  No, I don't.  But thank you.

12          MR. TUDDENHAM:  We have not changed the claim;

13  it's our understanding of the law.  And I do not think

14  that it is improper to enter into a summary judgment

15  motion expressing the clearest understanding of the law

16  one can muster.  If we had changed our claim, if we had

17  changed the factual basis for the class certification, I

18  would understand that.  If we were suddenly doing

19  something that required testimony from individual workers,

20  we should be thrown out.  But we haven't changed anything.

21  We're just saying if you assign them to a 24-hour shift,

22  you owe them for 24 hours unless you qualify, you do the

23  one thing the employer has to do, which is regularly

24  schedule --

25          THE COURT:  Got the argument.  Thank you very

1      much.

2                     Let me turn to defense motion, if I can.

3                     Mr. Golder.

4                     MR. GOLDER:  Thank you, Your Honor.

5                     And could I just very briefly respond to a

6      couple things just to be clear for the Court?

7                     If the Court finds that it's a day rate, that

8      does not mean there's going to be no damages.  That's not

9      true.  There will always be overtime damages even if it's

10     a day rate.  Because even if it's a day rate, once you go

11     over 40, you still need to pay overtime.  So I just wanted

12     to make that clear for the Court.

13                    The other thing I wanted to make clear is

14     respond to the plaintiffs' reading of *Andryeyeva*.  Now,

15     this is an unusual situation where the same plaintiffs'

16     counsel here were counsel in that case, made similar

17     arguments in that case that they're making here.  And the

18     Court was very clear about it's 13 hours, not 24.  And I

19     just direct the Court to a couple points in the *Andryeyeva*

20     decision.

21                    THE COURT:  That's okay.  I'll take a look at

22     that, thanks.  I'd like to hear from you on your motion

23     now.

24                    MR. GOLDER:  Yes, Your Honor.

25                    Since I know time is brief, I don't know if

1   there's specific questions that Your Honor had about any

2   of the --

3         THE COURT:  Why is Judge Nathan wrong?

4         MR. GOLDER:  And we appreciate that this Court

5   will likely give strong deference to Judge Nathan.  And

6   instead of talking about 259, I'll talk about it very

7   briefly, the defense that gets rid of all liability under

8   the FLSA, I'm going to focus on liquidated damages a

9   little bit more.

10        We pointed out to the Court in our papers why it

11  is we believe that Judge Nathan was wrong.  We

12  respectfully disagree that we were not relying on the

13  court decision, we were relying on the 1975 regulation,

14  and the court decision was our further investigation of

15  what was going on.  We appreciate that a 259 defense is

16  very hard to make because it comes up in a situation where

17  a defendant did something wrong and a court says, yeah, we

18  know you did something wrong, but you have a really good

19  reason for having a violation so we're going to have no

20  damages here.  So we appreciate that courts look very

21  sceptically on that defense.  Again, we made the arguments

22  in the papers.  And I think Judge Nathan spent a long time

23  in the *Green* decision issuing her order.

24        But what Judge Nathan did not do is spend a lot

25  of time on the 260 defense which is a much lesser burden

1    than the 259 defense.

2              THE COURT:  Liquidated damages.

3              MR. GOLDER:  Yes, Your Honor.  Yes, Your Honor.

4         There the standard is act or omission giving

5    rise to such action was in good faith and that the company

6    had a reasonable grounds for believing that the act or

7    omission was not a violation.

8              And under the facts of this case, how they

9    unfolded, I cannot see any arguments otherwise, that this

10   was not a good faith --

11             THE COURT:  So a 260 argument doesn't rely

12   specifically on DOL's interpretation.

13             MR. GOLDER:  That's right, Your Honor.

14             THE COURT:  You're saying it can be broader to

15   include reliance on the *Weil* decision.

16             MR. GOLDER:  That's exactly right, Your Honor.

17   And Judge Nathan spent -- I'm not really sure why, but

18   Judge Nathan spent a very short time denying summary

19   judgment on the 260 liquidated damages defense, although

20   she did open the door saying that she could re-visit the

21   issue and could find that there are no liquidated damages.

22   But, yes, Your Honor, it doesn't have to be a regulation,

23   doesn't have to be a ruling, it doesn't have to be

24   strictly in conformity.  You just need a reasonable basis,

25   and it needs to be in good faith.

