**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

DAVERLYNN KINKEAD *et al.*, *individually*
*and on behalf of all others similarly situated,*
    *Plaintiffs,*

     v.

HUMANA AT HOME, INC. *et al.*,
    *Defendants.*

No. 3:15-cv-01637 (JAM)

**ORDER GRANTING IN PART, DENYING IN PART, AND DEFERRING IN PART**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

    Plaintiffs are home healthcare workers employed by defendant Humana, Inc. and its

corporate affiliates. They have filed this collective and class action lawsuit alleging that

defendants have unlawfully failed to pay them regular and time-and-a-half overtime wages for

the number of hours that they worked. They bring their claims under the Fair Labor Standards

Act, as well as under the Connecticut Minimum Wage Act and New York Labor Law.

    Both parties now move for summary judgment. Docs. #312; #314. For the reasons

explained below, I will grant in part, deny in part, and defer in part the motions for summary

judgment.

<h3 align="center">BACKGROUND</h3>

    These motions are the latest stage of a long-running dispute between the parties. Because

I discuss this case's history at length in *Kinkead v. Humana at Home, Inc.*, 330 F.R.D. 338 (D.

Conn. 2019), I address here only the facts and procedural developments pertinent to the instant

motions.

    The plaintiffs in this case are home healthcare workers ("HHWs") who go to the homes

of elderly and disabled people to provide "companionship services." Plaintiffs all worked for

Humana, Inc. and related company defendants (collectively, "defendants"). Defendants employ HHWs to serve clients in two types of arrangements: as *live-in* and *non-live-in* caregivers. A live-in caregiver spends a 24-hour shift in a client's home, part of which time the HHW sleeps and has meals as needed. A non-live-in caregiver spends a discrete number of hours or "shift" at a client's home (*e.g.*, an 8-hour or 12-hour shift).

The Fair Labor Standards Act ("FLSA") generally requires that employers pay time-and-a-half wage rates for hours that an employee works beyond the regular 40-hour work week. *See* 29 U.S.C. § 207(a). In 2013, the U.S. Department of Labor ("DOL") promulgated a new regulation, 29 C.F.R. § 552.109, which expanded the class of workers eligible for overtime pay under the FLSA. Prior to the issuance of this regulation, the FLSA's overtime pay requirements did not apply to companionship service workers whose services were provided by means of a third-party employer like Humana. *See Kinkead v. Humana, Inc.*, 206 F. Supp. 3d 751, 753 (D. Conn. 2016). The new regulation eliminated this exemption effective January 1, 2015. *Ibid.*

The validity of the new regulation was put into doubt for a time by an adverse decision from a district court in the District of Columbia, but the D.C. Circuit eventually reversed the district court's decision in August 2015. *See ibid.* (citing *Home Care Ass'n of Am. v. Weil*, 76 F. Supp. 3d 138 (D.D.C. 2014), *rev'd and remanded*, 799 F.3d 1084 (D.C. Cir. 2015)). While the regulation remained in limbo, defendants did not generally pay overtime.

In November 2015, plaintiff Daverlynn Kinkead sued defendants, alleging that she had worked as a HHW in Connecticut and that the new regulation entitled her to overtime pay for hours that she worked from January 2015 until May 2015. Doc. #1. Kinkead based her claim on the FLSA as well as on cognate provisions of the Connecticut Minimum Wage Act ("CMWA"), Conn. Gen. Stat. § 31-58 *et seq*.

In July 2016, I denied defendants' motion to dismiss, concluding that—notwithstanding the intervening legal challenge to the rule's validity—the regulation went into effect as of its intended effective date of January 1, 2015. *See Kinkead*, 206 F. Supp. 3d at 753-55. In May 2017, I granted the joint motion for conditional certification of a national FLSA collective action pursuant to 29 U.S.C. § 216(b). Doc. #114.

The litigation then took another turn in November 2017 when I granted plaintiffs leave to file an amended complaint. Docs. #180; #181 (first amended complaint). Plaintiffs added claims under New York Labor Law ("NYLL") and named another co-plaintiff, Claude Mathieu, who worked for defendants from approximately February 2015 to July 2016, as a class representative for New York HHWs. Under the amended complaint, Kinkead and Mathieu sought collective and class action relief to recover unpaid overtime wages under the FLSA as well as under parallel provisions of both the CMWA and NYLL. In addition to their claims for *overtime* hours, plaintiffs also sought relief for *unpaid* hours, alleging that defendants systematically undercounted the hours for which they paid HHWs who worked live-in shifts. Doc. #181 at 17-18 (¶¶ 64-73).

In May 2018, plaintiffs moved to certify four different classes pursuant to Fed. R. Civ. P. 23. Doc. #204. The first two classes—the "Connecticut Effective Date Class" and the "New York Effective Date Class"—sought to be paid for overtime hours owed from January 1 to October 12, 2015.

The second two classes—referred to as the "Connecticut Unpaid Hours Class" and the "New York Unpaid Hours Class"—sought additional relief of unpaid wages, whether straight time or overtime, on the ground that defendants did not properly calculate the hours to be credited and compensated for those HHWs who worked live-in shifts.

For the Connecticut Unpaid Hours class, plaintiffs sought certification of a class limited to HHWs who worked live-in shifts between January 1, 2015, and January 25, 2016. Plaintiffs at that time sought payment for at least 13 hours per live-in shift, the minimum under Connecticut law, even if some plaintiffs actually worked more than 13 hours during a live-in shift. For the New York Unpaid Hours class, plaintiffs sought certification of a class of HHWs who worked between November 11, 2009, and the present, alleging that New York HHWs were entitled under state law to be paid for the full 24 hours of a live-in shift. At that time, it was an unresolved question whether New York law required that an HHW be paid for a full 24 hours or for only 13 hours for a live-in shift. *See Kinkead*, 330 F.R.D. at 344.[1] So plaintiffs based their New York unpaid hours claim in the alternative on a 13-hour statutory minimum number of hours, as with their Connecticut Unpaid Hours Class claim. *Ibid.*

In addition, because the legal uncertainty at that time had implications for the overtime claims of the New York Effective Date Class, plaintiffs moved to file a second amended complaint to add Shirley Caillo as a representative plaintiff alongside Mathieu, on the basis that Caillo worked live-in and non-live-in shifts totaling over 40 hours per week—regardless of whether she was credited for 13 or 24 hours per live-in shift under New York law. Doc. #256-1 (second amended complaint). In March 2019, I granted plaintiffs' second motion to amend their complaint and I certified the following four classes:

> (1) The Connecticut Effective Date class, consisting of all home healthcare workers employed by defendants in Connecticut who worked in excess of 40 hours in a week between January 1, 2015, and October 12, 2015.
>
> (2) The New York Effective Date class, consisting of all home healthcare workers employed by defendants in New York who

---

[1] The New York Court of Appeals has since issued its ruling. *See Andryeyeva v. New York Health Care, Inc*., 33 N.Y.3d 152, 176-83 (2019) (upholding the NYSDOL's interpretation of 12 N.Y.C.R.R. § 142-2.1(b) as applied to employees assigned to 24-hour shifts, including the HHWs in this action).

worked in excess of 40 hours in a week including at least one 24-hour live-in shift between January 1, 2015, and October 12, 2015.

(3) The Connecticut Unpaid Hours class, consisting of all home healthcare workers employed by defendants in Connecticut who worked 24-hour live-in shifts between January 1, 2015, and January 25, 2016.

(4) The New York Unpaid Hours class, consisting of all home healthcare workers employed by defendants in New York who worked 24-hour live-in shifts between November 11, 2009 and the present.

*Kinkead*, 330 F.R.D. at 358-59.

The parties have now filed cross-motions for summary judgment, Docs. #312, #314, and the Court heard oral argument on both motions in November 2019, Doc. #368.

## DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close and contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (*per curiam*); *Benzemann v. Houslanger & Assocs., PLLC*, 924 F.3d 73, 78 (2d Cir. 2019).

With these principles in mind, I will address each summary judgment motion in turn.

### *Plaintiffs' motion for summary judgment*

Plaintiffs seek summary judgment on their claims, as well as on some issues within those claims. Doc. #312.

***FLSA overtime for live-in shifts***

Plaintiffs seek summary judgment on the FLSA overtime claims for all "opt-in [p]laintiffs who worked more than 40 hours in a week between January 1, 2015 and October 15, 2015," which is the Effective Date period. Doc. #312-1 at 12; *see also id*. at 11-20.

As noted above, I have previously ruled that all HHWs who worked more than 40 hours per week are eligible for FLSA overtime during the Effective Date period. The parties agree that overtime was not paid to HHWs whose work weeks were composed entirely of *non*-live-in shifts during the Effective Date period. But the parties disagree as to which other HHWs—those who worked *only* live-in shifts or a *combination* of live-in and hourly shifts—are entitled to FLSA overtime on the basis of working more than 40 hours per week, as well as for how much overtime. In other words, the parties disagree about how to calculate who is eligible for FLSA overtime and, for those who are eligible, how to calculate the number of hours for which FLSA overtime is owed.