1          Here, if you are Humana on January 15, 2015,

2     there is no law that says that these people are

3     non-exempt.  That's how the liquidated damages good faith

4     defense is viewed.  It's not with 20/20 hindsight; it is

5     at the time the actions were made, were they in good

6     faith, were they reasonable.  And with 20/20 hindsight,

7     unfair 20/20 hindsight, there are multiple federal judges

8     who have said that Humana was right.  We appreciate that

9     Your Honor was not one of them, but there are multiple

10    federal judges who have said --

11         THE COURT:  I'm not sure you appreciate that,

12    but you acknowledge that might be the better word.

13         MR. GOLDER:  Thank you, Your Honor, yes.

14         So if we have multiple federal judges who are

15    saying yes, Humana, you did it right, that was the right

16    decision based on the law, they were properly classified

17    as exempt, I don't know how you don't find that there's no

18    liquidated damages.  And I apologize for the triple

19    negative.  But they knew the law.  They were going to

20    re-classify.  They investigated the law.  They discussed

21    the law.  When the *Weil* decision came out, that's when

22    they decided not to re-classify.  So for the time period

23    from when the decision was issued by the district court to

24    the circuit court reversal, the only law in place was that

25    they were exempt.

1          Again, going back to an earlier point I made to

2    the Court, it's at the time the decision was made.  And

3    the Court can parse this.  And I believe the *Guerrero* case

4    parsed it, that's the district court case out of Florida

5    said, look, we're going to find no liquidated damages,

6    good faith up until -- and I think the Court said

7    something around November 12th because that was the time

8    when the Department of Labor was not enforcing the rule.

9    So, for example, the Court here could say no liquidated

10   damages from January 1, 2015, until either October 13 or

11   maybe November 12 because that's when the Department of

12   Labor said we're not going to enforce it.  And then from

13   the time period after that the Court could say, Humana,

14   you needed to -- if there's anything that happened after

15   then, it's on you because it was clear that the law had

16   been reversed and Department of Labor said now we're going

17   to enforce it, so now it's going to be a violation that

18   you have liquidated damages.

19          THE COURT:  Okay.  You're just looking really

20   for a carve-out period from -- if I agree with Judge

21   Nathan, and also as to the liquidated damages provision,

22   you're simply saying Humana was acting in good faith until

23   when the D.C. Circuit decision --

24          MR. GOLDER:  Our contention to Your Honor is

25   that it was up until the time that the Department of Labor

1    said we're not enforcing it.  So November, I believe it

2    was November 12th of 2015.  But I think our arguments are

3    the strongest and we appreciate our arguments are the

4    strongest from January 1 to October 15, 2015, when there

5    was no circuit court decision made.

6             THE COURT:  Okay.

7             MR. GOLDER:  And I have a number of other

8    sub-arguments, but I don't know if -- not on the

9    liquidated damages good faith.  I don't know if the Court

10   has any other questions.

11            THE COURT:  I don't think so.  Thank you very

12   much.

13            MR. GOLDER:  Thank you.

14            THE COURT:  Counsel.

15            MR. TUDDENHAM:  I think Judge Nathan's opinion

16   on the 259 issue speaks for itself.  I won't waste any

17   time on that.

18            On the good faith question, a couple things.

19   One, Judge Nathan didn't -- just denied it because, of

20   course, good faith goes to the Court; it's not a jury

21   issue.  And therefore I suspect the Court just thought it

22   would wait until it heard the evidence at trial, which may

23   be the safest thing here as well.

24            They want the Court to find that there's good

25   faith and no liquidated damages because of the *Weil*

1    decision.  But that really isn't the issue.  We agree that

2    during the pendency of the appeal from January 1 to

3    October 23, they had a reasonable basis not to pay the

4    overtime.  By the same token, I think our clients had a

5    reasonable basis not to sue, and their statute of

6    limitations certainly shouldn't have run during the period

7    when the defendant had no obligation to pay.  The question

8    is what happened on October 23rd when the D.C. Circuit had

9    reversed.  The effective date of this regulation is

10   January 1.  They had an obligation to pay the overtime

11   retroactively to January 1.  And they did not do it.  They

12   still haven't done it.  And the question is:  Did they

13   show good faith in not doing that?

14            In order to show good faith, they have to show

15   that they took affirmative reasonable steps to ascertain

16   their liability.  But the evidence they put on that they

17   consulted the DOL non-enforcement policies and other

18   people in the industry doesn't cut it.  The DOL

19   non-enforcement policy is perfectly clear that it was DOL

20   that wasn't going to enforce, but that individuals had the

21   right to sue and that the non-enforcement policy was not a

22   get-out-of-jail-free card, was not absolving them of

23   liability.  So if that's what they were relying upon, they

24   sure didn't read it in good faith.