It boils down to a dispute about how many hours per live-in shift HHWs should be credited with as "work" hours. Under the FLSA, the general rule is that "work" is "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Singh v. City of New York*, 524 F.3d 361, 367 (2d Cir. 2008) (quoting *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 602 (1944)). The time spent "perform[ing] activities predominantly for the benefit of the employer" is compensable. *Reich v. S. New England Telecommunications Corp.*, 121 F.3d 58, 64 (2d Cir. 1997).

For employees who are required to be on duty for 24 hours or more, regulations promulgated by the DOL pursuant to the FLSA allow the employer and employee to agree to exclude time for meal and sleeping periods when an employee is not working:

> Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep… [But] [w]here no expressed or implied agreement to the contrary is present, the 8 hours of sleeping time and lunch periods constitute hours worked.

29 C.F.R. § 785.22(a); *see also Bonn-Wittingham v. Project OHR, Inc.*, 792 F. App'x 71, 74 (2d Cir. 2019) (citing regulation and noting "the practice, common in the home healthcare industry, of assigning employees to so-called 'twenty-four hour' sleep-in shifts during which employees were actually expected to work only thirteen hours, with eight hours deducted for sleeping and three hours deducted for meal breaks").

Plaintiffs argue that HHWs are entitled to be credited with the full 24 hours per live-in shift for the purpose of overtime because there is no genuine fact issue to show the existence of an agreement with live-in HHWs to exclude from the workday "bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours," as would be required by 29 C.F.R. § 785.22 ("section 785.22").[2] I conclude that there is a genuine fact issue about whether there was such an agreement.

As a preliminary matter, there is a genuine issue of fact what information in the record evidences the relevant agreement between the parties. The parties agree that each HHW signed a

---

[2] If such an agreement is shown to exist, plaintiffs concede defendants may treat up to 11 hours per day as non-compensable. Doc. #312-1 at 13. So at a minimum, plaintiffs maintain that members of the FLSA collective are entitled to be credited for 13 hours per live-in shift. *Id.* at 20 n. 10; *see also* Doc. #381 (Tr. at 15:16-22) ("So our position is if they qualify for the 785.22 exemption, if the Court is convinced that they did regularly schedule it, then they owe for 13 hours and it doesn't matter with individuals if they did or didn't get sleep.").

Caregiver Agreement upon hiring, which provides that, apart from the 8 hours of intermittent work, the "remainder of your daily schedule will be allocated into the following hours: 3 hours for meals (on site), 8 hours sleep time (on site) and 5 hours for free time (on site)." Doc. #234-9 at 1; *see also* Docs. #312-2 at 3 (¶ 10); #325-1 at 4 (¶ 10 Resp.). Plaintiffs argue that "Humana sets forth the terms of work applicable to Caregivers in two written documents, an Associate Handbook, and a Caregiver Employment Agreement." Doc. #312-2 at 3 (¶ 8). While defendants "admit that these documents set forth certain terms of work generally applicable to Caregivers," they "dispute the assertion those are the only sources of Plaintiffs' terms of work," arguing that defendants also "conveyed terms of work during trainings, in verbal conversations, and in other written documents." Doc. #325-1 at 3 (¶ 8 Resp.). Exactly what documents and interactions even comprise the parties' agreement, whether it was express or implied, is a disputed question of fact.

Even assuming the parties had an agreement to exclude some meal and sleep periods, a further factual consideration is whether the meal and sleep periods were "bona fide" and whether the sleep periods were "regularly scheduled" as required under section 785.22. *See Salazar v. Life Ambulance Serv., Inc.*, 2001 WL 685755, at *3-5 (W.D. Tex. 2001) (concluding that the question of whether the sleep period at issue is "regularly scheduled" and "bona fide" should be submitted to a jury); *cf. Shannon v. Pleasant Valley Cmty. Living Arrangements, Inc*., 82 F. Supp. 2d 426, 432-33 (W.D. Pa. 2000) (employees agreed at least by implication to employer's sleep time policy, which did not pay them for sleep time unless they could not obtain five hours of sleep, but there was a genuine issue of material fact whether employer actually abided by this policy); *Trocheck v. Pellin Emer. Medical Service, Inc*., 61 F.Supp.2d 685, 694 (N.D. Ohio 1999) (where court found existence of agreement, it was still required to determine whether agreement complied with conditions prescribed under section 785.22).

There are unresolved factual issues as to whether the sleep and meal periods here are bona fide and regularly scheduled, as section 785.22 requires. Plaintiffs argue defendants "did not provide regularly scheduled sleep and meal times," Doc. #312-2 at 4 (¶ 15), and "[a]lthough Humana paid for 10 or 8 hours, Humana expected caregivers to be on-call throughout their 24-hour shift and thus expected them to perform 24 hours of work per shift," Doc. #322-1 at 3-4 (¶ 8 Resp.). At oral argument, plaintiffs took the position that to be "regularly scheduled" under section 785.22 "means that there is some consistency in this so that the worker can plan to use his free time, so that the worker can maintain something of a consistent circadian rhythm, so that the client knows when they can demand full attention from the caregiver and when they're supposed to leave them alone. Everybody needs to know this in advance. That's why the regularly scheduled." Doc. #381 (Tr. at 10:13-20); *see also id.* (Tr. at 12:16-13:20).[3]

But defendants point to the Caregiver Agreement, signed by all HHWs, which states "[Y]ou are paid for 8 hours of intermittent work per day at the Live-in pay rate...As you are also provided with room and board, the remainder of your daily schedule will be allocated into the following hours: 3 hours for meals (on site), 8 hours of sleep time (on site) and 5 hours of free time (on site). […] it is your responsibility to inform the Company if you are providing more than 8 hours of intermittent work per day during a live-in assignment." Doc. #314-2 at 3 (¶¶ 11-12). A reasonable jury could well conclude that this language did serve to render the breaks "regularly scheduled."

The parties also dispute the import of certain of the deposition testimony on the question of whether the sleep and meal periods would qualify as "regularly scheduled" under section

---

[3] In response to my questioning as to whether the Caregiver Agreement would have to state a specific time period for sleep and meal periods on each day to be "regularly scheduled," counsel for plaintiffs stated that it would have to do so: "It can be the middle of the day, it can be the middle of the night. Whatever it is, it has to be a specific block of at least eight hours for sleep." Doc. #381 (Tr. at 12:18-21); *see also id.* (Tr. at 11:12-24).

785.22. For example, defendants point out that Kinkead estimated that she was able to get 8 hours of sleep during 70 percent of her live-in shifts, Doc. #325 at 6-7 (¶ 15 Resp.), but plaintiffs submit that when later asked about receiving at least five hours of uninterrupted sleep, Kinkead could not recall the percentage, Doc. #322-1 at 20-21 (¶ 41 Resp). While defendants interpret one opt-in plaintiff Morant's testimony as admitting that she received three hours per day for meals, Doc. #325 at 6-7 (¶ 15 Resp.), plaintiffs point out that Morant testified she was assigned to be on-call for her entire shift, Doc. #322-1 at 21 (¶ 42 Resp). Defendants further argue that some of the opt-ins, including Morant, admitted receiving at least three hours per day for meals and testified they were not on call during the whole shift because they received break time. Doc. #325-1 at 3 (¶ 18 Resp.). In turn, plaintiffs identify testimony from other opt-in plaintiffs that they frequently ate with their clients, "carrying on conversation, and interacting with the client during their meals which is work time, not a meal break…." Doc. #312-2 at 6 (¶ 19). The parties' contrasting positions over plaintiffs' testimony also represent disputes of material fact.

Because there are unresolved factual issues regarding whether the sleep and meal periods at issue here are bona fide and regularly scheduled, they prevent a conclusion that the parties did or did not have an agreement that ratified the arrangement such that the section 785.22 exemption would apply. Indeed, based on the disputed factual record, a reasonable jury could conclude that there was an agreement between the parties to exclude bona fide regularly scheduled meal and sleep time. A jury might also conclude that the pay structure implemented here was not designed to provide bona fide regularly scheduled sleep period and meal periods. Disputed factual issues thus preclude me from granting summary judgment to plaintiffs on their claim that members of the FLSA collective are entitled to be credited with 24 hours per live-in shift. I will therefore deny plaintiffs' motion as to claims for overtime for all members of the

FLSA collective who worked in excess of 40 hours in a week between January 1, 2015, and October 15, 2015, insofar as those claims rest on being credited with 24 hours per live-in shift.