25            THE COURT:  So your argument is there's no good

```
 1   faith on October -- what was the date of the --

 2            MR. TUDDENHAM:  October 23rd is the mandate from

 3   the D.C. Circuit.

 4            THE COURT:  So you're saying October 24 when

 5   they don't start cutting checks that day for the last ten

 6   and a half months of overtime, that showed bad faith?

 7            MR. TUDDENHAM:  And maybe not October 24th.

 8   Maybe November 1st.

 9            THE COURT:  Soon after.  And that was bad faith

10   for them not to essentially comply with the law as

11   clarified at that point?

12            MR. TUDDENHAM:  They have not shown that they

13   acted in good faith.  It's their burden to show that they

14   acted in good faith.

15            THE COURT:  Okay, right.  You can treat it as a

16   factual matter in terms of, you know, how many lawyers did

17   they consult.

18            MR. TUDDENHAM:  Exactly.

19            THE COURT:  You could.  But you could also look

20   at it as them saying, well, you know, this is a debatable

21   issue in terms of whether they had liability at all during

22   that period.  It was so debatable, in fact, I had to issue

23   a decision on this back in 2016.  And I noted, and I

24   remember even certifying it to the circuit because not

25   everybody had agreed with me.  And so I guess I wonder why
```

1    that's not enough alone.

2              MR. TUDDENHAM:  Because if they had, upon the

3    mandate issued really in August when the D.C. Circuit

4    issued its opinion, if they had gone to an attorney and

5    sought advice as to what this means and the attorney had

6    said, well, you know, it's a tough call but I think you

7    don't have any liability, that would give them a good

8    faith defense.  But they didn't do that.  They had put on

9    no evidence that they consulted a knowledgeable attorney.

10   They did, however, in their reply brief say that they

11   consulted with their in-house counsel.  But when we did

12   discovery asking for those communications with in-house

13   counsel, they claimed it was privileged.  Well, you

14   can't -- they can't rely on whatever their in-house

15   counsel told them as the justification for not paying the

16   money back and then claim it's privileged when we ask for

17   it in discovery.

18             So what we're left with is October 23rd came.

19   They just didn't pay.  They waited for us to sue them.

20   And then they found some lawyers who have ginned up a

21   defense that we didn't have to pay, that Your Honor had to

22   rule on.  Fair enough.  But the question of good faith has

23   to do with at the time the money was owed.

24             THE COURT:  I think what you're saying really

25   is -- I'm not sure I understand your argument as being a

1    strictly temporal one.  It seems to me you're saying it's

2    a subjective one.  Did they act with pure heart?  And if

3    they had had pure heart, they would have been out

4    consulting lawyers left and right.  And I have a question

5    about that.  I'm not sure -- usually when I see good

6    faith, this kind of requirement, to me it often means is

7    it good faith in light of objective criteria of what the

8    law is and whether there was a reasonably debatable basis

9    for their failure to comply with the law.  I think that's

10   kind of what I'm struggling with.

11           MR. TUDDENHAM:  The law on liquidated damages is

12   quite clear that to show good faith they have to show both

13   subjective good faith and objective good faith.  And it's

14   the lack of subjective good faith that is missing here and

15   certainly precludes summary judgment.

16           There's another reason that summary judgment

17   isn't appropriate, because of course there are all kinds

18   of other violations here.  There was the failure to pay

19   24-hour workers for more than eight hours of work.  Which

20   continued until January of 2016.  There was the failure to

21   pay overtime of any kind to 24-hour workers until

22   January 16 or January of 2016.  So it's not just the

23   failure to pay retroactively upon the D.C. Circuit

24   decision.  There are these other violations.  And they

25   have put on no evidence of good faith inquiry as to their

1   obligation with respect to those matters.  And rather than

2   parse this by violation, it seems to me the wiser thing to

3   do is to simply deny their motion because they have not

4   made a case for summary judgment on good faith liquidated

5   damages.

6            THE COURT:  And I can decide it at the trial

7   stage just as Judge Nathan suggested.

8            MR. TUDDENHAM:  Absolutely.  You can decide it

9   after the jury rules on everything else.  It's sort of a

10  last-minute call by the Court.

11           THE COURT:  Okay.  Anything else?

12           I'd like to hear from the parties on the

13  relation back argument.  Maybe I'll hear from Mr. Golder

14  first since it's his argument.