But I will grant summary judgment to plaintiffs on the FLSA overtime claims to the extent they rest on members of the FLSA collective being credited with 13 hours per live-in shift, which the parties do not dispute is the minimum number of hours even if defendants prove that there was an agreement in compliance with section 785.22 to exclude meal and sleep time.[4]

### FLSA regular rate

Plaintiffs also move for summary judgment on the applicable "regular rate" for the FLSA overtime claims. Doc. #312-1 at 20-23. In order to calculate any overtime wages owed, I must first determine the "regular rate" received by plaintiffs. *See* 29 U.S.C. § 207(a)(1). Although the FLSA does not expressly define the "regular rate" of pay, DOL interprets the rate as a "rate per hour," 29 C.F.R. § 778.109, and "the Supreme Court has determined that it is 'the hourly rate *actually paid* the employee for the normal, non-overtime workweek for which he is employed.'" *Grochowski v. Phoenix Const.*, 318 F.3d 80, 87 (2d Cir. 2003) (quoting *Walling v. Youngerman-Reynolds Hardwood Co.,* 325 U.S. 419, 424 (1945) (emphasis in original)).

Section 778.109 of the DOL regulations "computes the regular rate by dividing a worker's Weekly Pay by the total number of hours *actually worked* during the workweek for which compensation was paid." *Powell v. Carey Int'l, Inc.*, 514 F. Supp. 2d 1302, 1318 (S.D. Fla. 2007) (emphasis added). If the employee receives an *hourly* rate, then the "regular rate" is simply the hourly rate. *See* 29 C.F.R. § 778.110(a). On the other hand, if the employee receives a

---

[4] Defendants' argument that plaintiffs waived this claim is not convincing. *See* Doc. #325 at 18-19. As an initial matter, the caselaw cited by defendants does not categorically foreclose me from considering an alternative theory of relief solely due to its position in a footnote. And plaintiffs rightly point out "[t]he bulk of Plaintiffs' summary judgment brief discussed the question of whether Humana was entitled to claim the § 785.22 exclusion for 8 hours of sleep time and 3 hours of meal times from each 24-hour shift and specifically noted, in the body of the brief, that if Humana could claim the exclusion, it would be liable for a minimum of 'only 13 of the 24 hours per shift.'" Doc. #332 at 14.

*day* rate, then the "regular rate" is the hourly rate as calculated by dividing the total sum received at such day rates in a workweek by the total number of hours actually worked that week. *See* 29 C.F.R. § 778.112.

Here, the parties do not dispute that the "regular rate" is the hourly rate or an hourly rate based on weekly earnings. Nor do they dispute that HHWs working non-live-in shifts were paid at an hourly rate. But the parties dispute the rate basis for live-in HHWs. And whether HHWs are compensated at an hourly rate under section 778.110 or at a day rate under section 778.112 directly affects the calculation of the regular rate, which in turn determines the overtime rate.

Plaintiffs argue that HHWs working live-in shifts were paid at an hourly rate: that the remuneration paid per live-in shift was not intended to compensate for all hours worked, as would be required to constitute a day rate. According to plaintiffs, each week's regular rate for live-in workers is the weekly per-live-in shift compensation divided by 8 hours worked per live-in shift in that week. Doc. #312-1 at 23. A problem with this argument is that it is inconsistent with plaintiffs' position (as described in the preceding section of this ruling) about how to calculate the number of hours to be attributed to a live-in shift for purposes of determining whether live-in HHWs should receive overtime. For purposes of the overtime calculation, plaintiffs argue that each live-in shift must be counted as at least 13 working hours. Yet now for purposes of calculating the regular rate to be paid to workers with live-in shifts, plaintiffs argue that live-in workers should be assumed to have actually worked just 8 hours per live-in shift. Plaintiffs do not explain or justify this contradiction. *See Powell*, 514 F. Supp. 2d at 1318 (rejecting similar inconsistent position).

Apart from this contradiction in plaintiffs' position, it seems to me that there is a genuine issue of fact about the calculation of the regular rate for live-in workers, because there is a genuine issue of fact about whether live-in workers were paid an hourly rate or paid a day rate. Plaintiffs acknowledge that the post-2012 Caregiver Agreements purport to pay a "day rate," stating that "[a]s a Live-in Caregiver you will be paid a standard rate of pay per day. The standard rate is based on 8 hours of intermittent work." Doc. #234-9 at 1 (¶ 3). But the Caregiver Agreement further specifies an hourly breakdown for the HHW's pay and provides that "it is your responsibility to inform the Company if you are providing more than 8 hours of intermittent work per day during a live-in assignment." *Ibid.* Corporate deposition testimony in turn provides that if a live-in HHW reported working more than 8 hours, then defendants might pay an hourly rate above the day rate. Docs. #325-1 at 4 (¶ 11 Resp.); #325-3 at 16-17 (Ex. A). Plaintiffs also point to pay stubs, which reflected compensation in hours worked, not days. Doc. #312-2 at 4 (¶ 14).

In light of this disputed record, I conclude that there is a genuine fact issue about whether live-in HHWs were paid a day rate or an hourly rate. *See Serrano v. Republic Servs., Inc.*, 227 F. Supp. 3d 768, 772-73 (S.D. Tex. 2017) (concluding the same in light of evidence that worker could receive an additional hourly rate beyond alleged "day rate"). Accordingly, I will deny summary judgment as to the calculation of the regular rate.

### CMWA overtime claims

Plaintiffs next move for summary judgment on their overtime claims under the Connecticut Minimum Wage Act ("CMWA"), arguing that the Connecticut Effective Date Class became eligible for state law overtime on January 1, 2015, and HHWs are thus entitled to compensation for unpaid state overtime wages under Conn. Gen. Stat. § 31-68. Doc. #312-1 at

24. In accordance with my prior ruling about the effective date of the federal regulation, there is no genuine fact issue that members of the Connecticut Effective Date Class gained overtime eligibility as of January 1, 2015, and that those HHWs who qualified were nevertheless not paid overtime during the Effective Date period. I agree with plaintiffs that all Connecticut Effective Date Class HHWs who qualify for CMWA overtime are entitled to payment for overtime, and I will grant summary judgment to plaintiffs on this issue.

### *Working hours per live-in shift under CMWA*

As with their FLSA claims, plaintiffs contend that the members of the Connecticut Effective Date Class and the Connecticut Unpaid Hours Class are entitled to be credited with 24 hours per live-in shift for the purpose of calculating CMWA overtime pay. Doc. #312-1 at 24-25, 27. Plaintiffs also argue that the Connecticut Unpaid Hours Class is entitled to be credited with, and compensated for, 24 hours of work for each live-in shift that occurred between January 1, 2015, and January 25, 2016 (along with any CMWA overtime that results from crediting Connecticut Unpaid Hours Class members with 24 hours per live-in shift). *Id*. at 27.

The CMWA prescribes wage and overtime guarantees similar to the FLSA. *See Tapia v. Mateo*, 96 F. Supp. 3d 1, 5 (D. Conn. 2015). Like the FLSA, the CMWA requires employers to compensate non-exempt employees at one and one-half time the regular rate for any work over 40 hours a week. *See* Conn. Gen. Stat. § 31-76c; *see also Williams v. Gen. Nutrition Centers, Inc.*, 326 Conn. 651, 658 (2017).

Connecticut law also parallels the FLSA with respect to crediting the number of hours worked during live-in shifts if the parties have agreed to do so, providing as follows:

> (A) "Hours worked" include all time during which an employee is required by the employer to be on the employer's premises or to be on duty, or to be at the prescribed work place, and all time during which an employee is employed or permitted to work, whether or

> not required to do so, provided time allowed for meals shall be excluded unless the employee is required or permitted to work. […]
>
> (D) Notwithstanding the provisions of this subdivision, when an individual employed by a third-party provider to provide "companionship services", as defined in the regulations of the federal Fair Labor Standards Act, is required to be present at a worksite for a period of not less than twenty-four consecutive hours, such individual and his or her employer may agree in writing to exclude a regularly scheduled sleeping period of not more than eight hours from hours worked, provided (i) adequate on-site sleeping facilities are furnished to such individual, and (ii) such individual receives at least five hours of sleep time. If the scheduled sleeping period is more than eight hours, only eight hours will be excluded. If the scheduled sleeping period is interrupted by an assignment to work, the interruption shall be counted as hours worked. If such individual does not receive at least five hours of sleep time during the scheduled sleeping period, the entire sleeping period shall be considered hours worked.

Conn. Gen. Stat. § 31-76b(2). This section provides that employers and employees may agree to exclude regularly scheduled sleep time, just like they may do under the FLSA. If there is an agreement in writing for a regularly scheduled sleep period and if the employee is allowed time for meals, then live-in HHWs may be credited with as few as 13 hours per live-in shift rather than 24 hours.

Plaintiffs rely on section 31-76b to argue that the Connecticut Effective Date Class and the Connecticut Unpaid Hours Class should be credited with 24 hours per 24-hour shift for the purpose of determining overtime owed to HHWs under state law. *See* Doc. #312-1 at 24-25, 27-28. As with their FLSA overtime claims, plaintiffs take the position that, because defendants cannot show that there was an "agree[ment] in writing to exclude a regularly scheduled sleeping period of not more than eight hours from hours worked," Conn. Gen. Stat. § 31-76b(2)(D), HHWs in Connecticut must receive credit for working 24 hours per live-in shift.