15           MR. GOLDER:  Very briefly, if I may, Your Honor,

16  on the argument about good faith, the only time a good

17  faith argument is being made to a Court is because an

18  employee has not been paid wages.  There is no requirement

19  that a company after the fact has to pay wages to

20  establish good faith here.  It is the decision is -- the

21  determination is what was the decision at the time of the

22  act.  So whether or not they decided to pay back overtime

23  wages or not is irrelevant to the determination, not to

24  mention, as Your Honor pointed out, even October of 2015

25  it was still unclear whether or not that's owed.  And we

1   would contend that it's still not crystal clear whether

2   that money is owed or not.  The weight of authority with

3   Your Honor is saying that it was owed, but there are still

4   multiple federal courts that said not.  Again, under those

5   scenarios, I don't see how it's not reasonable and in good

6   faith when you look at the time of the act, not 20/20

7   hindsight.

8             THE COURT:  You lost in the Ninth Circuit,

9   right?

10             MR. GOLDER:  Yes.

11             THE COURT:  You lost on the issue.

12             MR. GOLDER:  Yes, Your Honor.

13             THE COURT:  Talk to me a bit about the relation

14   back argument, your argument on that.

15             MR. GOLDER:  Yes, Your Honor.

16             When plaintiffs filed their case, there was no

17   New York plaintiff.  There was a Connecticut plaintiff.

18   And there was a Connecticut claim.  And there was a

19   federal claim.  Just because it's a collective action does

20   not put Humana on notice that every single potential state

21   law is at issue in the case.  That's not the law in

22   *Ecolab*.  We rely heavily on that, Your Honor, and that's

23   where our arguments are from.  If Your Honor has specific

24   questions about that.

25             THE COURT:  Well, to the extent that the

 1   plaintiffs -- as to the New York violations, to the extent

 2   that they tracked essentially the effective date claims,

 3   that wasn't something new, right?  You're really trying

 4   to -- it seems to me you're really going after the claims

 5   in which would basically go back to, was it 2009, I

 6   think --

 7              MR. GOLDER:  Yes, Your Honor.

 8              THE COURT:  -- as to certain New York -- the

 9   New York overtime class, I believe, right?

10              MR. GOLDER:  That's right, Your Honor.

11              THE COURT:  So that's what you're saying

12   essentially was new introduced here and not part of what

13   the original in fact or kind of compatible with the claims

14   that were actually brought in this Court for the first

15   time in 2015.

16              MR. GOLDER:  That's right, Your Honor.  In fact,

17   they didn't make claims before January 1, 2015, under the

18   FLSA or Connecticut law.

19              THE COURT:  I understand your argument, thank

20   you.

21              MR. GOLDER:  Any other questions?

22              THE COURT:  No, I don't think so.

23              I'll hear from plaintiffs on the relation back

24   issue, if you'd like.

25              MR. TUDDENHAM:  Bear with me, I want to get the

1  right stuff here.

2          Rule 15 makes clear that relation back turns on

3  whether the subsequently alleged claim arises out of the

4  same transaction or occurrence as the original claim.  It

5  is the facts that are important.  It is the facts that put

6  the defendant on notice.  If you put them on notice of

7  facts that create a violation, the fact that you allege a

8  different statutory violation that arises out of those

9  facts, it doesn't matter.  It relates back because you're

10  on notice of the facts.

11          The original complaint complained that we were

12  not being paid for all of our hours of work and we weren't

13  getting overtime.  That's what the New York effective date

14  claim is about.  That's what the New York unpaid wage

15  claim is about.

16          THE COURT:  But the unpaid wage one goes back in

17  time, right?

18          MR. TUDDENHAM:  It goes back in time.  But,

19  again, because the focus of relation back is putting the

20  defendant on notice that they've done something and done

21  something with respect to New York workers, because the

22  FLSA claim was nation-wide claims clearly saying you

23  didn't pay New York workers for all their hours for work,

24  that puts them on notice that they may have to pay under

25  the New York minimum wage --

1          THE COURT:  Does it put them on notice, though,

2     as to the time period?  I guess that's the concern.

3          MR. TUDDENHAM:  Your Honor has already ruled in

4     the class cert opinion, "Even limiting the analysis to

5     New York Effective Date class, the first-filed doctrine

6     would - if applicable - give priority over *Green*.