I do not agree. As I explained above with respect to plaintiffs' FLSA overtime claims, there are disputed issues of fact regarding whether the sleep periods here were regularly

scheduled. So just like with plaintiffs' motion for summary judgment on this issue relating to their FLSA overtime claims, unresolved questions of fact preclude me from concluding as a matter of law that there was or was not an agreement—and whether there was a written agreement or not—between the parties to exclude regularly scheduled sleep periods from hours worked per live-in shift.

Accordingly, and for principally the same reasons that I denied summary judgment on plaintiffs' FLSA overtime claim, I conclude that disputed factual issues preclude summary judgment on plaintiffs' claim that the Connecticut Effective Date Class and the Connecticut Unpaid Hours Class are both entitled to be credited with 24 hours per live-in shift for the purpose of calculating CMWA overtime.

In the alternative, plaintiffs move for summary judgment on their claim that the Connecticut Effective Date Class and the Connecticut Unpaid Hours Class members are entitled to be credited with and paid for 13 hours per live-in shift, which is the minimum number of hours to which Connecticut HHWs are entitled under state law. *See* Doc. #312-1 at 25 n. 14. As to the Connecticut Effective Date Class claims, I agree with plaintiffs and, just as I did with respect to the FLSA overtime claims, I will grant summary judgment to plaintiffs on the Connecticut Effective Date Class claims insofar as they rest on crediting HHWs with 13 hours per live-in shift for the purpose of determining eligibility for and calculating CMWA overtime.

But the analysis differs as to the Connecticut Unpaid Hours Class claims for uncompensated straight time hours. As I explained in my prior ruling on class certification, plaintiffs sought to certify the Connecticut Unpaid Hours Class on the theory that, because Connecticut law entitled Connecticut workers to be paid for 13 hours per live-in shift, class members were entitled to payment for the statutory minimum number of hours rather than 8

hours per shift, even if some HHWs actually worked more than 13 hours during a 24-hour live-in shift. *See Kinkead*, 330 F.R.D. at 344, 352-53. And as I further explained, to succeed on its claims the Connecticut Unpaid Hours class would need to show (1) that Connecticut law required defendants to credit and pay HHWs like plaintiffs for 13 hours of work per live-in shift, and (2) that defendants only credited and paid plaintiffs for 8 hours per live-in shift of straight time compensation. *Id.* at 348 (citing Docs. #181 at 17 (¶¶ 68-70); #204-1 at 8-9, 18; #206-5 at 5-6).

Connecticut law required defendants to credit and pay HHWs for a minimum of 13 hours of work per live-in shift. But based on the current record, I cannot conclude that defendants only credited and paid HHWs in the Connecticut Unpaid Hours Class for 8 hours of straight time per live-in shift. This is because, as noted above with respect to the FLSA claims, the parties fiercely dispute the characterization of how live-in HHWs were paid: plaintiffs contend that Connecticut live-in HHWs were paid at an hourly rate for 8 hours of work per live-in shift, and defendants maintain that HHWs were paid a day rate for each live-in shift that compensated them for all hours worked, even if they worked more than 8 hours. *See* Docs. #312-2 at 3-4, 7 (¶¶ 10, 14, 12, 29); #325-1 4-6, 14 (¶¶ 10, 14, 12, 29 Resps.). Until it is clear that compensation for live-in shifts was on an hourly or daily basis, there are unresolved factual issues as to whether Connecticut HHWs were paid only for 8 hours per live-in shift for the purpose of determining any unpaid straight time. I will therefore deny summary judgment to plaintiffs on the question of whether members of the Connecticut Unpaid Hours Class claims are entitled to be credited with and paid for the statutory minimum of 13 hours per live-in shift.

### *Unpaid hours claims under CMWA*

Plaintiffs seek summary judgment on the Connecticut Unpaid Hours Class claims for any uncompensated hours (whether straight time or overtime) that result after being credited with 24 hours per live-in shift, Doc. #312-1 at 27-28, as well as any claims by the Connecticut Effective Date Class for uncompensated straight time hours after crediting HHWs with 24 hours per live-in shift, *id*. at 26-27. Plaintiffs further contend that any uncompensated straight time hours are recoverable at the regular rate, which is calculated under the CMWA the same as it is under the FLSA, rather than at the minimum wage rate. *Id*. at 8-9, 27-28.

Plaintiffs' claim for uncompensated straight time hours at the regular rate is known as a "gap-time" claim. A "gap-time" claim is a type of claim "in which an employee has not worked 40 hours in a given week but seeks recovery of unpaid time worked, or in which an employee has worked over 40 hours in a given week but seeks recovery for unpaid work under 40 hours." *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 201 (2d Cir. 2013) (quoting *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 115 (2d Cir. 2013)). "Unlike an overtime claim, a gap-time claim requires no predicate showing of minimum hours worked; rather, an allegation of hours worked without compensation may give rise to a gap-time claim." *Id.* at 202. Ordinarily, a plaintiff with a gap-time claim will seek to be paid on the basis of the plaintiff's regular hourly rate—rather than the minimum wage rate—for the straight time hours he or she has not been paid. *See, e.g.*, *McGlone v. Contract Callers Inc.*, 114 F. Supp. 3d 172, 173 (S.D.N.Y. 2015) (asserting a "gap-time" claim under which plaintiffs' "regular hourly wage rate" should be applied to a calculation of damages for unpaid regular hours worked under New York law).

The FLSA does not provide a cause of action for unpaid gap time, because the FLSA requires no more than payment of a minimum wage and payment of overtime wages, such that "the FLSA is unavailing where wages do not fall below the statutory minimum and hours do not rise above the overtime threshold." *Nakahata*, 723 F.3d at 202. Although it is unclear whether Connecticut labor law allows a gap-time claim, I need not resolve that issue because the complaint does not allege a Connecticut gap-time claim. Instead, the complaint's second cause of action under Connecticut law seeks relief only for failure to pay overtime wages. Doc. #256-1 at 19; *see Gurrieri v. Cty. of Nassau*, 2018 WL 6590564, at *3 (E.D.N.Y. 2018) (declining to consider gap-time claim where only overtime claim alleged in complaint). Accordingly, I will deny plaintiffs' motion insofar as they seek summary judgment for the Connecticut Classes on a gap-time claim under the CMWA.

As to any claim of the Connecticut Unpaid Hours Class for uncompensated CMWA overtime on the basis of being credited with 24 hours per live-in shift, my earlier analysis of the Connecticut Effective Date Class claims for CMWA overtime that were predicated on crediting HHWs with 24 hours per live-in shift applies. Insofar as plaintiffs seek summary judgment on Connecticut Unpaid Hours Class claims for CMWA overtime on the basis of crediting HHWs with 24 hours per live-in shift, I will deny their motion for the same reasons.

### CMWA regular rate

For both the Connecticut Effective Date Class and the Connecticut Unpaid Hours Class, plaintiffs seek summary judgment on the applicable regular rate. Doc. #312-1 at 25-26. The regular rate under the CMWA is calculated in the same manner as the regular rate is calculated under the FLSA. *See Williams*, 326 Conn. at 659. But just as with plaintiffs' motion for summary judgment as to the regular rate for the FLSA collective, I conclude summary

judgment on the calculation of the CMWA regular rate is precluded by disputed factual issues as to whether members of the Connecticut classes who worked live-in shifts were paid on an hourly or daily basis. Accordingly I will deny plaintiffs' motion for summary judgment as to the calculation of the CMWA regular rate.

### NYLL overtime claims

Plaintiffs move for summary judgment on the New York Effective Date Class claims, arguing that members of this class became eligible for overtime under New York Labor Law ("NYLL") on January 1, 2015, and that all members are thus entitled to unpaid state overtime wages as a matter of law for hours worked in excess of 40 hours per week after that date. Doc. #312-1 at 28.

As with the Connecticut Effective Date Class, it is clear that members of the New York Effective Date Class became eligible for New York overtime as of January 1, 2015, and that those who did qualify for such payment were not paid overtime during the Effective Date period.[5] I therefore agree that all New York Effective Date Class members who qualify for state law overtime are entitled to such payment, and I will grant summary judgment to plaintiffs on this issue.

### Working hours per live-in shift under NYLL

Plaintiffs next contend that the New York Effective Date Class and the New York Unpaid Hours Class are entitled to be credited with 24 hours per live-in shift for the purpose of determining overtime eligibility and unpaid overtime wages under New York law, citing a recent decision from the New York Court of Appeals, *Andryeyeva v. New York Health Care, Inc.*, 33 N.Y. 3d 152 (2019). *See* Doc. #312-1 at 9-10, 28-31, 33. Plaintiffs also argue that the New York

---

[5] As noted earlier, this is with the exception of those HHWs in New York who worked only non-live-in shifts.