7     Plaintiffs filed the initial complaint in this suit before

8     the compliant in *Green*, and I granted the first motion

9     amend on the understanding that plaintiffs intended their

10    New York claims to relate back to the filing of the

11    initial complaint."  We were first filed because the

12    New York -- and you say New York claims --

13          THE COURT:  Did I go on to say I wasn't going to

14    go on and resolve that issue specifically?

15          MR. TUDDENHAM:  No.  You go on to say, "Relation

16    back is proper when an amended pleading asserts a claim or

17    defense arising from the same conduct, transaction, or

18    occurrence..."

19          The original complaint here asserted FLSA

20    claims, not paying overtime, and -- as the claims that

21    underlie the New York effective date claims do.  This is

22    on page -- star 15.

23          But the New York effective date claims are the

24    same as the New York unpaid hours claims.  The only

25    difference is the cause of action.  Both allege you didn't

1    pay live-in workers for all of their hours of work and you

2    didn't properly pay overtime.

3         And as for the fact that the statute of

4    limitations goes back, again, if Rule 15 means what it

5    says and pleading that New York workers didn't get paid

6    the right number of hours and didn't get paid overtime

7    puts them on notice for New York minimum wage claim, well,

8    the statute of limitations for New York minimum wage is

9    six years.  It puts them on notice that they have done

10   something to New York workers and they have to be on

11   notice that the law in New York has a longer statute of

12   limitations.  It's the facts under Rule 15.  They are

13   notified that the facts that they did wrong create a

14   problem in New York that exposes them in New York and

15   New York has a longer statute of limitations.

16        I would refer the Court to a case *Slayton v.*

17   *American Express Co.*, 460 F.3d 215, 228.  It's a Second

18   Circuit case.

19             THE COURT:  2006.

20             MR. TUDDENHAM:  It's 2006, yes.  You know the

21   case.

22             THE COURT:  Yes.

23             MR. TUDDENHAM:  It has a lengthy discussion

24   about relation back.  It cites *Tiller v. Atlantic Coast*

25   *Line* case, Supreme Court case where the plaintiff sued for

1   negligence.  A train was backing up and they were

2   negligent in backing it up.  Subsequently amended to

3   allege violations of the Federal Boiler Safety Act or

4   something like that.  And the court said, well, the

5   violations of the Federal Boiler Safety Act arose out of

6   the same backing up train, so it relates back.  It's the

7   facts that put them on notice.

8           The original complaint put them on notice that

9   they weren't paying for all hours, weren't paying

10  overtime.  That's why the effective date claim relates

11  back and it's why the unpaid hours claim relates back.

12          THE COURT:  All right.  Thank you.

13          Mr. Golder.

14          MR. GOLDER:  Briefly, Your Honor.

15          This is a similar problem with the argument that

16  there is with liquidated damages.  Again, we're

17  determining at the time of the offense.  When the lawsuit

18  was filed, if you asked anyone at Humana do you think

19  there are New York claims involved in this case, the

20  answer is no.  There was a Connecticut claim and there's a

21  Fair Labor Standards Act claim.  It doesn't mean that any

22  other state law claims are going to be alleged if and when

23  the Court is going to issue notice.

24          The other point I wanted to make, I just wanted

25  to direct the Court -- and this is off topic back to the

 1    daily rate of calculation, just CFR 778.109 which talks
 2    about total pay.  When you're figuring out the regular
 3    rate of pay, you are adding all pay and dividing it by the
 4    number of hours worked.  That includes hours that you got
 5    paid and hours you didn't get paid.  This is not like the
 6    *JetBlue* case where the plaintiffs were paid the same wage,
 7    hourly wage for every hour, even assuming we're in the
 8    world of hourly rate instead of day rate.  They're paid
 9    different rates as the plaintiffs contend to the Court.
10    And if they're working a non-live-in shift, that's a third
11    rate of pay.  So the way to figure out the regular rate of
12    pay is you take all the pay that you've gotten and then
13    you divide by the number of hours that you worked.  That
14    includes hours that you got paid and hours that you didn't
15    get paid.
16              THE COURT:  Thank you.
17              MR. GOLDER:  Thank you, Your Honor.
18              THE COURT:  If you have anything to say in
19    response to that last point.
20              MR. TUDDENHAM:  Yes, Your Honor.
21              I do believe Counsel may have mistakenly
22    misquoted 109.
23              What 109 says is that the regular rate is all
24    your compensation divided by the hours for which that
25    compensation was paid.  So if the compensation was paid

 1    for eight hours, you divide by eight hours.  Even if

 2    statutorily the worker worked 24 hours, if the

 3    compensation was paid for eight, as it says in the

 4    agreement, then you divide by eight.