Unpaid Hours Class is entitled to be credited with, and compensated for, 24 hours of work for each live-in shift during the period November 11, 2009, to January 25, 2016, in determining unpaid straight time (along with any state law overtime resulting from crediting New York Unpaid Hours Class members with 24 hours per live-in shift). Doc. #312-1 at 10, 33.[6]

Determining the number of hours HHWs should be credited with during each live-in shift under the NYLL is similar to the method employed under the FLSA, as the New York Court of Appeals reaffirmed in *Andryeyeva*, *see* 124 N.Y.3d 152, 165-67. New York law mirrors federal law, providing that HHWs assigned to a twenty-four-hour shift "must be paid not less than for thirteen hours per twenty-four hour period so long as they are afforded at least eight hours for sleep and actually receive five hours of uninterrupted sleep." *Bonn-Wittingham*, 792 F. App'x at 74-75 (quoting *Andryeyeva*, 33 N.Y.3d at 153); *see also* N.Y. Lab. Law Art. 19 § 663.

Indeed, New York regulations expressly incorporate the federal exemption under 29 C.F.R. § 785.22 for the determination of how many hours a live-in HHW is entitled to be paid the minimum wage for a 24-hour shift:

> The minimum wage shall be paid for the time an employee is permitted to work, or is required to be available for work at a place prescribed by the employer[....] However, a residential employee— one who lives on the premises of the employer—shall not be deemed to be permitted to work or required to be available for work: (1) during his or her normal sleeping hours solely because he is required to be on call during such hours; or (2) at any other time when he or she is free to leave the place of employment. Notwithstanding the above, this subdivision shall not be construed to require that the minimum wage be paid for meal periods and sleep times that are excluded from hours worked under the [FLSA], in accordance with

---

[6] Specifically, plaintiffs argue that because the New York Unpaid Hours Class was compensated for only 10 hours per live-in shift from November 11, 2009 to on or about January 1, 2012, members of this class were under-compensated 14 hours per live-in shift. Doc. #312-1 at 33. Because the New York Unpaid Hours Class was compensated for only 8 hours per live-in shift from January 1, 2012, to January 25, 2016, plaintiffs further argue that members of this class were under-compensated 16 hours per live-in shift. *Ibid*.

> sections 785.19 and 785.22 of 29 C.F.R. for a home care aide who
> works a shift of 24 hours or more.

12 N.Y.C.R.R. § 142-2.1(b). The New York State Department of Labor ("NYSDOL") has

interpreted the phrase "required to be available for work at a place prescribed by the employer"

as meaning that employers may "exclude up to 11 hours for sleep and meal breaks from

compensable hours," if those breaks "are regularly scheduled substantial periods of assignment-

free personal time." *Andryeyeva*, 33 N.Y.3d at 176-83 (upholding NYSDOL's interpretation of

12 N.Y.C.R.R. § 142-2.1(b)).

In light of the foregoing, it is clear that a genuine issue of fact remains about the

exclusion of hours under NYLL just as a genuine issue of fact remains for the exclusion of hours

under the FLSA (as I have discussed above). I will therefore deny plaintiffs' motion to the extent

that the New York Effective Date Class and the New York Unpaid Hours Class claims for

overtime rest upon the premise that members should be credited with 24 hours per live-in shift.

In the alternative plaintiffs seek summary judgment for the New York Effective Date

Class and the New York Unpaid Hours Class claims on the ground that HHWs are entitled to be

credited with and paid for 13 hours per live-in shift, which is the minimum number of hours

required under state law. Doc. #312-1 at 31 n. 18.

As to the New York Effective Date Class claim, just as I did with the FLSA overtime

claims and the Connecticut Effective Date Class overtime claims, I will grant summary judgment

to plaintiffs to the extent that class members should be credited with the statutory minimum of 13

hours per live-in shift for the purpose of determining eligibility for and calculating NYLL

overtime.

While the analysis is necessarily different as to the New York Unpaid Hours Class claim

for uncompensated straight time on the ground that HHWs are entitled to be credited with and

paid for 13 hours per live-in shift, my analysis of plaintiffs' motion for summary judgment on the Connecticut Unpaid Hours Class claims for uncompensated straight time hours applies. As noted, the parties hotly dispute if and for how many hours Humana paid HHWs in New York who worked live-in shifts, or if HHWs were paid a day rate for each live-in shift that was intended to compensate HHWs for all hours worked, regardless of the actual number. Docs. #312-2 (¶¶ 12-14, 25, 27, 29); #325-1 (¶¶ 12-14, 25, 27, 29 Resps.). Accordingly, until it is clear if compensation for live-in shifts was on an hourly or daily basis, there are unresolved factual issues as to whether New York HHWs were paid only for 8, 10, or more hours per live-in shift for the purpose of determining any unpaid straight time. I will therefore deny summary judgment to plaintiffs to the extent that they claim that members of the New York Unpaid Hours Class claims are entitled to be credited with and paid for the statutory minimum of 13 hours per live-in shift.

### *Unpaid hours under NYLL*

Plaintiffs seek summary judgment on the New York Unpaid Hours Class claims for uncompensated straight time hours after crediting HHWs with 24 hours per live-in shift, Doc. #312-1 at 33-35, as well as any claims for uncompensated straight time hours by the New York Effective Date Class resulting from being credited with 24 hours per live-in shift, *id*. at 32. Plaintiffs seek to recover for hours worked during live-in shifts by HHWs in New York that went uncompensated by defendants through January 25, 2016, at the regular rate. *Id*. at 9-10, 32, 34.

As to plaintiffs' claim for NYLL overtime for the New York Unpaid Hours Class that rests on crediting HHWs with 24 hours per live-in shift, my earlier analysis of the New York Effective Date Class claims for overtime on that same basis applies. So insofar as plaintiffs seek

summary judgment on New York Unpaid Hours Class claims for NYLL overtime hours on the basis of crediting HHWs with 24 hours per live-in shift, I will deny it for the same reasons.

Plaintiffs otherwise assert a gap-time claim under New York law, again seeking to be paid at the regular rate for straight-time hours that they worked but for which they were not compensated. As an initial matter, to the extent that plaintiffs' briefing relies on section 191 and section 198 of Article 6 of the NYLL, Doc. #312-1 at 33, I decline to consider these provisions, because the operative complaint does not allege a violation of Article 6 but instead a violation of Article 19 of the NYLL. *See* Doc. #256-1 at 19 (¶¶ 73-75) (third cause of action for "NEW YORK LABOR LAW, ARTICLE 19: UNPAID WAGES AND OVERTIME WAGES" and alleging violation of "NYLL, Article 19, § 650, *et seq.*, and 12 NYCRR § 142-2.2").

Article 19 is New York's Minimum Wage Act and establishes minimum wage standards. *See* N.Y. Lab. Law §§ 650 *et seq*. Section 663(1) of Article 19 provides, "If any employee is paid by his or her employer less than the wage to which he or she is entitled *under the provisions of this article*, he or she shall recover in a civil action the amount of any such underpayments…." N.Y. Lab. Law § 663(1) (emphasis added). Because of the limitations of this language and because Article 19 pertains to payment of a minimum wage, rather than a higher regular rate wage, I agree with decisions of other district courts concluding that section 663(1) does not support a claim to gap-time recovery of wages for unpaid hours at a regular rate. *See Williams v. Epic Sec. Corp.*, 358 F. Supp. 3d 284, 301-02 (S.D.N.Y. 2019); *McGlone*, 114 F.Supp.3d at 173.

Nor does plaintiffs' gap-time claim find support in 12 N.Y.C.R.R. § 142-2.2, because that provision concerns solely payment at minimum wage rather than payment for straight-time at a regular rate. Plaintiffs have not established that their gap-time claim is supported by the

provisions of New York labor law that they rely on in their complaint, and therefore I will deny plaintiffs' motion for summary judgment as to their gap-time claim under New York law.[7]

### Regular rate under NYLL

For both the New York Effective Date Class and the New York Unpaid Hours Class, plaintiffs argue that the regular rate under NYLL is calculated in the same manner as the regular rate is calculated under the FLSA. Doc. #312-1 at 31, 33-35. For the same reasons that I denied summary judgment on the calculation of the FLSA and the CMWA regular rate, I will deny plaintiffs' motion for summary judgment as to the NYLL regular rate because a genuine fact issue remains as to whether HHWs were paid an hourly rate or a day rate for live-in shifts.

## Defendants' motion for summary judgment (Doc. #314)

I will turn now to defendants' motion for partial summary judgment. Doc. #314.

### Good faith defense to liability

Defendants seek summary judgment on the ground that they "relied in good faith on the then-effective 1975 regulations, as well as DOL's administrative practices and enforcement policies stating that the Home Care Regulation would not be enforced until November 12, 2015." Doc. #314-1 at 20; *see also id*. at 17-23. A federal law known as the Portal-to-Portal Act provides that an employer shall not be subject to retroactive FLSA liability if the employer proves that its acts or omissions were "in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation . . . or any administrative practice or enforcement policy [of the Department of Labor] with respect to the class of employers to which [they] belong." 29 U.S.C. § 259(a).