 5              THE COURT:  Okay.

 6              So I thank all counsel for your papers.  You've

 7    given me a lot to think about.  I'm going to try to rule

 8    as soon as I can on your motions.

 9              I always encourage the parties, I'm sure I've

10    encouraged you before, if you have a wish to meet with a

11    magistrate judge.  Have you met with Judge Spector

12    previous in this case?

13              MR. SWEENEY:  Your Honor, we have not, although

14    we have engaged professional mediators.

15              THE COURT:  You have, all right.  Judge Spector

16    is a professional too.  If you would like to take on

17    his -- it seems like there's a lot of balls in the air.

18    Do you have any sort of timetable on that in terms of

19    what -- do you have ongoing -- I don't want to get into

20    the substance of any ongoing discussions.  Are there

21    ongoing discussions about a solution here to this case?

22    Should I be full steam ahead trying to issue a ruling?

23              MR. SWEENEY:  We have had discussions,

24    Your Honor, and they continue.  Part of the issue is

25    putting some things together.  We had some issues with

 1   whether the proper Fair Labor Standards notice went out.

 2   And that notice, there is a second supplemental notice

 3   that goes out tomorrow -- today or tomorrow.

 4            THE COURT:  Okay.

 5            MR. SWEENEY:  So there's a period of time that

 6   another group will get notice for that.  So there are some

 7   issues involved, but we continue the conversations.  We

 8   intend to continue the conversations.  I didn't mean to

 9   slight the magistrate judge.  We have engaged mediators --

10            THE COURT:  I didn't understand it that way.

11            So for your FLSA action, you've got 15 states,

12   right?

13            MR. SWEENEY:  I believe that's about correct,

14   yes.

15            THE COURT:  And about a little north of 200

16   opt-ins?  Does that sound right?

17            MR. SWEENEY:  Yes.  At this stage.  There's over

18   300 new notices that are going to issue tomorrow.

19            THE COURT:  So I'm actually -- I'm just trying

20   to figure out and understand this action a little more

21   than I do.  I haven't quite seen an action with this many

22   tentacles.

23            Is the bulk of liability at issue in this case

24   with respect to the state law claims or is it with respect

25   to the FLSA?

1           MR. SWEENEY:  The bulk of the liability would be

2    with the state law claims, particularly the New York

3    claims, they go back in time.

4           THE COURT:  Right, okay.  I get that.

5           All right.  And how many workers then would be

6    effected, do you have a sense of are at issue for the

7    state law claims in both New York and Connecticut?  I know

8    the time frames.  I'm just wondering.  This isn't for any

9    particular use that I have, but do you have a sense --

10   parties have a sense how many workers?

11          MR. SWEENEY:  We do have it in the records.  It

12   would take us a little bit --

13          THE COURT:  No, I was just wondering.

14          MR. SWEENEY:  I believe it's about 800.

15          THE COURT:  Okay.  So it is quite a bit larger

16   number of workers there than with respect to the FLSA

17   claims.

18          MR. SWEENEY:  FLSA claim would be 200 before the

19   next notice issues.

20          THE COURT:  And for one aspect of the New York

21   claims you have a broader time claim.

22          MR. SWEENEY:  Yes.  And an aspect of the

23   Connecticut claims as well have a broader time frame.

24   They have that period from after the effective date period

25   to January 31st or 26th of 2016.

1          THE COURT:  All right.  Thank you all again.

2     Stand in recess.

3               (Proceedings adjourned at 2:51 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T E

4

5   RE: DAVERLYNN KINKEAD, Individually and on behalf of all
         others similarly situations v. HUMANA, INC., ET AL.
6                    No. 3:15CV1637(JAM)

7

8            I, Diana Huntington, RDR, CRR, Official Court

9   Reporter for the United States District Court for the

10  District of Connecticut, do hereby certify that the

11  foregoing pages 1 through 55 are a true and accurate

12  transcription of my shorthand notes taken in the

13  aforementioned matter to the best of my skill and ability.

14

15

16

17

18                    _____/s/_____

19                         DIANA HUNTINGTON, RDR, CRR
                              Official Court Reporter
20                         United States District Court
                            141 Church Street, Room 147
21                         New Haven, Connecticut 06510
                               (860) 463-3180
22

23

24

25