---

[7] Because the operative complaint does not cite Article 6 of the NYLL, I have no occasion to consider the validity of any gap-time claim under provisions of Article 6. *See Contrera v. Langer*, 314 F. Supp. 3d 562, 568-70 (S.D.N.Y. 2018) (discussing divided authority on this issue).

The Second Circuit has explained that the Portal-to-Portal Act defense "requires the employer to establish three interrelated elements: (1) that its action was taken in reliance on a ruling of the [federal] Administrator, (2) that it was in conformity with that ruling, and (3) that it was in good faith." *Equal Employment Opportunity Comm'n v. Home Ins. Co.*, 672 F.2d 252, 263 (2d Cir. 1982). "The defendant faces a high burden to demonstrate that it has done more than merely possess an 'honest intention to ascertain' whether it was complying with FLSA; the defense 'was not intended to allow an employer to insulate itself from liability for the consequences of its own improvident interpretation of the statute.'" *Scott v. Chipotle Mexican Grill, Inc*., 67 F. Supp. 3d 607, 613 (S.D.N.Y. 2014) (quoting *Equal Employment Opportunity Comm'n*, 672 F.2d at 266 (internal citations omitted)).

I reject defendants' reliance on the good faith defense for substantially the reasons well-stated by Judge Nathan in *Green v. Humana At Home, Inc.*, 380 F. Supp. 3d 400 (S.D.N.Y. 2019). To begin with, the good faith defense applies only to reliance on administrative actions, not judicial rulings. *Id.* at 412. Although defendants maintain they relied on the "then-effective 1975 regulations, as well as DOL's administrative practices and enforcement policies," it was the initial adverse ruling by the district court in the District of Columbia in *Weil* that prompted defendants to allegedly rely on the DOL pronouncements. *See Home Care Ass'n of Am. v. Weil*, 76 F. Supp. 3d 138 (D.D.C. 2014), *rev'd and remanded*, 799 F.3d 1084 (D.C. Cir. 2015).

Moreover, "the defendant must demonstrate that [the administrative policy] was an *objectively* reasonable object of reliance." *Green*, 380 F. Supp. 3d at 414 (emphasis in original); *see also Scott*, 67 F.Supp.3d at 612-13. But here DOL's non-enforcement policy of the caregiver exemption applied only to DOL enforcement actions, *not* private enforcement actions. It was not reasonable for defendants to conclude from the DOL's declaration of non-enforcement

that they could not be subject to liability by means of a private enforcement action, especially since the district court's decision in *Weil* was subject to a pending appeal.[8]

And even assuming that defendants demonstrated objectively reasonable reliance, the record falls short of demonstrating that defendants showed good faith as a matter of law. To establish good faith under the Portal-to-Portal Act, an employer must show more than its subjective state of mind. *Scott*, 67 F. Supp. 3d at 612. The DOL interpretive regulations provide that "good faith" is an objective test: whether the employer "acted as a reasonably prudent man would have acted under the same or similar circumstances. 'Good faith' requires that the employer have honesty of intention and no knowledge of circumstances which ought to put him upon inquiry." 29 C.F.R. § 790.15(a) (citing legislative history).

The regulations further elaborate on the "good faith" requirement, explaining that an employer is entitled to rely upon an administrative "ruling . . . stating positively that the Fair Labor Standards Act does not apply to certain employees," so long as the employer "had no notice of any facts or circumstances which would lead a reasonably prudent man to make further inquiry as to whether the employees came within the Act's provisions." *Id*. at § 790.15(b). Here, for reasons already mentioned with respect to the *Weil* proceedings and the surrounding regulatory contest, whether defendants had "knowledge of circumstances which ought to" have

---

[8] The DOL statements discuss only its "time-limited non-enforcement policy" and the fact that "the Department will not bring enforcement actions against any employer for violations of FLSA obligations" resulting from the new regulations for 30 days after the Court of Appeals issues a mandate. Application of the Fair Labor Standards Act to Domestic Service; Announcement of 30-Day Period of Non-Enforcement, 80 Fed. Reg. 55,029 (Sept. 14, 2015); *see also* Application of the Fair Labor Standards Act to Domestic Service: Dates of Previously Announced 30-Day Period of Non-Enforcement, 80 Fed. Reg. 65,646 (Oct. 27, 2015); Application of the Fair Labor Standards Act to Domestic Service; Announcement of Time-Limited Non-Enforcement Policy, 79 Fed. Reg. 60,974 (Oct. 9, 2014). That the DOL in its discretion decided to delay its own enforcement had no effect on private enforcement. Some of defendants' statements undercut any suggestion to the contrary. For example, defendants relay that they "understood that even though DOL was likely to appeal the District Court decision invalidating the Final Rule, *that DOL would not attempt to enforce the Home Care Regulation against employers* while the appeal was pending." Doc. #314-2 at 5 (¶ 29) (emphasis added).

caused it to inquire further as to the import and effect of DOL's statements is a disputed question of fact that would precludes summary judgment on defendants' good faith. *See id.* at § 790.15(a).

Defendants have not demonstrated they are entitled to summary judgment on their section 259 defense as a matter of law for their purported good-faith reliance on DOL administrative regulations, practices, or enforcement policies. I will therefore deny defendants' motion for summary judgment with respect to their good faith defense under the Portal-to-Portal Act.

### *Good faith defense to liquidated damages*

Defendants seek summary judgement on their defense to liquidated damages under 29 U.S.C. § 260, N.Y. Lab. Law § 663 and Conn. Gen. Stat. § 31-72. *See* Doc. #314-1 at 23-25.[9] The FLSA provides that an employer who violates the compensation provisions of the Act is liable for unpaid wages "and an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). The Portal-to-Portal Act, however, allows a court to deny an award of liquidated damages under the FLSA if the employer shows that, despite the failure to pay appropriate wages, the employer acted in subjective "good faith" and had objectively "reasonable grounds" for believing that the acts or omissions giving rise to the failure did not violate the FLSA. *Herman v. RSR Services Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999) (quoting 29 U.S.C. § 260). "The employer bears the burden of proving good faith and reasonableness, but the burden is a difficult one, with double damages being the norm and single damages the exception." *Ibid.*

---

[9] Defendants argue that plaintiffs have conceded summary judgment as to the good faith defense against liquidated damages under New York and Connecticut state law because plaintiffs' briefing in opposition expressly "does not address the question of Plaintiffs' claim for liquidated damages under state law." Doc. #334 at 9. Yet defendants' own argument in support of summary judgment focuses only on the liquidated damages under the FLSA. Indeed, defendants' motion for summary judgment makes no other mention of liquidated damages under N.Y. Lab. Law § 663 and Conn. Gen. Stat. § 31-72 except for mentioning state law in the section header, as well as noting that the FLSA good faith standard applies to NYLL and that the liquidated damages provision of the CMWA was changed to echo the FLSA's liquidated damages provision. *See* Doc. #314-1 at 23-24, 23 n. 7. Accordingly, I will deny defendant's motion insofar as it seeks summary judgment as to liquidated damages under New York and Connecticut state law.

"To establish 'good faith,' a defendant must produce 'plain and substantial evidence of at least an honest intention to ascertain what the Act requires and to comply with it.'" *Persky v. Cendant Corp.*, 547 F. Supp. 2d 152, 157 (D. Conn. 2008) (looking to the liquidated damages provision of the FLSA and quoting *Reich v. Southern New England Telecomms. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997)). Showing good faith "requires more than ignorance of the prevailing law or uncertainty about its development. It requires that an employer first take active steps to ascertain the dictates of [the law] and then move to comply with them." *Reich*, 121 F.3d at 71. "[T]hat [an employer] did not purposefully violate the provisions of [the statute] is not sufficient to establish that it acted in good faith." *Ibid.* In addition, the reasonableness requirement "imposes an objective standard by which to judge the employer's conduct." *Persky*, 547 F. Supp. 2d at 157 (internal quotations omitted).

Defendants' motion for summary judgment as to liquidated damages fails for largely the same reasons I have rejected their motion for summary judgment on their good faith argument as to liability. Defendants have not met their "difficult" burden of showing good faith by identifying "plain and substantial evidence of at least an honest intention to ascertain what the FLSA requires and to comply with it" based on the undisputed facts in the record. For example, defendants assert "[i]t was Humana's understanding that because the Final Rule was invalidated, the original regulations remained in effect (*i.e.* that Live-In HHAs were still exempt from the FLSA)." Doc. #314-2 at 5 (¶ 28). But defendants do not identify or cite any specific factual basis for this "understanding." *See Hernandez v. Jrpac Inc.*, 2016 WL 3248493, at *34 (S.D.N.Y. 2016) (declining to credit conclusory assertions that defendants "acted in good faith to comply with the FLSA and the NYLL," absent evidence that defendants took some concrete step to assure compliance with those laws).

Even assuming defendants demonstrated subjective good faith, defendants have not shown that they had objectively reasonable grounds for believing their actions complied with the FLSA during the pendency of the *Weil* litigation. This is because DOL's non-enforcement policy did not apply to private enforcement actions, as explained above with respect to defendants' good faith defense to liability.

Accordingly I will deny summary judgment to defendants on the issue of liquidated damages. In so concluding, I will note that the Court retains discretion to grant or deny liquidated damages at a later date. *See Persky*, 547 F. Supp. 2d at 157 ("Even assuming that [the employer] acted in good faith the decision to award liquidated damages [under the FLSA] is still within the discretion of the trial court" (internal quotation marks omitted)).

### Statute of limitations for willful violation of FLSA

Defendants argue that a two-year statute of limitations applies to the FLSA claims because their alleged noncompliance with 29 C.F.R. § 522.109 was not willful. *See* Doc. #314-1 at 25-27. Defendants thus seek summary judgment on FLSA claims that fall outside that period. *Ibid*.

An employer's exposure to liability under the FLSA ordinarily is limited to two years. *See McLaughlin v. Richland Shoe Co*., 486 U.S. 128, 135 (1988). Recovery for a period of three years is permissible only if a violation of the FLSA is willful. *See* 29 U.S.C. § 255(a) (extending statute of limitations where there is a willful violation); *Kuebel v. Black & Decker Inc*., 643 F.3d 352, 366 (2d Cir. 2011) (citing 29 U.S.C. § 255(a)).

"An employer willfully violates the FLSA when it 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by' the Act." *Young v. Cooper Cameron Corp*., 586 F.3d 201, 207 (2d Cir. 2009) (quoting *McLaughlin*, 486 U.S. at 133). "To

show that a FLSA violation is willful, an employee must prove that the employer was more than negligent." *Saunders v. City of New York*, 594 F. Supp. 2d 346, 358-59 (S.D.N.Y. 2008). But "[a] plaintiff need not show that an employer acted with intent to discriminate or in bad faith." *Pollis v. New Sch. for Soc. Research*, 132 F.3d 115, 119 (2d Cir. 1997).

Because proof of willfulness requires a factual showing that the employer either "knew or showed reckless disregard," *Porter v. New York Univ. School of Law*, 392 F.3d 530, 531 (2d Cir. 2004) (quoting *McLaughlin*, 486 U.S. at 133), it is generally a question for the jury. *See Kuebel*, 643 F.3d at 366 (vacating summary judgment because "Kuebel has raised a question of fact as to whether B & D acted willfully" and "[i]f a jury found such evidence to be credible, it might reasonably conclude that B & D willfully violated the FLSA").

Here, plaintiffs have raised genuine issues of fact about whether defendants' alleged noncompliance with the FLSA was willful. Plaintiffs point to, *inter alia*, "(1) Humana's advance knowledge of the effective date of 29 C.F.R. § 552.109, (2) its deliberate decision not to consult an attorney regarding the effect of either the D.C. Circuit's reversal of *Weil I* or DOL's non-enforcement policy, (3) its decision to assume based on conversations with unnamed persons that it had no liability until November 12, 2015…." Doc. #322 at 20; *see also* Doc. #322-1 at 13-19 (¶¶ 22-39 Resps.). Defendants do not point to evidence that conclusively shows their noncompliance was *not* willful or done with reckless disregard. Accordingly, I will deny summary judgment with respect to whether defendants acted willfully and whether they should be subject only to a two-year statute of limitations for plaintiffs' FLSA claim.

### Statute of limitations for NYLL claims

Defendants argue that the NYLL claims (the New York Effective Date Class and the New York Unpaid Hours Class) are time-barred to the extent that they do not relate back to the

original complaint that was filed in this action, which alleged only FLSA and CMWA claims. Doc. #314-1 at 27-29. The original complaint that was filed in this action in November 2015 alleged claims under the FLSA and Connecticut law solely by Connecticut HHWs, Doc. #1, and plaintiffs filed an amended complaint to add their New York law claims in November 2017, Doc. #181. When plaintiffs moved to amend their complaint to add New York plaintiffs with New York law claims, I granted the motion to amend on the understanding that plaintiffs intended their New York claims to relate back to the filing of the initial complaint, Doc. #182 (Tr. at 13:16-14:6), while also noting that "I'm going to allow the amendment of the complaint without prejudice to raising such kinds of arguments that there may be of any kind of limitations on the New York claims," *id*. (Tr. at 30:5-8); *see also* Doc. #180.

A complaint may "relate back" to an earlier complaint for statute of limitations purposes under certain circumstances as described in Rule 15 of the Federal Rules of Civil Procedure. For example, relation back is proper if an amended pleading "asserts a claim or defense arising from the same conduct, transaction, or occurrence as set out … in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). "[T]he central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." *Lehman XS Tr., Series 2006-GP2 by U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, 916 F.3d 116, 128 (2d Cir. 2019) (internal quotations omitted).

In light of these principles, I conclude that plaintiffs' New York law claims relate back to the original complaint but only in part. On the one hand, plaintiffs' New York law claims relating to defendants' failure to pay workers overtime under New York law since January 1, 2015, properly relate back to the essentially identical claims previously alleged by plaintiffs

under the FLSA and Connecticut law. I do not agree with defendants that they had insufficient notice of plaintiffs' claims for overtime under New York law for those HHWs who worked live-in shifts *after* January 1, 2015, which by definition is the New York Effective Date Class. Just as the Connecticut overtime claim was premised on the same conduct and policy that formed the basis of plaintiffs' FLSA overtime claim—defendants' policy of not paying HHWs overtime—so too are the claims for overtime under New York law predicated on the same factual basis as the FLSA overtime claim. So I will deny defendants' motion for summary judgment with respect to "relation back" for the New York Effective Date claims.

On the other hand, defendants' remaining New York law claims do not properly relate back to the initial complaint. The first amended complaint expanded the temporal scope of the action by including unpaid straight time hours claims of HHWs who worked for defendants *prior* to January 1, 2015, thanks to the six-year statute of limitations for the NYLL claims, which ultimately resulted in the New York Unpaid Hours Class consisting of HHWs who worked live-in shifts since November 11, 2009—six years prior to filing of the initial complaint. *See* Doc. #256-1.

It is difficult to characterize plaintiffs' *non*-overtime claims that allege violations of New York law and that are based on conduct *prior* to January 1, 2015, as arising from the same factual basis as the initial overtime claims alleging violations of federal and Connecticut law *beginning* on January 1, 2015. This is not a case where the original complaint contained only "very general allegations" that were later simply "delineate[d] with more detail." *Slayton v. Am. Exp. Co.*, 460 F.3d 215, 229 (2d Cir. 2006). Instead, the New York Unpaid Hours claim for unpaid straight time wages prior to January 1, 2015, necessarily depends on facts that were not set out in the original complaint and invokes a legal theory not suggested by the original

complaint, which alleged only overtime claims under the FLSA and CMWA. *See Zorrilla v. Carlson Restaurants Inc.*, 255 F. Supp. 3d 465, 477 (S.D.N.Y. 2017) (no relation back because "[t]his claim relies on facts not set out in the original pleading—Defendants' payment practices after Swan's employment ended—and invokes a legal theory not suggested by the First Complaint").

Nor do the original overtime claims under the FLSA and CMWA provide sufficient notice to defendants of their potential liability for unpaid straight time wages under NYLL, at least prior to January 1, 2015. It is difficult to say that claims commencing on January 1, 2015, are sufficient to give notice about claims *pre-dating* January 1, 2015, especially if the legal basis for the earlier claims also differs. As defendants point out, they "could not possibly be on proper notice of claims relating to such time period [November 11, 2009 to December 31, 2014], as that time period was not at issue in the originally filed case." Doc. #334 at 12.

Accordingly, I will grant summary judgment to defendants on the relation back issue on the basis that, to the extent that the amended complaint (filed in November 2017) asserts unpaid hours claims based on violations of New York law prior to January 1, 2015, it does not relate back to the initial complaint for statute of limitations purposes. But to the extent that the New York law claims depend on conduct after January 1, 2015, I conclude that these allegations properly relate back to the original complaint and so I will deny summary judgment to this extent with respect to the application of the statute of limitations for the New York Unpaid Hours Class claim. In light of these rulings, the New York Unpaid Hours Class will now consist of HHWs employed by defendants in New York who worked live-in shifts between November 9, 2011— six years prior to when the amended complaint was filed—and the present.

### *Effective date for New York overtime requirements*

Defendants next argue that the Court should defer to a NYSDOL internal memorandum regarding the effective date of 29 C.F.R.§ 552.109, as representing New York's determination of when for purposes of New York law the state law overtime requirements were modified by the change in the federal caregiver exemption. Doc. #314-1 at 29-31. Because this memorandum determined that 29 C.F.R.§ 522.109's effective date was October 13, 2015 for NYLL purposes, defendants seek summary judgment on the New York Effective Date Class claims, which are claims for overtime during the period of January 1, 2015 to October 12, 2015. *Id.* at 31.

This argument appears to be a reprise of an earlier argument that the NYSDOL memorandum had estoppel effect on plaintiffs' claims. *See* Doc. #279 at 9-13; *see also* Doc. #289. I rejected this argument when I certified the classes, explaining "[t]he only analysis of New York law in [the NYSDOL memorandum] is to note that the NYLL mirrors federal regulations—law that the NYSDOL certainly is not charged to enforce. So, neither document precludes or binds the action here." *Kinkead*, 330 F.R.D. at 358. The same reasoning applies now, and I will deny defendants' motion for summary judgment insofar as it seeks to dismiss claims on the basis of the NYSDOL memorandum.

### *Reasonableness of the Caregiver Agreement under 29 C.F.R. § 785.23*

Defendants next argue that the Caregiver Agreement was reasonable as a matter of law under 29 C.F.R. § 785.23. *See* Doc. #314-1 at 31-35.[10] That section of the FLSA regulations provides in part that "any reasonable agreement" between the parties about the number of hours

---

[10] Although defendants seek summary judgment on the issue that "Plaintiffs' Caregiver Agreement was reasonable under 29 C.F.R. § 785.23 and, if not, reasonable under 29 C.F.R. § 785.22," Doc. #314 at 2, defendants' arguments do not address section 785.22, *see* Doc. #314-1 at 31-35. Insofar as defendants' motion seeks summary judgment on the reasonableness of the Caregiver Agreement pursuant to section 785.22, I will deny it.

that a live-in employee works and that "takes into consideration all of the pertinent facts will be accepted." 29 C.F.R. § 785.23.

Assuming that section 785.23 applies, and plaintiffs advance several reasons why it does not, *see* Doc. #322 at 25-33, the record shows that the facts "pertinent" to whether the HHWs "ordinarily" had enough time for eating and sleeping—key to the question of whether the Caregiver Agreement was "reasonable" under this section—are fiercely contested. In light of these unresolved factual issues, I cannot decide on summary judgment whether the Caregiver Agreement (even assuming that it comprised the parties' entire agreement) took all the pertinent facts into account such that it was reasonable under section 785.23. Indeed, a reasonable jury could find that the Caregiver Agreement was *not* reasonable because it did not "[take] into consideration all of the pertinent facts" as to whether a HHW should be "considered as working all the time he is on the premises," as is required by section 785.23.

Defendants advance other arguments as to why the Caregiver Agreement is reasonable under section 785.23. *See* Doc. #314-1 at 31-35. But they are unavailing in light of the disputed factual record, which would still preclude summary judgment on the Caregiver Agreement's reasonableness under section 785.23. I will deny defendants' motion for summary judgment on this ground.

### Overtime claims of HHWs who worked no more than three live-in shifts in any week

Defendants seek summary judgment on the overtime claims of any HHW who worked no more than three live-in shifts in any given workweek and, specifically, Mathieu's overtime claim because she never worked more than three live-in shifts per week. Doc. #314-1 at 36-37.

Like so many other positions adopted by defendants, this argument rests on the assumption that defendants must credit HHWs with only 13 hours per 24-hour shift under the

FLSA and NYLL (and presumably, although defendants do not specifically state as much, under the CMWA). *Id*. at 36. But while the parties do not dispute that the *minimum* number of hours that must be credited to HHWs is 13 hours per live-in shift, there remain genuine questions of material fact as to whether HHWs must be credited with *more than* 13 hours per live-in shift under the FLSA, CMWA, and NYLL. These factual issues were also why I denied defendants summary judgment on the issue that 13 hours is the *maximum* number of hours that HHWs are entitled to be credited with per live-in shift. Accordingly, I will deny defendants' motion for summary judgment on Mathieu's overtime claim or the overtime claims of any other HHWs who worked no more than three live-in shifts in a week.

More generally, to the extent that defendants argue that crediting and paying HHWs for 13 hours per live-in shift "is the maximum number of hours at issue in this litigation" on the basis that plaintiffs have "conceded" this issue, *see* Doc. #314-1 at 35-36, I do not agree. I will deny defendants' motion insofar as it seeks summary judgment on this point for the same reason that I denied summary judgment to plaintiffs on the issue that HHWs were entitled to be credited with 24 hours per live-in shift: that disputed questions of material fact preclude a conclusion as a matter of law about whether HHWs are entitled to be credited and paid for 13 or 24 hours.

### *Adequacy of per-live-in shift compensation to HHWs*

Defendants argue that the day rate paid to live-in HHWs fully compensated them for all hours that they worked, thereby eliminating any non-overtime claims and limiting any overtime claims to half-time on the basis that the regular rate is based on a day rate. Doc. #314-1 at 37-39.

As an initial matter, defendants contend that "neither [New York] named Plaintiff Caillo nor Plaintiff Mathieu have standing to assert an unpaid hours claim prior to January 1, 2015, because neither worked in a live-in capacity prior to January 1, 2015." *Id*. at 37. But, the Second

Circuit has made clear "the obvious truth that class actions necessarily involve plaintiffs litigating injuries that they themselves would not have standing to litigate," and because "class action plaintiffs are not required to have individual standing to press any of the claims belonging to their unnamed class members, it makes little sense to dismiss the state law claims of unnamed class members for want of standing when there was no requirement that the named plaintiffs have individual standing to bring those claims in the first place." *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88, 95 (2d Cir. 2018).

As to defendants' argument that the "day rate" paid per live-in shift fully compensated HHWs, there are disputed questions of fact as to whether the per-live-in shift compensation paid was in fact a day rate that was intended to cover all hours worked, regardless of the actual number (*i.e.*, any hours beyond the 8 hours), as I explained above with respect to plaintiffs' motion on this issue. So, as with plaintiffs' motion, I will deny defendants' motion for summary judgment that the per-live-in shift amount fully compensated HHWs because it was a day rate.

Defendants next submit that they are "entitled to judgment as a matter of law on the 'unpaid' hours claims of any Live-In HHA who never earned below the minimum wage[.]" Doc. #314-1 at 44; *see also id*. at 39-44. I will grant defendants' motion for summary judgment on this ground to the extent I have already concluded above with respect to plaintiffs' summary judgment motion that plaintiffs may *not* maintain a "gap-time" claim for straight-time wages above the minimum wage rate. I will otherwise deny defendants' motion to the extent that defendants may claim that they paid the minimum wage to live-in workers, because genuine fact issues remain about the number of hours worked and the rate basis of live-in wages.

Defendants also argue that "any overtime owed based on FLSA principles applicable to FLSA, New York and Connecticut overtime law since January 1, 2015 is owed at the half-time

rate." Doc. #314-1 at 44; *see also id*. at 43-44. Defendants' argument on this point again rests on the premise that HHWs working live-in shifts were paid a day rate, which should be used as the basis for calculating the regular and overtime rates, and I have already concluded that genuine fact issues remain about whether live-in HHWs were paid a day rate.

### *Offsets*

Finally, defendants argue that they are entitled to certain offsets that would reduce plaintiffs' potential recovery under 29 C.F.R. §§ 207(e)(6), (h). *See* Doc. #314-1 at 44. Courts have divided over whether "an employer may only credit extra payments against overtime liability accruing in the same workweek." *Compare Scott v. City of New York*, 592 F.Supp.2d 475, 482 (S.D.N.Y. 2008) (29 C.F.R. § 778.202 "resolve[s] the ambiguity" in § 207(h)(2) to make clear that premium credits may only be credited against liability in the same work period), *with Singer v. City of Waco*, 324 F.3d 813, 828 (5th Cir. 2003) (offsets may be applied cumulatively).

The Second Circuit has not ruled on the issue by published decision but has "reject[ed] the defendants' argument that their purported 'overpayments' of overtime in certain weeks should offset their liability for other weeks" and noted different approaches taken by courts in an unpublished opinion. *Harold Levinson Assocs., Inc. v. Chao*, 37 F. App'x 19, 22 (2d Cir. 2002). And the Second Circuit's reasoning in *Harold Levinson* has been applied by district courts as standing for the proposition that overpayments may *not* be used to offset liability in other pay periods. *See, e.g.*, *Caltenco v. G.H. Food Inc.*, 2019 WL 4784065, at *12 n. 6 (E.D.N.Y. 2019) (citing *Harold Levinson*, 37 F. App'x at 22); *see also Conzo v. City of N.Y.*, 667 F. Supp. 2d 279, 291 (S.D.N.Y. 2009) (concluding "an employer may only credit extra payments against overtime liability accruing in the same workweek"). I am skeptical about defendants' offset argument in

light of these precedents but it is premature for me to decide at this time whether defendants may be entitled to the offsets they request. I will defer ruling at this time on defendants' motion for summary judgment on the issue of offsets.

## CONCLUSION

For the reasons explained above, plaintiffs' motion for summary judgment (Doc. #312) and defendants' motion for summary judgment (Doc. #314) are GRANTED IN PART, DENIED IN PART, and DEFERRED IN PART as set forth in this ruling.

It is so ordered.

Dated at New Haven this 31st day of March 2020.

/s/*Jeffrey Alker Meyer*

Jeffrey Alker Meyer
United States District Judge